# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| ENVIRONMENTAL DEFENSE, | ) | |
| NORTH CAROLINA SIERRA CLUB, | ) | |
| NORTH CAROLINA PUBLIC INTEREST | ) | |
| RESEARCH GROUP, | ) | Civil Action No. 1:00 CV 1262 |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DUKE ENERGY CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM IN SUPPORT OF
## DUKE ENERGY'S MOTION FOR SUMMARY
## JUDGMENT ON SUBJECT MATTER JURISDICTION

# TABLE OF CONTENTS

I.      NATURE OF THE CASE.........................................................................................1

II.     REGULATORY BACKGROUND...........................................................................5

III.    STATEMENT OF FACTS.....................................................................................11

IV.     QUESTION PRESENTED ....................................................................................12

V.      ARGUMENT .........................................................................................................12

VI.     CONCLUSION ......................................................................................................16

# TABLE OF AUTHORITIES
## (All emphasis is added unless otherwise indicated.)

**Cases**

*Acme Die Casting v. NLRB*, 26 F.3d 162 (D.C. Cir. 1994).................................................15

*Cleveland Elec. Illuminating Co. v. EPA*, 572 F.2d 1150 (6th Cir. 1978)..........................5

*Columbia Broad. Sys., Inc. v. United States,* 316 U.S. 407 (1942)...................................14

*Environmental Defense et al. v. Duke Energy Corp.*, 127 S.Ct. 1423 (2007).....2, 3, 4, 7, 9

*Essex Chem. Corp. v. Ruckelshaus*, 486 F.2d 427 (D.C. Cir. 1973) ..................................5

*In re: Tennessee Valley Authority, CAA Docket No. 00-6, 2000 EPA App. LEXIS 22*
(EAB June 29, 2000) .......................................................................................................11

*Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000) ............................................................12

*NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974)....................................................13, 14

*PBW Stock Exch., Inc. v. SEC*, 485 F.2d 718 (3[d] Cir. 1973)..........................................14

*Phelps Dodge Corp. v . NLRB,* 61 S.Ct. 845 (1941) ........................................................15

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943).....................................................................15

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947)..............................................................13, 15

*Tennessee Valley Authority v. Whitman*, 336 F.3d 1236 (11th Cir. 2003).......................11

*Union Elec. Co. v. EPA*, 427 U.S. 246 (1976) ...................................................................5

*United States v. Duke Energy Corp.*, 278 F.Supp.2d 619 (M.D.N.C. 2003) .............*passim*

*Wisconsin Electric Power Co. v. Reilly,* 893 F.2d 901 (7th Cir. 1990)...............................8

**Statutes**

5 U.S.C. §§551 ...................................................................................................................2

15 U.S.C. §§1-7 .................................................................................................................2

42 U.S.C. §7409 ................................................................................................................5

42 U.S.C. §7607(b).........................................................................................................8, 14

42 U.S.C. §7471 .............................................................................................................3, 13

CAA §307(b) ....................................................................................................................14

N.C. Gen. Stat. §143-215.107D ................................................................ 12

**Regulations**

40 C.F.R. §51.166(a)(2)(iv)(c) (2003).................................................... 8

40 C.F.R. §51.166(a)(7)(iv)(c) (2003).................................................... 7

40 C.F.R. §51.166(b)(2)(i) (1987)........................................................... 6

40 C.F.R. §51.166(b)(2)(iii)(a) ............................................................... 6

40 C.F.R. §51.166(b)(3)(i) ................................................................... 6, 7

40 C.F.R. §51.166(b)(4) ........................................................................... 8

40 C.F.R. §51.166(b)(21) ..................................................................... 7, 9

40 C.F.R. §51.166(b)(21)(ii) ................................................................... 7

40 C.F.R. §51.166(b)(21)(iv) .................................................................. 8

40 C.F.R. §51.166(b)(21)(v) (1993) ....................................................... 7

40 C.F.R. §51.166(b)(23)(i) .................................................................... 6

40 C.F.R. §52.21(b)(3)(ii)-(viii) (1980) ................................................. 7

40 C.F.R. §60.14(b)(1)-(2). .................................................................... 1

47 Fed.Reg. 6017 (Feb. 10, 1982) ......................................................... 3

47 Fed.Reg. 7836 (Feb. 23, 1982) ......................................................... 3

57 Fed.Reg. 32332-33 ........................................................................... 10

61 Fed.Reg. 38267................................................................................. 10

iii

On remand, Plaintiff United States of America ("EPA") wants this Court to rewrite the 1980 Prevention of Significant Deterioration ("PSD") rules so that they contain what EPA concedes those rules do not–a methodology for determining "projected actual" emissions increases. EPA wants this Court both to choose from a menu of "plausible" methodologies proposed by EPA's proffered expert and to apply such methodologies retroactively to Duke Energy Corporation's ("Duke Power") projects years after these projects were undertaken. The lack of a methodology creates a fundamental gap in the regulations that EPA has failed to remedy through either a legislative rule or administrative adjudication and that this court does not have the subject matter jurisdiction to fill.[1] Fundamental principles of administrative law preclude Duke Power's being found liable through a test created by litigation experts in an enforcement action and then applied retroactively by a court to projects that took place years ago. For this reason, Duke Power is entitled to summary judgment.

## I.   NATURE OF THE CASE

This case is about an agency -- the Environmental Protection Agency -- using litigation to shift fundamentally how the Clean Air Act regulates existing sources of emissions. EPA is seeking to apply retroactively a new emissions increase methodology not found in EPA's PSD rules to projects that Duke Power and other utilities completed

---

[1] This jurisdictional defect was not present before the remand, because this Court had ruled that the 1980 PSD Rules must be interpreted congruently with the New Source Performance Standards ("NSPS") rules and, therefore, required an increase in maximum hourly emissions rate. *See United States v. Duke Energy Corp.*, 278 F.Supp.2d 619, 640 (M.D.N.C. 2003) (*"Duke I"*). Unlike the nebulous "plausible" methodologies EPA offers on remand, the hourly emissions increase test is long-standing, determinate, and easily applied to any particular project, as reflected in EPA's earlier stipulation that none of the projects identified in the Complaint increased hourly emissions. The rules provide specific methodologies for evaluating an hourly increase. *See* 40 C.F.R. § 60.14(b)(1)-(2) & pt. 60, App. C. As a result, under an interpretation of the 1980 PSD Rules as establishing an hourly emissions increase test, the applicable test and methodologies were spelled out in legislative rules. EPA has failed to do so for the test and methodologies it seeks to apply on remand.

1

long ago.  The agency has taken inconsistent positions and is now retroactively targeting twenty years of accepted practice.[2]  EPA's action is unlawful and fundamentally unfair.

EPA presents this as an enforcement action brought under the Clean Air Act ("CAA").  Compl. ¶ 1.  An enforcement action brought under a federal statute may take one of two forms.  First, the court may be called upon by Congress to enforce a statutory requirement that is self-executing and thus requires no administrative action to implement.  For example, statutes like the Sherman Antitrust Act, 15 U.S.C. §§ 1-7, are self-executing.  The statute defines the prohibited conduct (*e.g.*, "monopolization"), and litigants call upon the courts, as authorized by Congress, to apply facts against that standard to determine whether liability exists.  *See id.* § 2.

The second type of enforcement action occurs when a court is called upon to enforce a requirement that, as directed by the underlying statute, must be (and has been) created by a regulatory agency either through the promulgation of a legislative rule or through the formulation of an order following an individual agency adjudication where there is no legislative rule.[3]  In this second type of enforcement action, courts apply facts to a regulatory standard established by an agency rulemaking or adjudicatory order to determine if liability exists.

The instant enforcement action is of the second type.  Title I of the CAA requires EPA and the states to develop and implement federally enforceable regulatory requirements governing emission of air pollutants, including prevention of significant

---

[2] This is an issue that is at the heart of this case.  This Court tackled it before, in its summary judgment rulings, and it must now tackle it again on remand ─ in this motion and in later proceedings, if any.  *See Environmental Defense et al. v. Duke Energy Corp.*, 127 S.Ct. 1423, 1436-37 (2007) ("*Duke III*").

[3] Under the Administrative Procedure Act ("APA"), "adjudication" is an "agency process for the formulation of an order," and "order" is defined broadly to mean the "whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing."  *See* 5 U.S.C. § 551(7), (6).

deterioration ("PSD").[4] To prevail in this case, EPA must show that each of the component repair and replacement projects at issue resulted in a significant "net emissions increase" within the meaning of the PSD rules promulgated in August 1980 and adopted in the North and South Carolina SIPs in 1982.[5] *See* 47 Fed.Reg. 7836, 7837 (Feb. 23, 1982) (N.C.); 47 Fed.Reg. 6017 (Feb. 10, 1982) (S.C.).

This Court in *United States v. Duke Energy Corp.*, 278 F.Supp.2d 619, 640 (M.D.N.C. 2003) ("*Duke I*"), held that EPA cannot make this showing without first establishing that the projects increased the units' hourly emissions rates. The Court also found that the "1980 [PSD] regulations do not provide" for the "actual-to-projected-actual test" that EPA seeks to apply through expert testimony in this enforcement action. *Id.* at 646.

In *Environmental Defense et al. v. Duke Energy Corp.*, 127 S.Ct. 1423 (2007) ("*Duke III*"), the Supreme Court vacated the judgment of the Fourth Circuit, which had affirmed this Court's judgment based on the hourly emissions increase holding of *Duke I* "for somewhat different reasons" than those advanced by this Court. Specifically, the Supreme Court found that, although the 1980 PSD rules "[o]n [their] face … specif[y] no

---

[4] *See, e.g.*, CAA § 161 ("each applicable implementation plan shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality").

[5] EPA now claims that *both* the 1980 PSD Rules and the 1992 revisions to these rules (known as the "WEPCo Rule") apply to some or all of the projects here. The parties acknowledged, however, at the outset of this case, that the 1980 PSD rules are the "controlling regulations" under which the challenged projects are to be assessed. *See Duke I*, 278 F.Supp.2d at 629. Indeed, EPA *argued to this Court* that, as to the few projects that took place after the effective dates of the 1992 WEPCo Rule in North and South Carolina, these rules did *not* apply because Duke affirmatively "opted out" of the "WEPCo calculus" by choosing not to submit at the time certain emissions data required by the rule. *See* Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. (Jan. 31, 2003) at 35 n.15 [Doc. #133] . This Court accepted EPA's explanation, finding "even for projects undertaken after the dates in which the WEPCo rule was adopted" by the states, that rule did not apply because Duke had chosen to "opt out." 278 F.Supp.2d at 647 n.25. EPA's change of position regarding which set of regulations are controlling here highlights EPA's own recognition of the weakness of its position regarding the applicable 1980 PSD Rules.

[emissions] rate at all," those rules "clearly do not define a 'major modification' in terms of an increase in the 'hourly emissions rate.'" *Id.* at 1434. The Supreme Court thus rejected this Court's ruling that a "net emissions increase" under those rules "can result only from [a project that results in] an increase in the hourly rate of emissions." *See* 278 F.Supp.2d at 640.

In the course of resolving what the 1980 PSD rules do *not* say, the Supreme Court in *Duke III* said rather less about what those rules *do* say. Conceding that it found the 1980 PSD rules to be "no seamless narrative," the Supreme Court could do little more than postulate that, because the term "actual emissions" is defined by those rules "in a manner that looks to the number of hours the unit is or probably will be actually running," what these "provisions are getting at is a measure of actual operations averaged over time." *See* 127 S.Ct. at 1434. The Supreme Court said nothing, however, that disturbs this Court's prior determination that the 1980 PSD rules do not on their face contain any language requiring, or setting forth a methodology for determining, "projected actual" emissions ─ much less any of the various "plausible" methodologies touted by EPA's proffered expert witness in this case.

Consequently, for EPA to prevail in this action, this Court must come up with a "projected actual" methodology that EPA itself has acknowledged is absent from the 1980 PSD rules, and use that test to judge the lawfulness of projects that were undertaken and completed years ago. This the Court cannot do. Neither a legislative rule nor an individual adjudication has established the specific legal standards that EPA seeks to apply to Duke Power. Accordingly, this Court lacks subject matter jurisdiction to do EPA's work for it and to find on that basis Duke Power liable for undertaking the projects that are the subject of this action. Duke Power is entitled to judgment as a matter of law.

## II.  REGULATORY BACKGROUND

Congress in 1970 directed EPA to develop National Ambient Air Quality Standards ("NAAQS") to protect the public health and welfare with an adequate margin of safety.  42 U.S.C. §7409.  The states, in turn, were asked to develop State Implementation Plans ("SIPs"), setting source-by-source emissions limits to meet the NAAQS.  *Id.* §7409(b).[6]  States issue operating permits to their sources incorporating these limits.  These limits are premised on a permitted source operating at its full design emitting capacity (*i.e.*, all year at maximum production capacity) without exceeding the NAAQS.[7]  The 1970 Amendments also directed EPA to issue NSPS to minimize the environmental impact of adding new emissions capacity that would not have been evaluated in setting SIP limits.[8]

In 1977, Congress enacted two more new source programs—the PSD and Non-Attainment New Source Review ("NNSR") programs.[9]  EPA promulgated rules in 1980 to implement the statutory PSD program codified in the 1977 Amendments.  The 1980 PSD rules have been incorporated into the federally enforceable North Carolina and South Carolina State Implementation Plans.  Those rules require a PSD permit for "major modifications."  The rules define "major modification" to mean "any physical change or change in the method of operation of" a major stationary source that would "result in a

---

[6] *See also Union Elec. Co. v. EPA*, 427 U.S. 246, 249-50 (1976).

[7] *See, e.g., Cleveland Elec. Illuminating Co. v. EPA*, 572 F.2d 1150, 1160 (6th Cir. 1978) ("The model [used to calculate required SIP limits] is operated on the assumption that the plants concerned operate 24 hours a day at full capacity and predictions are made for every day of the year.").

[8] "The legislative history of §111 [NSPS] … reveals that Congress was most concerned that new plants—new sources of pollution—would have to be controlled to the greatest degree practicable if the national goal of a cleaner environment was to be achieved." *Essex Chem. Corp. v. Ruckelshaus*, 486 F.2d 427, 434 n.14 (D.C. Cir. 1973).

[9] PSD applies to new sources in areas meeting the NAAQS (attainment areas), while NNSR applies in non-attainment areas.  Here, EPA has alleged PSD violations because the areas of North and South Carolina where Duke's plants operate were in attainment for all relevant pollutants during the relevant periods.

significant net emissions increase of any pollutant subject to regulation" under the CAA. *See* 40 C.F.R. § 51.166(b)(2)(i) (1987). Assuming that Duke Power's repair and replacement projects constitute physical or operational "changes" to emissions units within the meaning of this definition,[10] those projects could be "major modifications" requiring a PSD permit only if they actually caused a source-wide "net emissions increase" in actual annual emissions of a regulated pollutant above that pollutant's specified "significance" level for the stationary source at which the changed emissions unit was located.

> Under the 1980 PSD rules, a source-wide "net emissions increase" is defined as the amount by which the sum of the following exceeds zero:
>
>   (a) Any *increase in actual emissions* from a particular physical change or change in the method of operation at a stationary source; and
>
>   (b) Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

*See id.* § 51.166(b)(3)(i) (emphasis added). That is, a "net emissions increase" is the sum of the increase in "actual emissions" at the emissions unit that undertakes a "change" and the unrelated, contemporaneous increases and decreases in "actual emissions" at other emitting units of the stationary source. Given that the definition of "major modification" references changes that would result in a *significant* "net emissions increase" from the stationary source, and given that, in turn, the 1980 PSD rules define the relevant "significance" levels in terms of "tons per year" of a given regulated pollutant, *see id.* § 51.166(b)(23)(i), an "increase in actual emissions" must necessarily be expressed in terms of "tons per year." *See* 278 F.Supp.2d at 640 (explaining that "post-project

_____

[10] Duke does not concede that any of the challenged projects constituted a "change" under the PSD rules, because these projects were routine maintenance, repair, and replacement. 40 C.F.R. § 51.166(b)(2)(iii)(a). The instant motion does not address that issue.

6

emissions must be calculated on an annual basis, measuring emissions in tons per year"); *cf. Duke III*, 127 S.Ct. at 1434 ("[I]n the regulatory definitions of … 'significant' and 'net emissions increase' the rate is annual," measured in "tons per year.").

Left unaddressed and unanswered by the provisions of 40 C.F.R. § 51.166(b)(3)(i), however, is what is meant by "increase in actual emissions."[11] Indeed, nowhere do the 1980 PSD rules explain what "increase" means, let alone precisely how such an "increase" is to be determined. The provisions of 40 C.F.R. § 51.166(b)(21) do define what the term "actual emissions" itself means. But these provisions, in the 1980 PSD rules, do not define post-project emissions for existing units (such as Duke's) that have begun normal operations. Specifically, the rules define actual emissions "as of a particular date" as the "average rate, in tons per year, at which the unit actually emitted the pollutant during *a* two year period which *precedes* the particular date and which is representative of normal source operations." *Id.* § 51.166(b)(21)(ii) (emphasis added). As EPA put it to this Court, the plain language of this provision "obviously describes a method of quantifying *past* [*i.e.*, pre-change] emissions," and does not serve to "define[] post-change emissions." *See* Response of Plaintiff United States to Duke Energy's Motion for Summary Judgment (March 31, 2003) ("U.S. Resp.") at 4 n.9 (emphasis in original) [Doc. #152]. EPA recognized the absence of any definition of an existing unit's "projected emissions" in the 1980 PSD Rules and in later *revisions* of the PSD rules added such a definition. *See* 40 C.F.R. § 51.166(b)(21)(v) (1993) (these provisions were promulgated in the 1992 WEPCo Rule, and they apply only to utility units that "opt into" the rule); 40 C.F.R. §§ 51.166(a)(7)(iv)(c) (2003) (these provisions were promulgated in

---

[11] That no attention is given to what is meant by a post-project "increase" in emissions serves to underscore that the provision's entire focus is on the application of the term "net" in the phrase "net emissions increase." To that end, the definition provides a detailed explanation of the conditions under which "other [pre-project] increases and decreases" at other emitting units at a stationary source are deemed "contemporaneous" and "otherwise creditable." *See* 40 C.F.R. § 52.21 (b)(3)(ii)-(viii) (1980).

the 2002 PSD rulemaking, and they apply to all existing units in all industries) & 51.166(b)(40) (defining "projected actual emissions").

In the "WEPCo determination,"[12] EPA interpreted the 1980 PSD rules to require that an "increase" in emissions at any existing emissions unit undertaking any "change" be calculated by comparing its pre-project "actual" emissions to its post-project "potential-to-emit." *See* Memorandum from D. Clay, EPA Acting Administrator for Air and Radiation to D. Kee, Director, Air and Radiation Division, EPA Region V (Sept. 9, 1988) ("Clay Mem.") (attached as DX 1).[13]  The Seventh Circuit rejected that interpretation, finding it had no basis in the regulations, and directing that, if EPA wanted to adopt such a test, it must do so through rulemaking. *See WEPCo,* 893 F.2d at 917-18. EPA has never conducted rulemaking to adopt such an "actual-to-potential" test for existing emissions units.  To the contrary, in 2002, EPA adopted a prospective rule establishing an "actual to projected actual" test for any existing unit undertaking any "change." *See* 40 C.F.R. § 51.166(a)(2)(iv)(c) (2003).[14]

---

[12] In 1988, Wisconsin Electric Power Company ("WEPCo") proposed a "renovation" project at its Port Washington Plant, which had operated over 10 years at a maximum achievable capacity well below its original capacity. *See Duke I,* 278 F.Supp.2d at 632-33 (describing the WEPCo matter).  The State of Wisconsin requested that WEPCo obtain a determination from EPA on the applicability of PSD and NSPS to this renovation project.  The determination that the agency ultimately issued represented final agency action by EPA on the question of applicability of PSD to WEPCo's proposed project, and it was appealed to the Seventh Circuit under CAA § 307(b), 42 U.S.C. § 7607(b).  *See id.*

[13] Under the 1980 PSD rules, "potential to emit" is defined to mean, in relevant part, the "maximum capacity of a stationary source to emit a pollutant under its physical or operational design." *See* 40 C.F.R. § 51.166(b)(4).  In other words, its annual emissions operating at maximum design for 24 hours a day, 365 days a year.  In the WEPCo determination, EPA asserted that 40 C.F.R. § 51.166(b)(21)(iv), which defines the "actual emissions" of a unit "which has not begun normal operations" as its potential to emit, defines the post-project emissions of any existing unit that undertook a change.  As the Seventh Circuit held, that provision plainly applies only to units that have "not begun normal operations."  It does not apply to existing units. *See Wisconsin Electric Power Co. v. Reilly,* 893 F.2d 901, 916-17 (7th Cir. 1990) ("*WEPCo*").

[14] As mentioned earlier, EPA promulgated in 1992 a similar test, applicable only to utility units under circumstances not applicable here.  *See* 278 F.Supp.2d at 647 and n.25.

In any event, the permissibility of "actual-to-potential" is not at issue here, as EPA has expressly disavowed any reliance on that interpretation of the 1980 PSD rules in this litigation.[15] Instead, EPA wants the Court to apply here a so-called "actual-to-projected-actual" test. The Court is supposed to do so by choosing among a menu of "plausible" methodologies proposed by EPA's proffered expert and then applying such methodologies retroactively to Duke Power's projects years after these projects were undertaken.[16] EPA skirts, however, over the fact that the definition of "net emissions increase" under the 1980 PSD rules is altogether silent as to *how* an "increase" in actual emissions from an existing unit undertaking a "change" is to be determined under a "projected actual" interpretation.

EPA has also admitted in its briefs that the "plain language" of the provisions defining "actual emissions," 40 C.F.R. § 51.166(b)(21), simply do not "define[] post-change emissions" for an existing unit. *See* U.S. Resp. at 4 n.9. Consistent with EPA's own recognition of the limitations of the 1980 Rules, this Court concluded that "[n]owhere in the regulations [themselves] is there a reference to an actual-to-projected-actual test or to increased utilization." 278 F.Supp.2d at 646. In reaching this conclusion, the Court was bolstered (1) by the fact that EPA itself did "not rely on language of the 1980 PSD

---

[15] *See* 278 F.Supp.2d at 640 n.16 ("EPA elected not to seek application of [the actual-to-potential] test, although it did so not based on the validity of its position but for other considerations unknown to the court."); *see also id.* at 640 n.17 ("During the summary judgment hearing on July 18, 2003, the EPA indicated that it would not seek application of the actual-to-potential test but would rather pursue its contention that the emissions test under PSD requires consideration of both increased hourly rates and utilization."); *see also* 127 S.Ct. at 1430 n.4 (noting that, while EPA "argues that some of Duke's projects were governed by" the WEPCo rule, the Supreme Court "assume[d], as did the Court of Appeals and the District Court, that the 1980 PSD regulations control").

[16] In fact, if the Court were to accept EPA's invitation to apply an emissions increase test that is not set forth in the 1980 PSD rules, it would not be choosing among the "plausible" methodologies proposed by EPA's proffered expert only. Rather, the Court would have to try the issues, because Duke Power's fact witnesses and emissions expert (consistent with his expert report) are prepared to testify at trial that reasonable, contemporaneous projections of post-project operations show that Duke Power would not have expected the projects to cause emissions to increase.

9

regulations to support its method of calculating post-project emissions;" (2) by EPA's own emphatic assertion (in the 1988 WEPCo determination) that "[t]he [1980] PSD regulations provide no support for this view;"[17] and (3) by the fact that EPA's own "proffered expert on PSD regulations" had candidly admitted that the methodology for projection he applied, "which are variations of the actual-to-projected-actual test," were "'not set forth in the 1980 rules" but were only "'plausible approaches'" of his own creation. *Id.* at 646, *quoting* Sahu Dep. at 156 (Duke Energy Ex. 66) (attached as DX 2); Sahu Expert Report at 39, 41 (Duke Energy Ex. 110) (attached as DX 3). This Court concluded that EPA "cannot lawfully apply a standard [*i.e.*, methodology] not provided for in the regulations [merely] on the premise that it is a plausible approach." 278 F.Supp.2d at 646.[18]

As if to illustrate that no methodology for implementing the "projected actual" emissions test can be found in the 1980 PSD rules, and that administrative discretion must be exercised to develop the appropriate methodology for a given case, each time

_____

[17] Specifically, this Court noted that EPA responded to WEPCo's contention that the Agency "should . . . compare representative actual emissions prior to the change with 'projected' actual emissions after the renovations," stating that the 1980 "PSD regulations *provide no support for this view.*" *See* Clay Mem. at 7 n.4 (emphasis added); *see also* 57 Fed.Reg. at 32332-33 (discussing the projected actual test "*adopted today* [i.e., July 18, 1992] for utilities" (emphasis added)); 61 Fed.Reg. at 38267 ("the WEPCo rule ... prescribed *a new methodology,*" in 1992) (emphasis added).

[18] EPA subsequently confirmed the validity of this Court's decision in a deposition in another enforcement action against another electric utility company alleged to have undertaken "major modifications" without first obtaining a PSD permit, conducted nearly two years after this Court's *Duke Energy* decision. There, EPA's Rule 30(b)(6) witness on calculating emissions for PSD confirmed that the 1980 PSD rules did not provide for any "future projected actual" emissions test. *See* Deposition of James W. Little in *U.S. v. East Kentucky Power Cooperative, Inc.*, No. 5:04-CV-00034 (E.D. Ky.) (July 20, 2005) (attached as DX 4 at 43) ("That method of comparison, actual to projected actual, was not provided for" under the 1980 PSD rules); *id.* at 56 ("Q: Is it still today EPA's position that the 1980 regulations do not support the use of an actual to projected actual methodology for calculating emissions increases. Is the answer to that yes or no? … A: I believe it was not the intent of EPA at that time to lay out a different calculation method [from actual-to-potential for units that have *not* begun normal operations], so the answer, if I remember the question right, would be yes.").

10

EPA has purported to address projects at an existing unit, it has offered up a different approach for determining such emissions. One methodology was applied on remand of the WEPCo case to settle the controversy there. A different methodology was applied by the EPA Environmental Appeals Boards ("EAB") in *In re: Tennessee Valley Authority*, CAA Docket No. 00-6, 2000 EPA App. LEXIS 22 (EAB June 29, 2000).[19] Numerous other approaches have been advocated by EPA's proffered experts in the other enforcement cases brought in U.S. District Courts, including this one.

## III.   STATEMENT OF FACTS

A general overview of the facts giving rise to this action is set forth in the Court's August 26, 2003 decision, 278 F.Supp.2d at 622-625, and need not be repeated here.

The Duke Power units at issue in this case are extensively regulated under the CAA. They have permits that specify emission limits set to protect public health (with an adequate margin of safety) under the NAAQS, based on the conservative assumption that the units would operate at maximum capacity every hour in the year. In addition, they are regulated under (1) the CAA "Acid Rain" Program, which requires existing utility boilers to make further reductions in $SO_2$ and nitrogen oxides ($NO_x$) emissions; (2) the "$NO_x$ SIP Call Program," which requires additional reductions in $NO_x$ emissions from utility units in the eastern half of the U.S.[20]; and (3) North Carolina's 2002 Clean Smokestacks legislation, one of the nation's most stringent air emission control laws.[21] Duke's program to meet this new state law alone involves the installation of additional $NO_x$ and $SO_2$ controls on most of its units at an expected cost approaching $2 billion. *See*

---

[19] Subsequently, the Eleventh Circuit rejected the EAB's action because "the EAB and ALJ manufactured the procedures they employed on the fly, entirely ignoring the concept of the rule of law." *Tennessee Valley Authority v. Whitman*, 336 F.3d 1236, 1246 (11th Cir. 2003).

[20] *See Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000).

[21] N.C. Gen. Stat. §143-215.107D.

11

Knudsen Supp. Decl. ¶ 13 (attached as DX 5). None of Duke's units have violated *any* of the permit emission limits or control requirements established under these CAA and state programs.

## IV.  QUESTION PRESENTED

Whether this Court has jurisdiction to consider EPA's claim that Duke Power's component repairs and replacements resulted in a "net emissions increase" within the meaning of the 1980 PSD rules, based solely on the contention that such projects at existing emission units could have been "plausibly" projected to result in an increased utilization of the unit at issue, when those rules do not provide any methodology for implementing such a test and when EPA did not fill the "gap" in the rules by developing and applying such a methodology to Duke Power's projects through agency adjudication.

## V.  ARGUMENT

EPA faces a conundrum. It has stipulated that its case on emissions is based "solely" on its contention that the repair and replacement projects in question here "would have been projected to result in an increased utilization at issue" – *i.e.*, the so-called "projected future actual" emissions test. Order and Final Judgment at 2 [Doc. #313]. Yet the 1980 PSD rules─both their definitions of "net emissions increase" and "actual emissions"─contain no such test and set forth no instruction as to *how* an "increase in actual emissions" is to be predicted when a project involves a physical or operational change to an existing emissions unit. Thus, a "gap" exists in the regulatory structure of the 1980 PSD rules, a gap that EPA would have this Court fill by retroactive imposition of a "plausible" approach that EPA concedes is not in the 1980 rule, and that has been proffered for the first time by EPA's expert in this enforcement initiative.

It follows, therefore, that any case that EPA might hope to advance on remand necessarily rests on the notion that a specific methodology for implementing the "projected actual" emissions test can somehow be conjured today, in this enforcement

action, and then be applied by this Court to projects that were undertaken years ago. Such a notion runs afoul of the most basic principles of administrative law and fairness.

Under Title I of the CAA, EPA and the states are directed to develop and implement, generally through legislative rulemaking, federally enforceable regulatory requirements governing emission of air pollutants, including prevention of significant deterioration. CAA § 161 ("each applicable implementation plan shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality"). Under the APA, however, a federal regulatory agency like EPA may, in lieu of legislative rulemaking, choose to resolve particular matters through case-by-case adjudication where administrative discretion must be exercised to fill a "gap" in a legislative rule as exists here. *See* note 3, *supra*. That is, a regulatory agency like EPA, assuming it has been granted adjudicative power under its enabling statute, is "not precluded from announcing new principles in an adjudicative proceeding," with the "choice between rulemaking and adjudication" resting in the "first instance within the [agency's] discretion." *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) (*citing SEC v. Chenery Corp.*, 332 U.S. 194 (1947)).

Although it is accepted that the "function of filling in the interstices of [a federal statute] should be performed, as much as possible, through [the] quasi-legislative promulgation of rules to be performed in the future," it is also recognized that any "rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise." *Id.* at 292-93. Therefore, in "performing its important functions," an agency, required to implement a regulatory program through administrative action, "must be equipped to act either by general rule or

13

by individual order." *Id.* at 293. Adjudication allows the agency to address "problems which must be solved despite the absence of a relevant general rule." *Id.*[22]

Does adjudication, then, offer EPA the chance to fill the regulatory gap in the 1980 PSD rules – i.e., to address a "problem which must be solved despite the absence of a relevant general rule," *id.* – by employing one of the methodologies for implementing the "actual-to-projected actual" emissions increase test advocated by EPA's proffered expert in an individualized assessment of the challenged projects? Conceivably, it might,[23] except that ***EPA has undertaken no agency adjudications individually assessing Duke Power's projects***.[24]

---

[22] While such legal obligations may be created through agency adjudication, unlike obligations imposed under legislative rules that govern all future conduct, the legal standards established by agency adjudication are binding *only on the party subject to the adjudication. See, e.g., Columbia Broad. Sys., Inc., v. United States,* 316 U.S. 407, 418 (1942) ("Unlike an administrative order or a court judgment adjudicating the rights of individuals, which is binding only on the parties to the particular proceeding, a valid exercise of the rule-making power is addressed to and sets a standard of conduct for all to whom its terms apply."); *PBW Stock Exch., Inc. v. SEC,* 485 F.2d 718, 732 (3$^{d}$ Cir. 1973) ("Rulemaking by an agency characteristically involves the promulgation of concrete proposals, declaring generally applicable policies binding upon the affected public generally, but not adjudicating the rights and obligations of the parties before it.").

[23] EPA's application, in an adjudicatory setting, of a "projected actual" emissions test and methodologies to a specific project undertaken by Duke Power would have to be justified under the "retroactivity" principles announced by the Supreme Court in *Chenery, supra,* and could not be sustained in any event if doing so was found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Furthermore, even then, this Court would not have subject matter jurisdiction to review the agency's action. Under CAA § 307(b), 42 U.S.C. § 7607(b), the Fourth Circuit would have exclusive jurisdiction to review such "final agency action."

[24] EPA certainly had the opportunity to take up adjudication of Duke Power's projects before, or at least close to the time at which, they occurred. See Letter from R. Shearin, Duke to R. Helms, NCDERN (Aug. 17, 1983) (App. Ex. 99) (attached as DX 6); Letter form R. Shearin, Duke to R. Davis, SCDHEC (Aug. 17, 1983 (App. Ex. 100) (attached as DX 7); Letter from W. Culler, Bureau of Air Quality Control to R. Shearin, Duke (Aug. 23, 1983 (App. Ex. 101) (attached as DX 8); Letter from R. Helms, NCDENR, to R. Shearin, Duke (Sept. 15, 1983) (App. Ex. 102) (attached as DX 9). NCDENR's response, warning that the "reconstruction" regulations could be triggered if the costs of work performed during the extended outage exceeded 50% of the cost of a replacement unit, reveals the agency's knowledge that maintenance, repair, and replacement projects would occur during the shutdown of the units. *See* Letter from R. Helms, NCDENR, to R. Shearin, Duke (Sept. 15, 1983) (App. Ex. 102) (attached as DX 9). Both NCDENR and SCDHEC letters were copied to EPA. EPA never objected to the states'

(continued . . .)

14

Instead, EPA has brought a judicial enforcement action and is proceeding under the assumption that this Court can do in this litigation that which EPA itself has not done – *i.e.*, exercise discretionary authority "to deal [with] specialized" problems "on a case-by-case basis." *Cf. Chenery*, 332 U.S. at 203. This, the Court cannot do. It is an axiom of federal administrative law, reflecting fundamental separation of powers principles under the U.S. Constitution, that a court sits in review of agency action, such as an order issued at the culmination of agency adjudication, but it may not in the first instance exercise discretionary judgment that only the agency could exercise in formulating an administrative order involving the specific matter. For where an action involves a "determination of policy or judgment which the agency alone is authorized to make and which it has not made," a "judicial judgment cannot be made to do service for an administrative judgment." *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). *Cf. Acme Die Casting v. NLRB*, 26 F.3d 162, 166 (D.C. Cir. 1994) (holding that where the agency's "precedent is all over the map," it is the agency, not the court, that "must select the rule" that would function as "an appropriate gap-filling measure"); *Phelps Dodge Corp. v. NLRB*, 61 S.Ct. 845, 854 (1941) ("We do not intend to enter the province that belongs to the Board, nor do we do so.").

In short, EPA cannot be permitted, in the guise of advocating that the Court adopt some sort of *ad hoc* methodology for implementing a "projected actual" emissions increase test that EPA's expert believes is "plausible," to transform this enforcement action into a judicial version of the very administrative adjudicative proceeding in which EPA itself has declined to engage. Fundamental principles of administrative law

---

determinations. Later, WEPCo described to EPA Duke's PMP project at Dan River Unit 2. Letter from N. Childress, WEPCo, to G. McCutchen, EPA (Sept. 27, 1988) (App. Ex. 84) (attached as DX 10). EPA took no action on Duke's PMP projects. Rather, EPA's Administrator distinguished Duke's Dan River 2 project on the ground that it did not involve steam drum replacement. Letter from L. Thomas, EPA Administrator, to J. Boston, WEPCo (Oct. 14, 1988) at 4 (App. Ex. 29) (attached as DX 11).

preclude Duke being found liable through a methodology created by litigation experts in an enforcement action and then applied retroactively by a court to projects that took place years ago. EPA has stipulated that its case here is based solely on the application of a "plausible" projected actual emissions increase methodology advanced by its proffered expert that EPA concedes is not contained in the 1980 PSD rules. This leaves a regulatory gap that could be only filled by an agency adjudication that addressed the fairness of retroactively applying a proffered methodology to projects undertaken by Duke Power in the distant past. Because this Court cannot fill the regulatory gap EPA has created and, without this gap being filled, EPA cannot meet its burden with respect to a necessary element of its case, this Court lacks subject matter jurisdiction and Duke Power is therefore entitled to judgment as a matter of law.

## VI.    CONCLUSION

For the foregoing reasons, Duke is entitled to summary judgment on all of EPA's claims.

16

Respectfully submitted, this the 21st day of November, 2007.

/s/ **T. Thomas Cottingham, III**

| | |
|---|---|
| Garry S. Rice | T. Thomas Cottingham, III |
| DUKE ENERGY CORPORATION | Nash E. Long, III |
| Legal Department | HUNTON & WILLIAMS LLP |
| 526 South Church Street, EC03T | 101 South Tryon Street, Suite 3500 |
| Charlotte, NC 28202 | Charlotte, NC 28280 |
| (704) 382-8111 | (704) 378-4700 |
| (704) 382-8137 ~ Fax | (704) 378-4890 ~ Fax |
| | Email: tcottingham@hunton.com; |
| | nlong@hunton.com |
| | |
| Dean M. Moesser | Henry V. Nickel |
| DUKE ENERGY CORPORATION | F. William Brownell |
| 5555 San Felipe St, Suite 1245 | Mark B. Bierbower |
| Houston, TX 77056 | Makram B. Jaber |
| (713) 375-0688 | HUNTON & WILLIAMS LLP |
| (713) 375-0883 ~ Fax | 1900 K Street, N.W. |
| | Washington, DC 20006-1109 |
| | (202) 955-1500 |
| | (202) 778-2201 ~ Fax |
| | |
| Peter G. Pappas | |
| NEXSEN PRUET ADAMS KLEEMEIER | |
| 701 Green Valley Road, Suite 100 | |
| Greensboro, NC 27408 | |
| (336) 373-1600 | |
| (336) 273-5357 ~ Fax | |
| | **Counsel for Defendant Duke Energy Corporation** |

17

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF DUKE ENERGY'S MOTION FOR SUMMARY JUDGMENT ON SUBJECT MATTER JURISDICTION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Jason A. Dunn
Deborah N. Behles
Richard M. Gladstein
Katherine E. Konschnik
James A. Lofton
Environmental Enforcement Section
Environment & Natural Resources Division
Department of Justice
1425 New York Avenue, N.W.
Washington, DC 20005

Ellen Rouch
Associate Regional Counsel
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, GA 30303

J. Blanding Holman, IV
Southern Environmental Law Center
200 W. Franklin Street, Suite 330
Chapel Hill, NC 27516-2520

Jeffrey M. Gleason
Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA 22902

I further hereby certify that I have mailed the forgoing **MEMORANDUM IN SUPPORT OF DUKE ENERGY'S MOTION FOR SUMMARY JUDGMENT ON SUBJECT MATTER JURISDICTION** to the following non-CM/ECF participants:

> Ronald J. Tenpas
> Acting Assistant Attorney General
> Environment and Natural Resourced Division
> United States Department of Justice
> Law and Policy Section
> P.O. Box 4390
> Ben Franklin Station
> Washington, DC 20044-4390
>
> Anna Mills Wagoner
> United States Attorney
> Lynne P. Klauer
> Assistant U.S. Attorney
> NCSB # 13815
> P.O. Box 1858
> Greensboro, NC 27102
>
> Andrew C. Hanson
> Attorney Advisor
> Air Enforcement Division
> Office of Enforcement and Compliance Assurance
> U.S. EPA
> 1200 Pennsylvania Ave., N.W.
> Washington, D.C. 20460

This 21st day of November, 2007.

**/s/ T. Thomas Cottingham, III**
T. Thomas Cottingham, III

724127