THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ENVIRONMENTAL DEFENSE, ET AL., | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:00 CV 1262 |
| | ) | |
| DUKE ENERGY CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFFS' OPPOSITION TO DUKE ENERGY CORPORATION'S
MOTION FOR SUMMARY JUDGMENT ON SUBJECT MATTER
<u>JURISDICTION</u>**

# TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

I.      This Civil Action Arose Under a Law of the United States . . . . . . . . . . . . . . . . -6-

II.     Any Alleged Ambiguity in How to Measure Emission Increases Under the 1980
        Rules Does Not Divest This Court of Subject Matter Jurisdiction . . . . . . . . . . . -6-

        A.      The Plain Language of the 1980 Regulations Requires a Prediction of
                Whether a Change Would Increase a Unit's Annual Utilization . . . . . . . -7-

        B.      Simply Because the Rules Do Not Prescribe the Precise Method of
                Calculating Increases Does Not Mean the Court Loses its Jurisdiction . -8-

        C.      EPA's Long-Standing Interpretation of the 1980 PSD Regulations Is
                Worthy of Deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

        D.      EPA Was Not Required to Initiate An Administrative Adjudication or
                Promulgate a New Legislative Rule Before Enforcing the 1980 Rules
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

III.    The 1992 Rules Clarified the Actual-to-Projected-Actual Test, and Were
        Legislative Only to the Extent They Expanded that Test to Most Utility Units
        Regardless of Whether Such Units Had Begun Normal Operations . . . . . . . . -15-

IV.     Duke's Challenge to the Actual-to-Projected-Actual Test is Jurisdictionally Barred
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106
(D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Auer v. Robbins*, 519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

*Bates v. United States*, 522 U.S. 23 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Blaustein & Reich, Inc. v. Buckles*, 364 F.3d 281 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . 15

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) . . . . . . . . . . . . . . . . . . . . . . 10

*Brock v. Entre Computer Ctrs.*, 933 F.2d 1253 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . 5

*Communities for a Better Env't v. CENCO Ref. Co.*, 179 F. Supp. 2d 1128, 1143-44
(C.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Envt'l Defense et al. v. Duke Energy Corp.*, 127 S. Ct. 1423 (2007) (*Duke III*) . . . *passim*

*Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954 (4th Cir. 1996) . . . . . . . . . . . . . 5

*Fattahi v. Bureau of Alcohol, Tobacco & Firearms*, 328 F.3d 176
(4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

*Fishing Co. of Alaska v. United States*, 195 F. Supp. 2d 1239
(W.D. Wash. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fox v. Bowen*, 835 F.2d 1159 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*General Motors Corp. v. EPA*, 363 F.3d 442 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . 17, 19

*Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Greenville Women's Clinic v. South Carolina Dep't of Health & Envt'l Control*,
317 F.3d 357 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Harrison v. PPG Indus., Inc.*, 446 U.S. 578 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Humanoids Group v. Rogan*, 375 F.3d 301 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . 10, 15

*Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825 (1988) . . . . . . . . . . . . 16

*Marbury v. Madison*, 1 Cranch 137, 2 L. Ed. 60 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Martin v. OSHRC*, 499 U.S. 144 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

*Molycorp, Inc. v. EPA*, 197 F.3d 543 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*National Family Planning & Reprod. Health Ass'n. v. Sullivan*, 979 F.2d 227
    (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) (*New York I*) . . . . . . . . . . . . . 2, 4, 18, 19

*O'Gilvie v. United States*, 519 U.S. 79 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Or. Paralyzed Veterans v. Regal Cinemas*, 339 F.3d 1126, 1133 (9th Cir. 2003) . . . . . . 8

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Puerto Rican Cement Co. v. EPA*, 889 F.2d 292 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . 3

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765
    (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*SEC v. Chenery*, 332 U.S. 194 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

*United States v. Chevron,* 639 F. Supp. 770, 778-79 (W.D. Tex. 1985) . . . . . . . . . . . . 10

*United States v. Cinemark*, 348 F.3d 569 (6th Cir. 2003) . . . . . . . . . . . . . . . . 8, 10, 13, 15

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . 3,7

*United States v. Cinergy Corp.*, 495 F. Supp. 2d 892, 907-08 (S.D. Ind. 2007)
    (*Cinergy IV*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272 (S.D. Ind. 2005) . . . . . . . . . . . . . 7

*United States v. Deaton*, 332 F.3d 698 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . 2, 7, 10, 13

*United States v. Hoechst Celanese Corp.*, 128 F.3d 216 (4th Cir. 1997) . . . . . . . . . . 9, 10

*United States v. La.-Pac. Corp,* 682 F. Supp. 1141, 1166 (D. Colo. 1988) . . . . . . . . . . . 9

*United States v. Murphy Oil,* 155 F. Supp. 2d 1117, 1138-42 (W.D. Wis. 2001) . . . . . . 10

*United States v. Murphy Oil,* 143 F. Supp. 2d 1054, 1104 (W.D. Wis. 2001) . . . . . . 8, 10

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 876 (S.D. Ohio 2003) . . . . . . . 9

*United States v. City of Painesville*, 431 F. Supp. 496, 500 (N.D. Ohio 1977) . . . . . . . 10

*West Va. Coal Ass'n v. Reilly*, 728 F. Supp. 1276 (S.D. W. Va. 1989) . . . . . . . . . . . . . 14

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) (*WEPCO*) . . . . . . 3, 4, 7, 12

# FEDERAL STATUTES

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

28 U.S.C. § 1345 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1355 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 7401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 7411(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 7413 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 9, 10, 14

42 U.S.C. § 7475(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 7477 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 7479(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 7604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

42 U.S.C. § 7607(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17, 19

# FEDERAL REGULATIONS

40 C.F.R. § 51.166(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 8

40 C.F.R. § 51.166(b)(21)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 8

40 C.F.R. § 51.166(b)(21)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

45 Fed. Reg. 52,676 (Aug. 7, 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 11, 16

56 Fed. Reg. 27,630 (June 14, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 12, 15, 16, 17

57 Fed. Reg. 32,314 (July 21, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 14, 16

61 Fed. Reg. 38,250 (July 23, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

# OTHER MATERIALS

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Plaintiff, the United States of America ("the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), and Plaintiff-Intervenors Environmental Defense *et al.* (collectively, "Plaintiffs"), submit this Opposition to Defendant Duke Energy Corporation's ("Defendant's" or "Duke's") Motion for Summary Judgment on Subject Matter Jurisdiction [DE 354]. Sections 113, 167, and 304 of the Clean Air Act (CAA, or Act), 42 U.S.C. §§ 7413, 7477 & 7604, authorize Plaintiffs to bring an action for injunctive relief and the assessment of civil penalties for violations of the Prevention of Significant Deterioration (PSD) provisions of the Act, and vest jurisdiction over such an action in this Court. This Court has subject matter jurisdiction over this civil enforcement action pursuant to these provisions and 28 U.S.C. §§ 1331 (Federal question), 1345 (United States as plaintiff), and 1355 (penalty).

Duke ignores these provisions and asserts a novel argument that runs counter to basic principles of jurisprudence and administrative law: that a purported ambiguity in an agency's regulations strips federal courts of jurisdiction over enforcement actions invoking those regulations. Memo, at 12-16. No support exists for Duke's theory, either as a factual or a legal matter. First, the applicable regulations clearly require an estimate of whether a project will increase an existing unit's utilization (the actual-to-projected-actual test that Duke claims is missing from the rules). As the Supreme Court recently held, the 1980 rules require projected increases in actual emissions to include any expected "increases in operating hours" that are "caused or enabled by" a physical change. *Envt'l Defense et al. v. Duke Energy Corp.*, 127 S. Ct. 1423, 1434-35 (2007) (*Duke III*). The Court must thus consider whether Duke's projects were expected to increase annual utilization – the number of hours per year Duke's units were expected to run. Second, even if the rules do not explain precisely how to make projections of annual utilization and emissions, that does not divest this Court of its jurisdiction, but simply counsels the Court to "turn to the agency's interpretation" and determine whether it is

reasonable and entitled to deference. *United States v. Deaton*, 332 F.3d 698, 710-11 (4th Cir. 2003). This case is no different than any of innumerable instances where courts are called on to determine whether a defendant has violated generally stated legal requirements. Simply put, that is what courts do. *See, e.g., id.* at 708-12; *see also Marbury v. Madison*, 1 Cranch 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

## BACKGROUND

The statutory PSD program applies to new major sources of air pollution, and existing major sources that undergo a "modification," defined in part as "any physical change" which "increases" air pollution. 42 U.S.C. §§ 7411(a)(4), 7475(a), 7479(2)(C). The statutory definition of "modification" leaves several constituent terms undefined. While a change is not a "modification" unless it "increases" emissions, the statute "is silent on how to calculate such 'increases' in emissions." *New York v. EPA*, 413 F.3d 3, 22 (D.C. Cir. 2005) (*New York I*).[1] Congress thus delegated EPA discretion to select the method of evaluation it thinks best, so long as EPA's action is reasonable and consistent with the statute. *See id.* at 27 ("Congress did not specify how to calculate 'increases' in emissions, leaving EPA to fill in that gap"). EPA thereafter promulgated the 1980 PSD rules, which measure emission increases in terms of actual annual emissions. *See* 45 Fed. Reg. 52676, 680, 700, 704-05 (Aug. 7, 1980); *Duke III*, 127 S. Ct. at 1429-30.

The 1980 rules require a source to predict, ***before*** undertaking a project, whether a change "would increase the actual annual emission of a pollutant above the actual average

---

[1] *New York I* is particularly relevant because it resolved a direct challenge to the PSD rules at issue here. Duke and others unsuccessfully argued that the 1980 rules were invalid to the extent they calculate increases in terms of actual annual emissions rather than hourly emissions. *See id.* at 18-20; Mot. to Reopen Pets. for Review (Ex. 1), at 3-4. Having now lost this issue both in a direct challenge to the rules in *New York I* and as a defense in *Duke III*, Duke has repackaged its same arguments as a jurisdictional challenge. The Court should reject this attempt to re-litigate what has already been decided: the actual annual emission increase test in the 1980 rules can be triggered by increased utilization.

for the two prior years." *Id.* at 1430; 40 C.F.R. § 51.166(b)(3)(i), (21)(ii) (recodified 1987). As part of this prediction, increases in "actual emissions" must include "increases in operating hours" enabled by a change. *Duke III*, 127 S. Ct. at 1435. The rules use a conservative assumption for projecting increases at units that have not "begun normal operations" – an actual-to-potential test. 40 C.F.R. § 51.166(b)(21)(iv); *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 296-99 (1st Cir. 1989). As EPA explained, potential emissions are a "proxy" for future emissions at units that have not begun normal operations, because emissions at such units are more "difficult to predict." 56 Fed. Reg. 27630, 27633 (June 14, 1991). For units that **have** begun normal operations, the proxy is inapplicable, which leaves the general prohibition against increases in "actual emissions." 40 C.F.R. § 51.166(b)(3)(i); *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 916 (7th Cir. 1990) (*WEPCO*). In such cases, data may be available from which increases in actual emissions can be predicted and, rather than assume full post-project utilization (*e.g.*, 24 hours of operation a day, 365 days a year), existing sources that are deemed to have begun normal operations may more realistically predict whether actual emissions will increase. Such predictions must include any expected increase in the "actual operating hours" the unit is expected to be utilized. *Duke III*, 127 S. Ct. at 1434-35; *United States v. Cinergy Corp.*, 458 F.3d 705, 708-09 (7th Cir. 2006); *WEPCO*, 893 F.2d at 916-18.

Under EPA's long-standing interpretation, both the actual-to-potential and actual-to-projected-actual tests are permissible readings of the 1980 rules, with the applicable test depending on whether a unit is deemed to have "begun normal operations." When it promulgated the rules, EPA stated that it would "generally" apply the more conservative actual-to-potential test to modifications, which recognized EPA's initial presumption that a unit that undergoes a non-excluded change has not begun normal operations in the post-change period within the meaning of the rules. 45 Fed. Reg. at 52677; *see Puerto Rican Cement*, 889 F.2d at 297; 61 Fed. Reg. 38250, 38254 (July 23, 1996). The Seventh

Circuit rejected this presumption for certain "like-kind" replacements in *WEPCO*, and instead required a more realistic prediction of actual annual emissions under the 1980 rules. 893 F.2d at 916-18; *New York I*, 413 F.3d at 15. On remand, EPA complied with that mandate by applying the actual-to-projected-actual test, taking into account a reasonable estimate of future utilization. *See* 1990 WEPCO Remand, at 1, 6-8 (Ex. 2). Additional rulemaking was not required prior to EPA's application of this comparison to WEPCo's units. Rather, as EPA explained, such a comparison was a reasonable interpretation of the 1980 rules for like-kind replacements at existing utility units. *See id.*

In 1991, EPA published notice in the Federal Register confirming that it would "continue to apply" the actual-to-projected-actual test under the 1980 rules to "'like-kind replacements' and other units which are found to have 'begun normal operations.'" 56 Fed. Reg. at 27633 & n.10; *see also id.* at 27633 ("linchpin under the current regulations for predicting future emissions [is] whether the unit has 'begun normal operations'"). EPA also announced it was "proposing ***clarifying*** amendments to these regulations and ***confirming*** its policies regarding some [sic] these provisions as they apply to utility projects pending adoption of the proposed amendments." *Id.* at 27630 (emphasis added). EPA specifically confirmed that annual emission increases are "calculated as the product of the hourly emissions rate times the ***utilization rate, expressed as hours of operation per year*** . . . ." *Id.* at 27632 n.6 (emphasis added).

EPA promulgated final amendments the following year, in 1992. *See* 57 Fed. Reg. 32314 (July 21, 1992). Like the 1991 proposal, the preamble to the 1992 final rule explicitly recounted EPA's application of an actual-to-projected-actual comparison under the 1980 rules on remand from *WEPCO*, and stated that the agency intended to "clarify" the future application of that test for utilities. *Id.* at 32317 n.10, 32323. The 1992 rules went on to eliminate the threshold question of whether a utility had "begun normal

operations," and instead allowed utilities to use the actual-to-projected-actual test regardless of whether their units had "begun normal operations." *Id.* at 32317.

## STANDARD OF REVIEW

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir.1996) (citations omitted). For a motion claiming a lack of subject matter jurisdiction, "[t]he moving party should prevail only if the material jurisdictional facts are not in dispute, and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citations omitted). In reviewing the record on summary judgment, courts "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs.*, 933 F.2d 1253, 1259 (4th Cir.1991) (citations omitted).

## ARGUMENT

This Court has jurisdiction over this CAA enforcement action under Section 113 of the Act and, more generally, under the Court's federal question jurisdiction. Duke's contention that separation of powers principles strip courts of their jurisdiction in cases seeking enforcement of allegedly ambiguous regulations is contrary to established law. Courts are often called on to determine whether a given set of facts proves a violation under general statutory and regulatory criteria and, in doing so, will defer to an agency's reasonable interpretation of its own regulations. Duke's claim is also contrary to the evidence demonstrating the long-standing nature of EPA's interpretation of the 1980 rules and Duke's understanding of that interpretation, and is barred by 42 U.S.C. § 7607(b).

## I. This Civil Action Arose Under a Law of the United States

District courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The CAA, 42 U.S.C. § 7401 *et seq.*, is a law of the United States. The Act unambiguously provides EPA and citizens with authority to enforce the PSD provisions of the Act and applicable regulations, and specifically vests jurisdiction over such actions "in the district court of the United States [where there is venue]." 42 U.S.C. § 7413(b); *see also id.* § 7604 ("district courts shall have jurisdiction" over citizen suits). Plaintiffs allege that Duke violated PSD by modifying, and thereafter operating, certain electricity generating units without obtaining permits authorizing these modifications and without installing the best available control technology. This Court clearly has jurisdiction over these allegations.

## II. Any Alleged Ambiguity in How to Measure Emission Increases Under the 1980 Rules Does Not Divest This Court of Subject Matter Jurisdiction

Duke claims the 1980 PSD rules do not specify "how" to measure emission increases at "existing units" (specifically, that an increase can result from "increased utilization"), and that because of this alleged ambiguity, the Court lacks jurisdiction to determine whether Duke's projects would increase emissions. Memo, at 7, 12. This argument fails for several reasons. First, the plain language of the 1980 rules *does* specify that an emission increase can result from a change that increases an existing unit's annual utilization, or "hours of operation." While the magnitude of the predicted increase depends on whether a changed unit has "begun normal operations" (if it has not, then future emissions are estimated using maximum potential rates and operating hours as a proxy), the rules plainly require that future emissions include any increase in "actual operating hours," which is what the actual-to-projected-actual test sought to be applied here captures. *Duke III*, 127 S. Ct. at 1434-35. Second, even to the extent the rules do not precisely spell out how an emissions increase is to be calculated, that does not strip

-6-

this Court of its jurisdiction. It simply means the Court must "turn to the agency's interpretation" and determine whether it is worthy of deference. *Deaton*, 332 F.3d at 710-11. Here, EPA's long-standing interpretation of the 1980 rules is entitled to deference because it is neither "plainly erroneous" nor "inconsistent with the regulation." *Id.* at 711.

### A. The Plain Language of the 1980 Regulations Requires a Prediction of Whether a Change Would Increase a Unit's Annual Utilization

Duke claims the 1980 PSD rules are impermissibly ambiguous because they do not "explain what 'increase' means" or describe "precisely how such an 'increase' is to be determined." Memo, at 7. Specifically, Duke claims the rules do not specify whether emission increases can come from a projection of "increased utilization" at existing units. *Id.* at 12. A unit's utilization is simply a function of the number of hours per year the unit runs. The 1980 rules define "[n]et emissions increase" in relevant part as "[a]ny increase in actual emissions from a particular physical change or change in the method of operation," 40 C.F.R. § 51.166(b)(3)(i)(*a*), with actual "tons per year" emissions "calculated using the unit's actual operating hours, production rates and types of materials processed, stored, or combusted during the selected time period." *Id.* § 51.166(b)(21)(ii). Thus, actual annual emissions may increase if a physical change would increase "operating hours" over baseline utilization levels.

This was precisely the issue resolved in *Duke III* when the Supreme Court held that "increases in operating hours" that are "caused or enabled by" a change must be included in the PSD emission increase test. 127 S. Ct. at 1435.[2] The Supreme Court held

---

[2] *See also id.* at 1434 ("'actual emissions' must be measured in a manner that looks to the number of hours the unit is or probably will be actually running."); *Cinergy*, 458 F.3d at 708-09 (natural reading of 1980 rules requires a "reasonable estimate of the amount of additional emissions that [a] change will cause," taking into account the expected impact on the total number of hours the plant will operate); *WEPCO*, 893 F.2d at 916-18 (7th Cir. 1990) (1980 rules require a "realistic" projection of increased utilization for like-kind replacements at existing units); *United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272, 1277 (S.D. Ind. 2005) (projected actual emissions are "measured using projected actual

(continued...)

that the plain meaning of the rules was so clear in this regard that requiring increased utilization to be ignored in the post-project emission projection would effectively invalidate the regulations. *Id.* at 1436. Duke's *ex-poste* attempt to re-litigate whether the 1980 rules require a projection of increased utilization enabled by a project is flatly contrary to their plain language, as well as *Duke III*.

###### B. Simply Because the Rules Do Not Prescribe the Precise Method of Calculating Increases Does Not Mean the Court Loses its Jurisdiction

As set forth above, the 1980 rules mandate an actual annual increase test measured on an actual-to-projected or actual-to-potential basis, depending on whether the unit at issue has begun normal operations. While the rules are clear that sources must predict whether a change will increase "actual operating hours" 40 C.F.R. § 51.166(b)(3), (21)(ii), the rules do not describe particular data or formulas that must be used to estimate such increases for units that have begun normal operations. Simply because the rules are "broadly-drafted" and do not prescribe precisely how to project future representative operating hours for such units does not render them ambiguous. *Or. Paralyzed Veterans v. Regal Cinemas*, 339 F.3d 1126, 1133 (9th Cir. 2003) (breadth is not ambiguity) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)). Indeed, such precision would be particularly inappropriate since the PSD rules apply to all major sources, not just utilities.

In any case, courts routinely determine whether a set of facts proves a violation of general regulatory criteria, and "[a]n agency's enforcement of a general statutory or regulatory term against a regulated party cannot be defeated on the ground that the agency has failed to promulgate a more specific regulation." *United States v. Cinemark*, 348 F.3d 569, 580 (6th Cir. 2003) (citing *SEC v. Chenery* 332 U.S. 194, 201 (1947)); *see Maynard*

---

[2](...continued)
operating hours and projected actual production rates"); *United States v. Murphy Oil,* 143 F. Supp. 2d 1054, 1104 (W.D. Wis. 2001) (actual-to-projected-actual or actual-to-potential test applies under 1980 rules, depending on whether normal operations have begun).

*v. Cartwright*, 486 U.S. 356, 361 (1988) (vagueness claim overcome "where reasonable

persons would know that their conduct is at risk"); *Fishing Co. of Alaska v. United States*,

195 F. Supp. 2d 1239, 1251-52 (W.D. Wash. 2002) (rejecting claim that rules "did not

provide sufficient guidance on what a vessel must do" to comply with a bycatch tonnage

limitation, because such a claim was an improper "attempt to read an ambiguity into the

regulations by claiming [vessels] had a right to know of means by which they could

comply" with the limit), *aff'd* 333 F.3d 1045 (9th Cir. 2003); *cf. Good Samaritan Hosp. v.

Shalala*, 508 U.S. 402, 418-19 (1993) (upholding interpretation even though rule could

have had a "more exact mode of calculating"); *United States v. La.-Pac. Corp,* 682 F.

Supp. 1141, 1166 (D. Colo. 1988) (source must "guess" amount of emissions).  Just

because the rules do not prescribe the ***information*** to be used in calculating whether

actual emissions will increase does not mean the rules are ambiguous, let alone strip this

Court's jurisdiction to enforce statutory and regulatory requirements for modifications.[3]

Nor is there any statutory requirement that EPA's rules must specifically prescribe

the evidence that Plaintiffs may use at trial to demonstrate Duke should have expected its

renovations to increase emissions.  *See* 42 U.S.C. § 7413(a) (authorizing enforcement

actions "on the basis of ***any information*** available to the Administrator") (emphasis

---

[3]Due process may limit penalties if a defendant lacks "fair notice" of the meaning of
ambiguous rules, but that is a separate issue from subject matter jurisdiction. *Greenville
Women's Clinic v. S.C. Dep't of Health & Envt'l Control*, 317 F.3d 357, 366 (4th Cir.
2002) (rule is not impermissibly vague "unless it is so unclear with regard to what
conduct is prohibited that it 'may trap the innocent by not providing fair warning,' or it is
so standardless that it enables 'arbitrary and discriminatory enforcement'"), *reinstated*
2002 WL 31875112 (4th Cir. Nov 15, 2002); *United States v. Hoechst Celanese Corp.*,
128 F.3d 216, 223-24 (4th Cir. 1997) (deferring to reasonable interpretation of ambiguous
rules but noting that fair notice doctrine may bar civil penalties).  Moreover, "fair notice"
is an issue about which Duke is ill-equipped to argue, in light of the plain language of the
1980 rules, EPA's long-standing public interpretation of those rules, and the evidence and
case law confirming that Duke and the industry have long been actually aware of EPA's
interpretation.  *See, e.g., United States v. Cinergy Corp.*, 495 F. Supp. 2d 892, 907-08
(S.D. Ind. 2007) (*Cinergy IV*), *reconsideration denied United States v. Cinergy Corp.*,
No. 1:99-cv-01693 (S.D. Ind. Nov. 5, 2007) (Ex. 3); *United States v. Ohio Edison Co.*,
276 F. Supp. 2d 829, 876 (S.D. Ohio 2003); *see also infra* Section IV.

added).  In fact, because it was the statutory definition of "modification" that ultimately imposed the duty upon Duke to obtain a permit for changes that would "increase" emissions, this Court would have authority to enforce the PSD requirements applicable to Duke's renovations even absent the promulgation of EPA regulations.  *See id* § 7413(a)(3), (b)(2); *Communities for a Better Env't v. CENCO Ref. Co.*, 179 F. Supp. 2d 1128, 1143-44 (C.D. Cal. 2001) (CAA citizen suit based on EPA interpretive policy).  In short, rather than stripping this Court of its jurisdiction due to a purported ambiguity, EPA's promulgation of the PSD rules provides both regulated sources, such as Duke, and regulators, such as EPA, the flexibility to use available information in determining whether annual emission increases should be (or should have been) expected.

Finally, even if the rules were ambiguous, it is well-settled that a court faced with ambiguous rules will "turn to the agency's interpretation" and defer to it so long as it is not "plainly erroneous" or "inconsistent with the regulation."  *Deaton*, 332 F.3d at 709-10 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413-14 (1945) and *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).  This case is like any other where a court determines if a defendant violated allegedly ambiguous requirements.  *See Deaton*, 332 F.3d at 708-12; *Cinemark*, 348 F.3d at 575-81; *Hoechst Celanese*, 128 F.3d at 219-23; *cf. Humanoids Group v. Rogan*, 375 F.3d 301, 306 (4th Cir. 2004) ("determining whether a regulation or statute is ambiguous presents a legal question, which we determine *de novo*").[4]

## C.    *EPA's Long-Standing Interpretation of the 1980 PSD Regulations Is Worthy of Deference*

EPA's long-standing statements regarding the 1980 rules demonstrate that the PSD emission increase test considers whether a change is expected to increase the hours an

---

[4]*See also United States v. Murphy Oil,* 155 F. Supp. 2d 1117, 1138-42 (W.D. Wis. 2001); *Murphy Oil,* 143 F. Supp. 2d at 1104-05; *United States v. City of Painesville*, 431 F. Supp. 496, 500 (N.D. Ohio 1977); *United States v. Chevron,* 639 F. Supp. 770, 778-79 (W.D. Tex. 1985).

existing source is utilized.  For instance, the 1980 preamble provided a detailed example of how the rules work.  It recites the case of a source that both adds a new emission unit and "plans to increase the hours of operation" at its existing unit above the level in its existing permit.  45 Fed. Reg. at 52705.  EPA explained that "***both*** changes will result in significant net increases in actual emissions" and therefore "***[b]oth*** changes then qualify as modifications."  *Id*. (emphasis added).  The example makes clear that a modification may result from an increase in the number of hours an existing unit is utilized.

Consistent with the 1980 preamble and the plain language of the rules, EPA confirmed in the initial WEPCO determination that PSD can be triggered by changes that are expected to increase the "hours of operation" a unit is utilized.  Letter from Lee Thomas (Oct. 14, 1988) (Ex. 4), at 4.  Similarly, EPA issued a 1990 interpretive letter comparing the 1980 PSD rules with the New Source Performance Standards rules, noting that the rules calculate emissions differently, with NSPS examining "<u>hourly</u> emissions rates" and PSD examining "total annual emissions to the atmosphere," which "are the product of the hourly emissions rate . . . ***times the utilization rate, expressed as hours of operation per year***."  Letter from David Kee (Jan. 30, 1990) (Ex. 5) at 4 (underline in original; bold italics added); *see also* Letter from David Kee (Mar. 8, 1990) (Ex. 6), at 2.

Subsequently, on remand from the Seventh Circuit's decision in *WEPCO*, EPA confirmed that under the "present regulatory framework" of the 1980 PSD rules, "increased utilization" is relevant to the PSD emission increase test.  Letter from William Rosenberg (June 8, 1990) (Ex. 2), at 1, 7.  Rather than the more conservative actual-to-potential comparison, which assumed maximum post-project utilization, the 1990 WEPCO Remand determination explained that for like-kind replacements at utilities:

> EPA will compare representative actual emissions for the baseline period to estimated future actual emissions based on all the available facts in the record. Specifically, in calculating post-renovation actual emissions, this approach takes into account . . . ***factors affecting [] likely post-renovation capacity utilization***.

*Id.* at 7-8 (emphasis added). EPA explained that "WEPCo has definite plans to return the plant to historical levels of utilization that are well above baseline levels of utilization, and which could not be physically or economically attained but for the renovation project" and therefore, while it would not be consistent with the Seventh Circuit's mandate to assume utilization at 100 percent capacity, it would be equally inconsistent to ignore the projected increased usage and its resulting impact on air quality. *Id.* at 7. EPA then announced in 1991, by notice in the Federal Register, that it would "continue to apply" this actual-to-projected-actual test under the 1980 rules to "'like-kind replacements' and other units which are found to have 'begun normal operations.'" 56 Fed. Reg. at 27633 & n.10. EPA also again stated that emission increases include "the utilization rate, expressed as hours of operation per year." *Id.* at 27632 n.6; *see also* 57 Fed. Reg. at 32328 (confirming relevance of "hours of operation" under the 1980 rules).

Duke's assertion that EPA created a new "increased utilization" test for this litigation is thus patently incorrect.[5] Rather, the actual-to-projected-actual test is long-standing and entitled to deference. The PSD rules require an inquiry into the effect of a

---

[5] Duke's assertion is also contrary to its own knowledge of EPA's interpretation. *See infra* Section IV. Duke's related assertion (Memo, at 9-10) that EPA elsewhere conceded the 1980 rules do not allow for projections of increased utilization simply ignores EPA's authoritative interpretations, and is in any case unsupported by the citations on which it relies. For instance, the footnote Duke quotes from the 1988 Clay Memo merely recognizes that an actual-to-projected-actual test is inapplicable where a unit is presumed not to have begun normal operations in its changed state, because in such instances the actual-to-potential test applies. Clay Memo (Ex. 7), at 7. As EPA explained in the WEPCO Remand and 1991 preamble, where that presumption is inapplicable, the actual-to-projected-actual test applies under the 1980 rules. In fact, the quoted footnote reveals that WEPCo itself acknowledged the existence of an actual-to-projected-actual test for units that have begun normal operations (though WEPCO unsuccessfully argued that such a test should focus on hourly rates, a proposition that was rejected by EPA and the Seventh Circuit). *See id.*; Letter from John Boston, WEPCO (July 29, 1988), at Encl. p. 35 (Ex. 8); 1988 Thomas Letter (Ex. 4), at 4; *WEPCO*, 893 F.2d at 916 n.11. Similarly, Duke's deposition snippets merely reflect the same pre-WEPCO historic presumption under the 1980 rules. In any case, even if these snippets could be read to support Duke's claim, they could not change the plain language of EPA's rules and EPA's authoritative interpretation of those rules, nor could they strip this Court's jurisdiction to enforce the Act's PSD requirements. *See also* Reply in Support of Mot. to Vacate [DE 359], at 3-4.

project on total actual annual emissions. Considering how a project affects the utilization of a unit – that is, how many hours the unit will be operated – is plainly a reasonable way of making that inquiry. Even it were not compelled, such an interpretation is neither "plainly erroneous" nor "inconsistent with the regulation," *Deaton*, 332 F.3d at 711, but rather fits comfortably within the requirement that PSD apply to projects that "would increase [] actual annual emissions" due to "increases in operating hours" that are "caused or enabled by" the project. *Duke III*, 127 S. Ct. at 1430, 34-35.

### D.    EPA Was Not Required to Initiate An Administrative Adjudication or Promulgate a New Legislative Rule Before Enforcing the 1980 Rules

Against the weight of the plain language of the regulations, EPA's long-standing interpretation of those regulations, and the case law demonstrating that Courts not only have authority to enforce allegedly ambiguous regulations, but must defer to reasonable agency interpretations of such regulations, Duke postulates that separation of powers principles required EPA to either initiate an administrative adjudication or promulgate a new legislative rule before litigating to enforce PSD requirements at Duke's plants. Memo, at 7, 12-15.[6]  But "the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *Chenery*, 332 U.S. at 203.  This is an ***enforcement*** case, not judicial review of final agency action, and the Court is fully authorized to apply the law based on the evidence presented in the first instance by the parties. *See Cinemark*, 348 F.3d at 579-81 & n.8 (rulemaking argument is "surplusage" because "enforcement action is either warranted by the statute and the regulation or it is not"); *see also Fattahi v.*

---

[6]Duke also implies that EPA had the chance to initiate such an adjudication when North and South Carolina supposedly issued "determinations" that Duke's renovations were exempt from PSD (Memo, at 14 n.24).  Even if it were legally relevant whether EPA had such an opportunity, the cited letters do not support an inference that a determination was made for any projects at issue in this case.  The letters say nothing about the alleged capital modifications undertaken by Duke, but rather discussed the simple restart of units placed in reserve shutdown with "minimal expenditures."  DX 6-9.

*Bureau of Alcohol, Tobacco & Firearms*, 328 F.3d 176, 179 (4th Cir. 2003) (rejecting separation of powers argument where court was "not reviewing an agency decision" but rather "determining whether" a statutory violation had occurred). As with any enforcement action, the parties will present evidence and the Court will consider *de novo* whether Duke's actions violated the law. *See also supra* note 4 and accompanying text.[7]

Duke's separation of powers argument also ignores an entire body of law that confirms agencies may act in ways other than adjudications or legislative rules. Contrary to Duke's legislative rule-versus-adjudication dichotomy, it is well-settled that agencies may act by "interpretative rules" that alter or expound upon the agency's interpretative views of a regulation, so long as they remain a "permissible" reading of the statute. *Nat'l Family Planning Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 230-31 (D.C. Cir. 1992); *cf. Martin v. OSHRC*, 499 U.S. 144, 151 (1991) ("the power authoritatively to **interpret** its own regulations is a component of the agency's delegated lawmaking powers") (emphasis added). Agencies may thus interpret their regulations to "suppl[y] crisper and more detailed lines" without formally amending legislative rules. *Am. Mining Congress v. Mine Safety and Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993); *see* 5 U.S.C. § 553(b); *West Va. Coal Ass'n v. Reilly*, 728 F. Supp. 1276, 1292 (S.D. W. Va. 1989), *aff'd* 932 F.2d 964 (4th Cir. 1991). Duke's argument ignores the fact that courts often give effect to such interpretive statements even though they are neither legislative nor announced in an adjudication. Indeed, courts will give effect to interpretations even

---

[7]Duke's assertion (Memo, at 14) that an individual administrative adjudication is a prerequisite to enforcement is also contrary to the unambiguously broad enforcement authority granted by the CAA. The **only** prerequisite to bringing a civil action to enforce the PSD provisions of the Act and applicable implementing regulations is the issuance of a Notice of Violation (NOV) 30-days prior to filing certain types of actions. *See* 42 U.S.C. § 7413(a), (b); Complaint [DE 1], ¶ 10. While sources may seek applicability determinations to obtain guidance from EPA pertaining to specific projects (as WEPCO chose to do for its projects), those determinations are not prerequisites to enforcement. *Id*; *see also* 57 Fed. Reg. at 32332. Here, Duke chose not to seek a determination.

where made for the first time in litigation. *E.g. Auer*, 519 U.S. at 461; *Cinemark*, 348 F.3d at 580 n.8; *see also Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 289-90 (4th Cir. 2004) (giving effect to agency information demand letter even though it was arguably the first time the agency had interpreted its rules as allowing for such letters); *Humanoids*, 375 F.3d at 305-07 (rejecting argument that agency interpretation of its own regulation was not adopted in a formal enough manner to warrant deference). Of course, in this case, to the extent the regulations were not already clear, EPA provided interpretive guidance long ago in sources such as the 1980, 1991, and 1992 preambles, and in the 1990 WEPCO Remand determination, which applied the same test sought to be applied here. *See supra* Section II.C. Duke's argument is thus both inapposite and incorrect.

## III.    The 1992 Rules Clarified the Actual-to-Projected-Actual Test, and Were Legislative Only to the Extent They Expanded that Test to Most Utility Units Regardless of Whether Such Units Had Begun Normal Operations

Duke concedes the existence of the actual-to-projected-actual test under EPA's 1992 rules, but argues that these rules are evidence that such a test did not exist prior to 1992.[8] That argument ignores EPA's application of the actual-to-projected-actual test under the 1980 rules on remand from the Seventh Circuit's *WEPCO* decision, and confirmation in the Federal Register that EPA would continue to apply that test under the 1980 rules at units that have begun normal operations. *See* 1990 WEPCO Remand (Ex. 2), at 1, 6-7; 56 Fed. Reg. at 27633. In the 1991 preamble and the 1992 rules, EPA made

---

[8]Duke also casually asserts (Memo, at 7, 8 n.14) that it is not subject to the 1992 rules. Duke is wrong, and the citation upon which Duke relies does not support its claim that Plaintiffs' conceded that Duke "opted out" of the 1992 *rules*. Plaintiffs have consistently argued that the 1992 rules apply to projects undertaken after the time those rules were adopted into the applicable State Implementation Plan. *See* U.S. Fourth Circuit Br. (Ex. 9), at 6; U.S. Opp. to Duke Mot. for Summary Judgment (Ex. 10), at 3-4, 7-8; U.S. Memo in Support of Mot. for Summary Judgment (Ex. 11), at 35. Rather, faced with Duke's claim that it "opted out" of the actual-to-projected-actual *test*, EPA argued that if indeed Duke opted not to use this more favorable "WEPCO *calculus*," the only alternative would have been the actual-to-potential test. *Id.* at 35 n.14 (emphasis added). Plaintiffs nowhere argued that the 1992 rules themselves were inapplicable, and Duke cites no support for the proposition that a regulated entity can simply opt out of applicable *rules*.

-15-

it clear that it was merely ***clarifying*** the existence and scope of the actual-to-projected-actual test for existing units.  57 Fed. Reg. at 32323; 56 Fed. Reg. at 27630, 27633.[9]  By "clarifying" the actual-to-projected-actual test in the 1992 rules, EPA was simply making "explicit something that was already implicit" in the 1980 rules, *Nat'l Family Planning*, 979 F. 2d at 238, and providing "crisper and more detailed lines."  *Am. Mining Congress*, 995 F.2d at 1112.  This portion of the 1992 rules, then, was interpretative, and does not imply that the actual-to-projected-actual test was impermissible for units that have begun normal operations under the 1980 rules.  *See Fox v. Bowen*, 835 F.2d 1159, 1163 (6th Cir. 1987) (upholding agency interpretation even though agency had recently proposed amending its existing regulation to make explicit the very interpretation it was urging the Court to accept).[10]  The 1992 rule as it related to the actual-to-projected-actual test was only legislative where it supplemented existing law; that is, where it broadened application of this test to virtually ***all*** electric utility units regardless of whether they had begun normal operations.  *See* 57 Fed. Reg. at 32317; *Nat'l Family Planning*, at 237.

## IV.  Duke's Challenge to the Actual-to-Projected-Actual Test is Jurisdictionally Barred

Under Section 307(b)(1) of the Act, a challenge to any nationally applicable regulation or final EPA action may be filed only in the D.C. Circuit Court of Appeals,

---

[9]In addition to stating that it was "clarifying" the existence of the actual-to-projected-actual test, EPA also announced that it would apply the test to like-kind replacements immediately, without waiting for the final rule to be promulgated.  56 Fed. Reg. at 27633. This was in sharp contrast to the preamble to the 1980 rules, in which EPA engaged in a lengthy discussion about the transition period for units being constructed or modified between the proposed and final rule.  45 Fed.Reg. at 52681-52686.

[10]Indeed, the Supreme Court has rejected – even in a criminal prosecution – the type of inference Duke seeks to draw here.  *See Bates v. United States*, 522 U.S. 23, 32 (1997) ("Congress' 1992 amendment hardly means that [the original criminal statute] did not previously cover the conduct in question."); *O'Gilvie v. United States*, 519 U.S. 79, 89 (1996) ("Congress might simply have thought that the then-current law . . . was unclear, [and] that it wanted to clarify the matter . . . ."); *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 839 (1988) (statutory amendment can be read as merely clarifying what original version of statute always required).

while a challenge to any regionally applicable regulation or final action must be filed in the appropriate regional Court of Appeals. *See* 42 U.S.C. § 7607(b)(1). Such challenges must be made within 60 days from the date notice is published in the Federal Register. *See id.* This judicial review mechanism is exclusive; under Section 307(b)(2), "[a]ction of the Administrator with respect to which review ***could have been obtained*** under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement." *Id.* § 7607(b)(2) (emphasis added). Thus, "any agency action that was reviewable in the courts of appeals cannot be challenged in an enforcement proceeding, whether or not review was actually sought." *Harrison* v. *PPG Indus., Inc.*, 446 U.S. 578, 605 (1980) (Stevens, dissenting); *see Duke III*, 127 S. Ct. at 1436. Final agency action for jurisdictional purposes can include publicly announced regulatory interpretations. *See General Motors Corp. v. EPA*, 363 F.3d 442, 451 (D.C. Cir. 2004).

As set forth *supra* Section II.C, EPA made clear long ago that PSD can be triggered by projects that increase a unit's annual utilization, beginning with the 1980 rules and EPA's contemporaneous interpretation in the 1980 preamble, and continuing through the 1990 WEPCO remand and publication in the 1991 Federal Register. *See* 56 Fed. Reg. at 27632-33 & nn. 6, 10. Any challenge to EPA's interpretation of the 1980 rules as regulating projects that are expected to "result in [] increased utilization of the unit at issue" (Memo, at 12) is thus barred as untimely and in the wrong court. *See* 42 U.S.C. § 7607(b); *Duke III*, 127 S. Ct. at 1436; *see also General Motors*, 363 F.3d at 451 (challenge to regulatory interpretation untimely where interpretation had previously been set forth in other interpretive documents); *Molycorp, Inc. v. EPA*, 197 F.3d 543, 546 (D.C. Cir. 1999) (challenge would be barred even if policy statement had changed EPA rule, because EPA had previously announced its policy in a letter to regulators).

To the extent Duke encourages this Court to step around that jurisdictional bar (as Duke urged once before in this case already – see *Duke III*, 127 S. Ct. at 1436) on the

basis that it could not have challenged EPA's interpretation earlier because no one could have anticipated that projections of increased utilization are required where the actual-to-potential test is inapplicable, the Court need only look to the plain language of the regulations and EPA's public statements about those regulations to determine that Duke was on notice. Indeed, Duke challenged the rules themselves on the basis that their focus on increased utilization and total annual emissions differed from the hourly rate test set forth in the NSPS regulations, and lost. *See New York I*, 413 F.3d at 18.[11]

The evidence also shows that Duke and the Utility Air Regulatory Group (UARG, of which Duke is a member), well understood the ramifications of EPA's 1980 rules and its interpretive statements concerning them. For instance, in comments on the 1991 proposal to expand the actual-to-projected-actual test to changes at all utility units, UARG recognized that the 1991 preamble was an immediately effective interpretative rule that "should be viewed as giving effect to the plain meaning of existing law." Industry Comments on Proposed Rule (Ex. 13), at 2. A memo sent on behalf of UARG to various trade associations confirmed that "EPA's <u>Federal Register</u> notice explaining what its ***current regulations*** provide concerning facility 'modifications' is fully consistent with law." Hunton & Williams Memo (July 9, 1991) (Ex. 14), at 1, 6-7 (emphasis added). The Memo also stated:

> [I]n the preamble . . . EPA announces a clarification of its WEPCo interpretation that represents a return to the Agency's past understanding of its . . . NSR rules. ***In practical effect, the preamble constitutes a separate interpretative rule on these issues, and these interpretations of existing law are effective immediately***.

---

[11]*See also supra* note 1; Mot. to Reopen Pets. for Review (Ex. 1), at 3-4; Joint Br. of Indus. Pets. (Ex. 12), at 20 (challenging preamble to 1992 Rule to the extent it construed 1980 rules to apply to changes that are expected to increase hours of operation).

*Id.* at 4 (emphasis added).[12] Other Duke and industry statements similarly confirm Duke's knowledge of the actual-to-projected-actual test under the 1980 rules.[13]

In short, Duke and the rest of the utility industry have long understood both the plain meaning of the 1980 rules and EPA's 1991 interpretive rule confirming the existence of the actual-to-projected-actual test, and they are barred from challenging that test now in this enforcement action. *See* 42 U.S.C. § 7607(b); *General Motors*, 363 F.3d at 451 (trade association's "letters make clear that industry was aware of EPA's regulatory interpretation, and [chose not to] mount[] a judicial challenge to that interpretation"). Duke had its chance to challenge the PSD regulations' focus on utilization in *New York I*. It's second attempt to do so was rejected by the Supreme Court in *Duke III*. Its third bite at the apple is foreclosed by Section 307(b).

## CONCLUSION

Duke's assertion that this Court lacks jurisdiction over this enforcement action is contrary to the plain language of the CAA, and its claim that a purported ambiguity in the

_____

[12]Industry frequently lauded EPA's ***clarification*** that the actual-to-projected-actual test applied under the 1980 rules to changes at existing units that were found to have begun normal operations (as opposed to the more conservative actual-to-potential test). *See, e.g.,* Industry Comments (Ex. 15), at 1 ("In the preamble to the proposed rule, EPA has announced a 'clarification' of its 'WEPCO' interpretations . . . . In practical effect, the preamble . . . constitutes the currently operable law."); *id.* at 3, 27 ("the proposed rule should be viewed as giving effect to the plain meaning of existing law, not as an expression of new law."); Supplemental Industry Comments (Ex. 16), at 1, 13-14 (supporting preamble's "clarification of existing law").

[13]*See* Duke Comments on Proposed Rule (Jan. 10, 1997) (Ex. 17), at 2 (1980 rules provide for "past-actual-to-future-actual" test); Joint Br. of Indus. Pets. (Ex. 12), at 19 n.35 (recognizing existence of "actual-to-projected-actual" test under 1980 rules); 30(b)(6) Dep. of Kris Knudsen (July 23, 2002), at 133-34 (Ex. 18) (testifying that Duke was aware of test applied on remand from *WEPCO*); *see also* Letter from Henry Nickel (June 5, 1989) (Ex. 19), at Encl. p. 4 (recognizing that PSD can be triggered by projects undertaken to reduce "forced outages"). Additional evidence of Duke's knowledge of EPA's interpretation of the 1980 PSD rules is likely to be contained in UARG documents that are the subject of Plaintiffs' recently-filed motion to lift the stay of enforcement of Magistrate Judge Eliason's discovery order requiring the production of documents that Duke obtained from UARG. *See* Motion to Lift Stay [DE 357] (Ex. 20). Plaintiffs reserve the right to submit such UARG documents to the Court upon their production.

-19-

1980 PSD rules divests this Court of its jurisdiction is contrary to the regulatory language and established law. The 1980 rules are not ambiguous simply because they and the statute allow the use of "any information" to calculate increases in actual emissions under the actual-to-projected-actual and actual-to-potential tests. Moreover, even if Duke were correct that the rules are ambiguous in relevant part, such ambiguity would not affect this Court's jurisdiction. Rather, a court faced with an ambiguous regulation will turn to the implementing agency's interpretation and determine if it is entitled to deference. Because considering the effect of increased annual utilization on a unit's total annual emissions is neither plainly erroneous nor inconsistent with the regulation, EPA's interpretation would deserve deference even if it were not compelled by the plain language of the 1980 rules.

In addition, the factual assertion underlying Duke's argument – that Plaintiffs created a new "increased utilization" test for this litigation – ignores the language of the regulations and EPA's long-standing application of both actual-to-potential and actual-to-projected-actual comparisons under the 1980 rules. Duke's assertion is also contrary to statements made by Duke and other industry voices in the 1980s and 1990s championing an actual-to-projected-actual test under the 1980 rules, urging its broader application, and recognizing that EPA statements clarifying the actual-to-projected-actual-test under the 1980 rules were authoritative interpretations that were "effective immediately." Indeed, because the plain language of the 1980 rules requires consideration of increased utilization, and because EPA announced long before this enforcement action that the actual-to-projected-actual test would continue to apply under the 1980 rules, Duke's challenge to that test is barred by the Act's exclusive judicial review provisions.

DATED: January 4, 2008.

Respectfully Submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources
    Division
United States Department of Justice

*/s/ Jason A. Dunn*
JASON A. DUNN
DEBORAH N. BEHLES
RICHARD M. GLADSTEIN
KATHERINE E. KONSCHNIK
JAMES A. LOFTON

OF COUNSEL:

ELLEN ROUCH
Associate Regional Counsel
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia  30303

Environmental Enforcement Section
Environment and Natural Resources
        Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-1111
jason.dunn@usdoj.gov

ANDREW C. HANSON
Attorney Advisor
Air Enforcement Division
Office of Enforcement and
        Compliance Assurance
U.S. EPA
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

ANNA MILLS WAGONER
United States Attorney
Lynne P. Klauer
Assistant U.S. Attorney
NCSB # 13815
P. O. Box 1858
Greensboro, NC 27402
(336) 333-5351

J. BLANDING HOLMAN, IV
N.C. Bar No. 23184
Counsel for Plaintiff-Intervenors
        Environmental Defense et al.
Southern Environmental Law Center
200 W Franklin Street, Suite 330
Chapel Hill, North Carolina 27516
(919) 967-1450

CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2008, the foregoing Opposition to Duke's Motion for Summary Judgment was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

T. Thomas Cottingham, III- Trial Attorney (and by overnight delivery)
Nash E. Long, III
Hunton & Williams
101 South Tryon Street, Ste. 3500
Charlotte, NC 28280

Peter Pappas
Adams Kleemeier Hagan Hannah & Fouts PLLC
701 Green Valley Road, Ste. 100
Greensboro, NC 27408

J. Blanding Holman
Southern Environmental Law Center
200 W. Franklin Street, Suite 300
Chapel Hill, NC 27516-2520

Jon Berkelhammer
Smith Moore LLP
300 North Greene Street, Suite 1400
Post Office Box 21927
Greensboro, NC 27420

and I hereby certify that the documents were mailed to the following non-CM/ECF participants:

Mark B. Bierbower
Hunton & Williams
1900 K Street, N.W.
Washington, D.C. 20006-1109

Garry S. Rice
Associate General Counsel
Duke Energy Corporation
422 South Church Street, PBO5#
Charlotte, NC 28242

John J. Buckley, Jr.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

*/s/ Jason Dunn*
Jason Dunn