IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| ENVIRONMENTAL DEFENSE, | ) | |
| NORTH CAROLINA SIERRA CLUB, and | ) | |
| NORTH CAROLINA PUBLIC INTEREST | ) | |
| RESEARCH GROUP | ) | |
| | ) | 1:00CV1262 |
| Plaintiff- Intervenors, | ) | |
| v. | ) | |
| | ) | |
| DUKE ENERGY CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

Tilley, Senior United States District Judge

This matter is before the Court on Plaintiffs' Motion to Vacate April 14, 2004, and August 26, 2003, Orders and Judgments [Doc. # 341] and on Defendant's Motion for Summary Judgment [Doc. # 354]. For the reasons stated below, Plaintiffs' motion is GRANTED IN PART and DENIED IN PART. Defendant's Motion for Summary Judgment is DENIED.

I.

On December 22, 2000, the United States Attorney General filed this action against Defendant Duke Energy Corporation ("Duke Energy") at the request of the Administrator of the United States Environmental Protection Agency (the "EPA").

The EPA brings this enforcement action under the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 et seq. Specifically, the EPA alleges that Duke Energy made modifications to coal-fired electrical generating plants in North Carolina and South Carolina without obtaining permits in violation of the Prevention of Significant Deterioration ("PSD") provisions of the CAA.[1]

On May 8, 2001, Environmental Defense, North Carolina Sierra Club, and North Carolina Public Interest Research Group Citizen Lobby/Education Fund (collectively "Intervenor-Plaintiffs") moved to intervene as plaintiffs. Intervenor-Plaintiffs' motion to intervene was granted on September 6, 2001. United States v. Duke Energy Corp., 171 F. Supp. 2d 560 (M.D.N.C. 2001) [Doc. # 24]. Intervenor-Plaintiffs then filed a complaint against Duke Energy alleging violations similar to those filed by the EPA [Doc. # 26].

All parties moved for summary judgment, and United States District Judge Frank Bullock, in a judgment and accompanying memorandum opinion filed August 26, 2003 [Doc. ## 234, 235], denied Duke Energy's motion for summary judgment, granted in part and denied in part the Plaintiffs' motion for partial summary judgment, (in which Intervenor-Plaintiffs had joined), denied Intervenor-Plaintiffs' motion for partial summary judgment, and denied Duke Energy's motion

---

[1] The EPA also alleged various other violations, including violations of the State Implementation Plans, which were approved under the CAA for North Carolina and South Carolina. The parties stipulated dismissal with prejudice of these claims, United States v. Duke Energy Corp., 2004 WL 1118582 (M.D.N.C. 2004) [Doc. # 313], which will not be discussed further in this opinion.

for partial judgment on the pleadings. United States v. Duke Energy Corp. (Duke I), 278 F. Supp. 2d 619 (M.D.N.C. 2003) [Doc. # 234]. Based on the legal determinations in Duke I, discussed infra, the parties submitted joint stipulations that eliminated the need for a trial [Doc. # 311]. On April 14, 2004, Judge Bullock entered an order and final judgment granting Duke Energy's summary judgment motion based on the joint stipulations. United States v. Duke Energy Corp., 2004 WL 1118582 (M.D.N.C. 2004) (the "April Order") [Doc. # 313].

Plaintiffs then appealed both the Duke I decision and April Order to the Fourth Circuit Court of Appeals. The Fourth Circuit affirmed both decisions, though on slightly different grounds. United States v. Duke Energy Corp. (Duke II), 411 F.3d 539 (4th Cir. 2005). Plaintiffs petitioned for a writ of certiorari, and the Supreme Court granted cert on May 15, 2006. United States v. Duke Energy, 547 U.S. 1127 (2006). The Supreme Court then reversed the Fourth Circuit's decision and remanded the case to the Fourth Circuit. United States v. Duke Energy Corp. (Duke III), 549 U.S. 561 (2007). The Fourth Circuit, in turn, remanded the case to this Court for further proceedings. [Doc. # 334][2].

---

[2] The issues before the Court at this time involve legal, not factual, determinations. Because these legal determinations are not dependant on the facts of the case, the Court adopts the general overview of the facts provided in Duke I.

Plaintiffs have now moved to vacate the several holdings of the Duke I decision.³ This Court has authority to vacate its prior decisions pursuant to the June 13, 2007 Remand Order and August 8, 2007 Mandate of the Fourth Circuit Court of Appeals, Fed. R. Civ. P. 54(b), and its own inherent authority. See American Canoe Assn., Inc. v. Murphy Farms, Inc., 326 F.3d 505, 514-15 (4th Cir. 2003) ("[A] district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted.").

II.

The CAA was passed in order "to speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the nation is wholesome once again." H.R. Rep. No. 91-1146, at 1 (1970), reprinted in 1970 U.S.C.C.A.N. 5356. In its 1970 amendments to the CAA, Congress directed the EPA to devise National Ambient Air Quality Standards ("NAAQS"), which establish the maximum allowable level of specific air pollutants. 42 U.S.C. § 7409. Congress also required the EPA to promulgate

---

³ The Motion to Vacate is discussed in greater detail in Section IV, infra. The specific portions of the Duke I decision Plaintiffs seek to have vacated are the following: (1) net emissions increases under PSD regulations are calculated by looking at per/hour emissions when holding the hours and conditions of operations constant; (2) routine maintenance, repair and replacement is determined by a "routine in the industry" standard; and (3) the burden of proof is on the EPA and Plaintiff-Intervenors to show that the projects at issue are not routine maintenance, repair and replacement.

4

regulations establishing New Source Performance Standards ("NSPS"), which set specific standards of operation for stationary sources of air pollution that are either new or undergoing modification. 42 U.S.C. § 7411.

In 1977, Congress again amended the CAA and established the Prevention of Significant Deterioration ("PSD") provisions. 42 U.S.C. § 7475. The PSD provisions were designed to ensure that relatively unpolluted areas did not decline to the minimum levels allowed by the NAAQS through increases in annual emissions. Under the PSD provisions, operators of a stationary source of air pollution are required to obtain a permit from the EPA before <u>constructing or modifying</u> a polluting facility. Id. at § 7475(a). After obtaining a permit, a utility must install the best available pollution reduction technology as part of the proposed modification. Id. The PSD program incorporates the definition of "modification" found in the NSPS provisions of the CAA. Id. § 7479(2)(c). "Modification" under section 7411(a) of the CAA "means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." Id. § 7411(a)(4).

Although both the PSD and NSPS provisions of the CAA use the same statutory definition of "modification," the EPA promulgated distinct regulations for each. Under the 1980 PSD regulations, the EPA limited the application of PSD review to "major" modifications, defined as "any physical change in or change in

5

the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the [CAA]." 40 C.F.R. § 51.166(b)(2)(i). Thus to trigger PSD permitting requirement, there must be (1) a "physical change" and (2) a "significant net emissions increase." Duke III, 549 U.S. at 578. The parties do not agree on how either criterion should be applied.

First, the parties disagree as to how to determine whether a physical change has taken place at a particular facility. Specifically, the parties disagree as to how to apply the regulatory exception for "[r]outine maintenance, repair, and replacement" ("RMRR") from the definition of "physical change." 40 C.F.R. § 51.166(b)(2)(iii). The regulations do not further define this exception, leaving room for interpretation as to what "routine" really means. The Plaintiffs contend the RMRR exception should be viewed in light of what is routine at a particular generating unit. Duke Energy argues that the RMRR exception should be viewed under a "routine in the industry" standard.

This Court agreed with Duke Energy in Duke I, holding that RMRR should be defined relative to an industrial category. Duke I, 278 F. Supp.2d at 631. In so holding, the Court first relied on legislative intent, concluding that when Congress incorporated the NSPS statutory definition of modification into the PSD amendments, it also incorporated the regulations implementing the NSPS program. Duke I, 278 F. Supp.2d at 629. Under the NSPS, RMRR is defined as

"[m]aintenance, repair, and replacement … routine for a source category." 40 C.F.R. § 60.14(e)(1). Therefore, the Court reasoned, in order for the PSD provisions to be given their proper scope, i.e. to be read consistently with the NSPS regulations, the RMRR exception under PSD must also be defined relative to a source category. Duke I, 278 F. Supp.2d at 630-31.

But the Court's analysis of the RMRR exception did not depend solely on an analysis of legislative intent. It was also based on prior agency interpretations. In 1988, the EPA issued an applicability determination for a proposed project at Wisconsin Electric Power Company (WEPCO)'s Port Washington facility, which was eventually affirmed by the Seventh Circuit in Wisconsin Elec. Power Co. v. Reilly (WEPCO), 893 F.2d 901 (7th Cir. 1990). As part of this determination, the EPA explained that "[i]n determining whether proposed work at an existing facility is 'routine,' the EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a common-sense finding." Mem. From Clay to Kee (Sept. 9, 1988) [Doc. # 350, ex. 3].

In the applicability determination, as well as in the appeal to the Seventh Circuit, the EPA compared the proposed projects at the Port Washington facility to projects undertaken at other electric utility facilities to show that the Port Washington projects were not "routine." WEPCO, 893 F.2d at 911. By making these comparisons in the WEPCO case, the EPA, (and the Seventh Circuit in

7

affirming the EPA's decision), confirmed the relevance of industry practice in the RMRR analysis. Id.; see also Duke I, 278 F. Supp.2d at 633. In making the Duke I determination, this Court also looked to the EPA's post-WEPCO statements regarding the way the application of the WEPCO criteria would affect utility life-extension projects. Duke I, 278 F. Supp.2d at 636-37. These statements again indicate that the EPA viewed the RMRR exception in light of industry practice. The EPA's current position, that RMRR must be viewed only in light of an individual unit, is thus entitled to less deference because it conflicts with an earlier agency interpretation. Duke I, 278 F. Supp.2d at 635.

As to the second criterion, the parties cannot agree how to determine whether a "significant net emissions increase" has occurred. Under the 1980 PSD regulations, "net emissions increase" is defined as

> the amount by which the sum of the following exceeds zero:
>
> (a) Any increase in actual emissions from a particular physical change or change in the method of operation at a stationary source; and
>
> (b) Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

40 C.F.R. § 51.166(b)(3)(i). In order to be "significant," a net emissions increase must "equal or exceed" one of the stated emissions rates, as measured in tons per year. Id. § 51.166(b)(23)(i). Increases or decreases in actual emissions are measured using a baseline emissions calculation equaling "the average rate, in tons per year, at which the unit actually emitted the pollutant during a two year period

8

which precedes the particular date and which is representative of normal source operations." Id. at 51.166(b)(21)(ii).  Additionally, while actual emissions are calculated "using the unit's actual operating hours [and] production rates," Id. at 51.166(b)(21)(ii), a mere increase in hours of operation or production rate does not qualify as a physical change.  Id. at 51.166(b)(2)(iii)(f).

In Duke I, this Court interpreted the regulations, holding that

> based on the PSD rule, the contemporaneous interpretations of the PSD rules, and the statutory language incorporating the NSPS concept of modification into PSD, post-project emissions must be calculated on an annual basis, measuring emissions in tons per year, and in calculating post-project emissions levels the hours and conditions of operation must be held constant.  Accordingly, a net emissions increase can result only from an increase in the hourly rate of emissions.

Duke I, 278 F. Supp.2d at 640.  Based on this holding, the EPA stipulated that none of the projects at issue resulted in an increase in the hourly rate of emissions, and thus could not trigger the pre-project permitting requirement under this standard.  April Order [Doc. # 313].  The Court then granted summary judgment in favor of Duke Energy.  Id. [Doc. # 313].

The Fourth Circuit Court of Appeals affirmed, "albeit for somewhat different reasons that those relied on by the district court."  Duke II, 411 F.3d at 542.  The Fourth Circuit held that "[w]hen Congress mandates that two provisions of a single statutory scheme define a term identically, the agency charged with administering the statutory scheme cannot interpret these identical definitions differently."  Id. at 546-47.  Citing the district court's analysis, the Court held that the PSD

9

regulations could, and must, be interpreted consistently with the NSPS regulations to require an increase in the hourly emissions rate. Id. at 550.

The EPA petitioned for a writ of certiorari and the Supreme Court overturned the Fourth Circuit. In Duke III, the Supreme Court held that "[t]he 1980 PSD regulations on 'modification' simply cannot be taken to track the agency's regulatory definition under the NSPS." Duke III, 549 U.S. at 577. Indeed, the Court found nothing in the text or legislative history of the amendments to the CAA to suggest that Congress intended to incorporate both the NSPS statutory definition of modification and its attendant regulations into the PSD regulations. Id. at 576. Because the PSD regulations were not automatically saddled with NSPS definitions, the Court looked to the plain language of the two sets of regulations to determine the reasonableness of the lower courts' interpretations. Ultimately, the Court determined that "[w]hat [the PSD] provisions are getting at is a measure of actual operations averaged over time, and the regulatory language simply cannot be squared with a regime under which 'hourly rate of emissions'… is dispositive." Id. at 577.

The Supreme Court found that attempts by the Fourth Circuit to conform the PSD regulations to the NSPS regulations led to an implicit invalidation of the PSD regulations, implicating § 307(b) of the CAA. Id. at 581. Section 307(b) limits challenges to the validity of a regulation during enforcement proceedings when the review of the validity of the regulation could have been obtained in the Court of

10

Appeals for the District of Columbia within sixty days of the rule-making. Id. Since this procedure was not followed in the case, there could be no challenge to the validity of the regulations before the Fourth Circuit. The Supreme Court remanded the case to the Fourth Circuit for further proceedings in light of its decision, and the Fourth Circuit, in turn, remanded the case to this Court.

IV.

The EPA and Intervenor-Plaintiffs seek to have all three parts of the August 26, 2003 Duke I decision vacated after the Supreme Court's decision in Duke III. First, Plaintiffs move to vacate the Duke I holding that post-project emissions increases should be determined by comparison of hourly rates of emissions. Defendant agrees that this section of Duke I should be vacated. Duke asserts, however, that the Court lacks authority to determine how post-project emissions should be measured, and asks that summary judgment be granted in its favor. This issue is addressed in subsection "a" below. Second, Plaintiffs move to vacate the Duke I holding that RMRR should be determined using the WEPCO multi-factor test that includes reference to the utility industry as a whole, rather than with reference to a particular unit. The RMRR issue is addressed in subsection "b" Third, Plaintiffs challenge the Duke I determination that EPA bears the burden of proof to show that Duke Energy's projects do not come under the RMRR exception. The burden of proof issue is handled in subsection "c." Subsection "d" deals briefly with the issue of "fair notice."

11

a.

In Duke III, the Supreme Court overruled the Duke I holding that a post-project emissions increase can only be found where the hourly rate of emissions increases. 549 U.S. at 577-78. Accordingly, the Plaintiffs' motion to vacate Duke I will be granted as to the entirety of Section IV of that opinion (subtitled "Net Emissions Increase"). The Court follows instead the holding and supporting rationale of Duke III, which makes clear that the plain language of the regulations requires a utility to obtain a pre-construction permit when proposed changes "would increase the actual annual emission of a pollutant above the actual average for the two prior years." Duke III, at 570.

Thus, a comparison must be made between pre-project levels of actual emissions and post-project levels of actual emissions. According to Duke III, "[a]ctual emissions" are measured "in a manner that looks to the number of hours the unit is or probably will be actually running." Id. at 578. If an increase in hours of operation is caused or enabled by a physical change, the increased hours must be included in the pre-project calculus. Id. at 577-78. Since the PSD program requires a pre-construction permit in the event of a significant net emissions increase, it is necessary for a utility such as Duke Energy to make a pre-project projection of what actual emissions will be before construction begins. United States v. Ohio Edison Co., 276 F. Supp.2d 829, 865 (S.D. Ohio 2003) ("[T]he Clean Air Act clearly requires that this calculation be made by the electric utility

12

*before* the physical change is actually undertaken."). Therefore, the actual-to-projected-actual test will be used to determine whether Duke Energy should have sought a pre-project permit for any of the projects at issue.

Although the parties appear to agree that the actual-to-projected-actual test is the appropriate standard, Duke Energy has moved for summary judgment claiming that the Court lacks jurisdiction to determine whether Duke Energy should have projected post-project emissions increases. Duke Energy argues that since the PSD regulations do not specify the exact methodology for calculating projected future emissions, a gap in the regulations exists that can only be filled through the exercise of legislative power. According to Duke Energy, this Court would have no power to interpret the regulations and would thus lack subject matter jurisdiction in this case. Duke Energy argues that this Court would have to choose one methodology from a panel of multiple, possible methodologies to apply in determining Duke Energy's project-actual-emissions. Under Duke Energy's logic, the EPA is asking the Court to create the law it would then apply.

While it is true that the PSD regulations do not provide an exact methodology to be used to determine future emissions, that fact does not divest a District Court of jurisdiction. The Court is not bound to choose a single formula in which to plug numbers from Duke Energy's various projects to determine what projected emissions should have been for each project. Nothing in the PSD regulations suggests that one particular formula must apply; in fact, the regulations

13

specifically allow the EPA to use a broad number of factors in determining what post-project emissions will be. Rather than create or a choose a formula to apply to Duke Energy's project retroactively, this Court need only determine whether Duke Energy reasonably should have projected a significant increase in emissions using whatever methodology would serve that purpose. Such a determination of reasonableness is well within the jurisdiction of the Court. United States v. Cinergy Corp.(Cinergy), 458 F.3d 705, 707-08 (7th Cir. 2006) (The circuit court has jurisdiction to interpret the reasonableness of the CAA regulations because "[t]he validity of the regulation is not at issue, just its meaning.") Nor does the Court's ruling place an unreasonable burden upon Duke Energy. As noted in Cinergy, the regulations do not require a utility to be prescient, rather they require the company to undertake a reasonable estimate of what post-project emissions would be. 458 F.3d at 709. Therefore, Duke Energy's motion for summary judgment is denied.

b.

The Duke I decision held that the RMRR exception must be analyzed using the WEPCO multi-factor test applied in reference to the source or industry category. Duke I, 278 F. Supp.2d at 631-35. Because this holding rested in part on the Court's determination that the NSPS regulations must be incorporated into the PSD regulations, the EPA argues that this holding must be vacated. The EPA instead asks the Court to apply RMRR with reference only to an individual unit.

To the extent the Court's holding on RMRR relied on incorporation of the NSPS regulations into the PSD regulations, the holding is indeed vacated in accordance with the Supreme Court's ruling in Duke III. Because the Court in Duke I held that a "common in the industry" test applies based on grounds independent from the NSPS and PSD regulations, however, the Duke I holding on this point is not vacated in its entirety and the Court now clarifies that holding.

The EPA is bound by its own interpretation of the PSD regulations, which have consistently referenced industry standards. Duke I thoroughly evaluated the statements of the EPA during the WEPCO determination for this case and the EPA's public statements regarding the RMRR exception. The regulatory history establishes that reference to other units in an industrial category must be part of the RMRR analysis and this part of the WEPCO analysis remains unaffected by the Supreme Court's holding in Duke III. The court does not adopt the Duke Energy position on "routine in the industry" whole cloth, however. To the extent that the RMRR holding in Duke I indicated that industry standards are the only factor, or appeared to approve the Duke Energy position that frequency within an industrial category by itself allows a utility to fall under the RMRR exception, that holding must be clarified, so that the parties may adequately prepare for trial.

Counterposing "routine in the industry" and "routine at a particular unit" actually presents a false dichotomy. Like the court in Pennsylvania v. Allegheny Energy, Inc.,, this Court "does not perceive a dramatic distinction between the

15

'routine at the unit' and 'routine in the industry' tests in application." 2008 WL 4960090, at * 8 (W.D. Pa. Nov. 18, 2008). Although the WEPCO factors will be evaluated with reference to the industry, the WEPCO test, which this Court has held is entitled to deference, dictates that the Court make a fact intensive, "common sense" evaluation. See WEPCO, 893 F.2d at 910-11.

This means that the Court will not forego any consideration of what occurs at individual units and look solely at industry practice to determine whether a project is RMRR. Instead, "the Court will consider all of the WEPCO factors, including frequency, taking into consideration the work conducted at the particular [Duke Energy] unit, the work conducted by others in the industry, and the work conducted at other individual units within the industry." United States v. East Kentucky Power Coop., Inc., 498 F. Supp.2d 976, 993-94 (E.D. Ky. 2007) ("EKPC"). To do otherwise would be to defy common sense, ignore the "case-by-case" determination required by the WEPCO test, and allow the industry to render the PSD program a nullity by making its own practice the sole standard. Thus, the Court is prepared to hear and consider a wide range of evidence at trial pursuant to the well-established WEPCO standard.

c.

The Duke I holding that the EPA bears the burden of proof of showing that Duke does not come within the RMRR exception to the PSD regulations must be revisited. Generally, the party seeking to benefit from an exception to a statutory

requirement carries the burden of proving that the exception applies. United States v. First City Nat'l Bank of Houston, 386 U.S. 361, 366 (1967); NLRB v. Kentucky River Comm. Care, Inc., 532 U.S. 706, 711 (2001); Johnson v. City of Columbia, 94 F.2d 129-30 (4th Cir. 1991). Other federal courts have applied this rule specifically to the RMRR exception in assigning the ultimate burden to the party claiming its benefit. See EKPC, 498 F. Supp.2d at 995 ("The EPA will have to prove that there was a 'modification' - i.e., a physical change that resulted in a net emissions increase. Once that is proven, the burden shifts to EKPC to prove that its activities are exempt from the definition of "modification" because they were routine."); United States v. Cinergy Corp, No. 99-cv-1693, 2006 U.S. Dist. LEXIS 8774, at *13-14 (S.D. Ind. 2006), aff'd by Cinergy, 458 F.3d 705 (7th Cir. 2006) ("it is Cinergy's burden to show that the activities at issue in this suit are exempt from CAA compliance"); United States v. Ohio Edison Co., 276 F. Supp.2d 829, 856 (S.D. Ohio 2003) ("[T]he general rule is that the party claiming the benefit of exemption to a statute bears the burden of proof. Thus, it is Ohio Edison's burden to show that the eleven activities are exempt from CAA compliance.")

Nothing in the statute, regulations, or legislative history provides an adequate reason for departing from the general rule widely applied by the Supreme Court and the Fourth Circuit, as well as other federal courts presented with this very issue, that the party seeking the exception bears the burden of proof. Thus, Plaintiffs' motion to vacate will be granted as to the holding regarding burden of

proof. Since Duke Energy seeks to benefit from the RMRR exception, Duke Energy carries the burden to show that the physical changes that took place at its plants were indeed routine maintenance, replacement, or repair.

d.

Finally, Duke Energy's argument that the EPA is retroactively changing the application of its methodology and rules and that this violates "the most basic principles of administrative law and fairness," insofar as it implicates the issue of fair notice, merits only limited consideration here. See Duke Energy's Memorandum in Support of Motion for Summary Judgment at 12-13. [Doc. # 355]. As Duke Energy itself has asserted, "[f]air notice is relevant if, and only if...the Court finds at trial that the Plaintiffs prevail for some of the projects at issue." See Duke Energy's Response to the Court's Request for Information on Section IV of the Supreme Court's Opinion and the Role of Fair Notice in the Remand Proceedings at 3. [Doc. # 351]. Fair notice is an issue that may well arise at trial but, as Duke Energy has rightly pointed out, the issue is not before the Court at this time, and so need not be decided here.

V.

As part of the parties' joint stipulations, the EPA and Intervenor-Plaintiffs stipulated that none of the Duke Energy projects at issue increased the unit's maximum hourly rate of emissions. [Doc # 311]. Therefore, based on the legal standard for measuring post-project emissions set forth in the Order, the Court

granted judgment for Duke Energy. United States v. Duke Energy, 2004 WL 1118582 (M.D.N.C. 2004) [Doc. # 313]. Because the Supreme Court overruled the legal standard used in this determination, Duke III, 549 U.S. at 578, Plaintiffs' motion to vacate the Judgment of April 14, 2004, is granted.

VI.

For the foregoing reasons, the Plaintiffs' Motion to Vacate [Doc. # 341] is GRANTED IN PART and DENIED IN PART, and Duke Energy's Motion for Summary Judgment [Doc. # 354] is DENIED. More specifically:

1. Section IV of the Duke I opinion is vacated and the actual-to-projected-actual test will be used to determine whether Duke Energy should reasonably have sought a pre-project permit for any of the projects at issue;

2. The portion of the Duke I opinion (contained in Section III. A) stating that the PSD regulations incorporated the NSPS regulations is vacated, but to the extent the Duke I decision held that the determination of RMRR takes industry practice into account through the multi-factor WEPCO analysis, that part of the Duke I decision is incorporated here as described above and Plaintiffs' Motion to Vacate [Doc. # 341] is denied;

3. The portion of the Duke I opinion placing the burden of proof on the EPA and Plaintiff-Intervenors to show the RMRR exception does not apply is vacated and the burden is placed on Duke Energy to demonstrate that the RMRR exception does in fact apply to the projects at issue;

4. Duke Energy's Motion for Summary Judgment [Doc. # 354] is denied;

5. The April 14, 2004 Order and Judgment [Doc. #313] is vacated.

This the 28th day of July, 2010

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge