IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )
ENVIRONMENTAL DEFENSE,              )
NORTH CAROLINA SIERRA CLUB,         )
and NORTH CAROLINA PUBLIC           )
INTEREST RESEARCH GROUP,            )
                                    )
        Plaintiff-Intervenors,      )
                                    )
        v.                          )    1:00CV1262
                                    )
DUKE ENERGY CORPORATION,            )
                                    )
                                    )
        Defendant.                  )
                                    )

MEMORANDUM OPINION AND ORDER

Osteen, Jr., District Judge


I.    FACTS

    In response to Plaintiffs' motion to compel Defendant Duke

Energy to produce communications with the Utility Air Regulatory

Group ("UARG"), Duke Energy filed a cross motion for a protective

order, arguing that the requested information was irrelevant,

protected by attorney-client privilege and work product

protection, and covered by the joint defense/common interest

rule.  UARG moved to intervene[1] and, in anticipation of being

_____

    [1] UARG moved to intervene for the limited purpose of
objecting to or appealing the Magistrate Judge's April 11, 2003

allowed to intervene, also moved for a protective order, claiming that disclosure would violate UARG's First Amendment rights, and argued that the documents in question were protected by attorney-client privilege and work product protection.  In an April 11, 2003, Order (Doc. 164), an October 22, 2003, Order (Doc. 244), and a November 3, 2003, Order (Doc. 250) ("2003 Orders"), Magistrate Judge Eliason addressed both Duke Energy's and UARG's arguments.  He denied UARG's motion to intervene[2] and found that Duke Energy had attempted to establish attorney-client privilege and work product protection by offering conclusory affidavits. The Magistrate Judge observed that the affidavits of Kris W. Knudson (Senior Technical Consultant for Air Quality at Duke Power), Jim M. Holloway III (attorney with Hunton & Williams), and Jeffrey F. Cherry (attorney with Hunton & Williams), proffered by Duke Energy, failed: 1) to show that "UARG and all of its members have any common litigation interest with respect to a specific litigation or anticipated litigation"[3] or 2) to

_____

Order.  (Doc. 244 at 3.)

    [2] Although the Magistrate Judge denied UARG's motion to intervene, "out of an abundance of caution" he considered all of UARG's arguments as if they had been raised by Duke Energy. (Doc. 244 at 8.)  UARG has appealed the Magistrate Judge's denial of its motion to intervene to the Fourth Circuit.

    [3] The Magistrate Judge specifically observed that Duke Energy, through its affidavits, had failed to show that "the UARG members have agreed to proceed together to prosecute or defend a shared, specific litigation interest," to "identify a specific litigation or threat of litigation," and to show that "counsel

2

show that the "requisite common interest," necessary for the

common interest rule to apply, existed.  (Doc. 164 at 20-21.)  He

explained:

> In summary, the UARG appears to be a trade
> association/lobbying group <u>which</u> <u>at</u> <u>times</u> perhaps
> engages in litigation, but no specific litigation has
> been identified for the documents at issue.  Also, Duke
> Energy does not show that the UARG members vote or
> otherwise agree to take a specific litigation stance.
> Nor has Duke Energy shown that the communications were
> only with respect to the agreed common shared
> litigation interest.  It was incumbent upon Duke Energy
> to come forward with specific facts showing these
> matters.  Conclusory statements and ambiguous evidence
> will not satisfy that burden.

As a result, the Magistrate Judge granted Plaintiffs' motion to

compel and denied Duke Energy's motion for a protective order.

Duke Energy objected and appealed those Orders to this court.

For the reasons set forth hereafter, this court finds that the

stay of the Magistrate Judge's 2003 Orders should be lifted and

the Orders should be affirmed.

## II.  STANDARD OF REVIEW

Upon a timely objection, this court must modify or set aside

any part of a magistrate judge's order on a non-dispositive

matter that "is clearly erroneous or is contrary to law."  Fed.

R. Civ. P. 72(a).  Here, the parties agree that the Magistrate

Judge's 2003 Orders should be reviewed by this court under a

---

for Duke Energy and the UARG appear as co-counsel in litigation
or that the UARG represents Duke Energy and the other members in
any binding sort of way."  (Doc. 164 at 20.)

clearly erroneous standard.  (See Doc. 413 at 4.)  "A factual

finding is clearly erroneous when [the court is] left with the

definite and firm conviction that a mistake has been committed.

Although the contrary to law standard permits plenary review of

legal conclusions, decisions related to discovery disputes . . .

are accorded greater deference."  Stonecrest Partners, LLC v.

Bank of Hampton Roads, 770 F.Supp.2d 778, 782 (E.D.N.C. 2011)

(internal quotation marks and citations omitted).  A district

court in the Eastern District of Virginia explained,

> [M]any courts have noted that decisions of a magistrate
> judge concerning discovery disputes and scheduling
> should be afforded 'great deference.'  Indeed, the
> fact-specific character of most discovery disputes and
> the discretionary standard for resolution of discovery
> disputes under the Federal Rules suggest that
> magistrate judges ordinarily have ample discretionary
> latitude in disposition of those matters.

In re Outsidewall Tire Litigation, 267 F.R.D. 466, 470 (E.D.Va.

2010).

## III. CLAIM & ISSUE PRECLUSION

In addition to directly challenging the substance of the

Magistrate Judge's 2003 Orders under a clearly erroneous standard

of review, Duke Energy alleges that claim and issue preclusion

bar this court from lifting the stay and enforcing the Magistrate

Judge's Orders in light of a third-party subpoena enforcement

action in the United States District Court for the District of

Columbia (described further below).  Neither claim preclusion nor

issue preclusion were directly addressed by the Magistrate

4

Judge.[4]

## A. D.C. Litigation

On April 8, 2002, the United States served non-party UARG through its counsel Hunton & Williams with two subpoenas *duces tecum*, which requested documents related to cases pending in the Southern District of Ohio against Ohio Edison and in the Middle District of North Carolina against Duke Energy.[5] Both Ohio Edison and Duke Energy are UARG members. (Doc. 394-3 at 4.) At issue were 20 boxes of documents (containing approximately 3,800 documents and 74,000 pages of material). (Doc. 394-3 at 9.) UARG objected that the subpoenas were unduly burdensome, that they sought irrelevant and/or privileged information, and that production would infringe on UARG's First Amendment rights. (Doc. 394-3 at 5.)

The D.C. Magistrate Judge appointed a Special Master,

---

[4] But see Doc. 244 at 4-5 n.2 ("It should also be pointed out that the UARG's own briefing shows that the district court in the Southern District of Illinois ruled on a motion to compel documents obtained from the UARG by another power company and upheld the attorney-client privilege and work product protection. This clearly demonstrates plaintiff's argument that this Court's Order is not stare decisis, but simply involves a ruling concerning a limited number of documents.") (internal citations omitted).

[5] The United States also filed motions to compel production in Ohio Edison and the present suit, and all of the parties acknowledged that there was "most likely some overlap in the documents requested directly from Defendants in the underlying litigation, and documents requested under the subpoenas directed to UARG." (Doc. 394-3 at 5.)

selected by both parties, to determine if the documents were
protected.  Recognizing the potential for overlap in the
requested documents and those requested in the suits against Ohio
Edison and Duke Energy, the D.C. Magistrate Judge recommended
that if "the Special Master examines any documents that were
subject to the rulings by the Ohio and North Carolina District
Courts, the Special Master should defer to the rulings of those
District Courts."[6]  (Doc. 394-3 at 15-16.)  In his Report and
Recommendation, the D.C. Magistrate Judge observed that, after
the 2003 Orders, "any documents concerning UARG that are listed
on Duke's privilege log will be turned over to the Government,
unless UARG successfully intervenes in that case and its request
for reconsideration is granted."  (Doc. 394-3 at 6-7.)

   The Special Master randomly selected 227 documents to
examine; because twenty-one of these documents were subject to
the rulings in the Ohio Edison or Duke Energy cases, the Special
Master set them aside (along with six other documents, therefore
reviewing an even 200 documents).  (Doc. 368-14 at 4.)  He
recommended sustaining the claims of privilege, although there

---

[6] In response to UARG's objection that the Special Master
should defer to the Ohio Edison ruling but not the 2003 Orders,
the D.C. Magistrate Judge, finding UARG's position "tantamount to
'rule shopping,'" stated, "If the Special Master selects a
document, the privilege status of which has been ruled upon by
the *Ohio Edison* court or the *Duke Energy* court, the Special
Master will defer to the ruling of that court and randomly select
a replacement document to review."  (Doc. 394-4 at 9.)

were "several groups of documents" for which he recommended

overruling the privilege claims or claims of work product

protection.[7] (Doc. 368-14 at 6.) Because of the burden of

separating the protected and non-protected documents, however,

the Special Master explained that the court might, as "a

practical matter," decline to order production of the documents.

(Id.) Based on the D.C. Magistrate Judge's recommendation that

the Special Master's report be adopted, the district court

adopted the report and quashed the subpoenas for all 3,800

documents except for one "clearly not privileged" Prevention of

Significant Deterioration ("PSD") modification outline.

## B. Claim Preclusion (Res Judicata)

"Res judicata, also known as claim preclusion, bars a party

from relitigating a claim that was decided or could have been

decided in an original suit" and was "designed to protect

'litigants from the burden of relitigating an identical issue

with the same party or his privy and [to promote] judicial

economy by preventing needless litigation.'" Laurel Sand &

---

[7] These included: lists of future UARG meetings and meeting locations, attendance sheets from meetings, lists of UARG committee members and attorneys designated to work with those committees, and meeting agendas. (Doc. 368-14 at 6.) The Special Master also identified documents where he disagreed "in whole or part with the claims of attorney-client and/or work product" (for example documents that were publicly available), but he questioned whether "the need of the United States is great enough to outweigh the time and resources needed to cull out and disclose these documents." (Doc. 368-14 at 8.)

<u>Gravel, Inc. v. Wilson</u>, 519 F.3d 156, 161-62 (4th Cir. 2008)

(<u>quoting</u> <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326

(1979)).  The Fourth Circuit has explained,

> Generally, claim preclusion occurs when three
> conditions are satisfied: 1) the prior judgment was
> final and on the merits, and rendered by a court of
> competent jurisdiction in accordance with the
> requirements of due process; 2) the parties are
> identical, or in privity, in the two actions; and, 3)
> the claims in the second matter are based upon the same
> cause of action involved in the earlier proceeding.

<u>In re Varat Enterprises, Inc.</u>, 81 F.3d 1310, 1315 (4th Cir.

1996).  Whether two causes of action are identical for claim

preclusion purposes depends on "whether the claim presented in

the new litigation arises out of the same transaction or series

of transactions as the claim resolved by the prior judgment."

<u>Laurel Sand & Gravel, Inc.</u>, 519 F.3d at 162 (internal quotation

marks omitted).

As the proponent of claim preclusion, Duke Energy bears the

burden of establishing all of its elements.  First, Duke Energy

must establish that there was a final judgment on the merits.

Courts that have addressed the issue agree that a magistrate

judge's order, before its adoption by a district court, does not

qualify as a final judgment.[8]  Because the Magistrate Judge's

---

[8] Although the Fourth Circuit has never addressed whether a
magistrate judge's order is a final order prior to adoption by a
district court, in <u>Maryland Cas. Co. v. Armco, Inc.</u>, 822 F.2d
1348, 1355 (4th Cir. 1987), the court stated, "We decline to hold
that the recommendations of a special master, which have been
vacated, rise to the level of a 'final judgment' in order to

2003 Orders have yet to be adopted by a district court, they were not final for purposes of claim preclusion when the D.C. litigation occurred. Therefore, the D.C. litigation is the prior final judgment on the merits. See Jewish War Veterans of the United States of America, Inc. v. Gates, 506 F.Supp.2d 30, 41 (D.D.C. 2007) (referencing a line of authority that has "declined to treat a Magistrate Judge's order as final until 'the district court makes it final'"); Stripling v. Jordan Production Co., LLC, 234 F.3d 863, 868 (5th Cir. 2000) ("We conclude that the magistrate judge's order did not qualify as a final judgment, such that it would provide a preclusive collateral estoppel effect."). For purposes of claim preclusion, the order in which two actions are commenced is irrelevant. Westwood Chemical Co., Inc. v. Kulick, 656 F.2d 1224, 1227 (6th Cir. 1981) ("Where two actions involving the same issue are pending between the same parties, 'irrespective of which action or proceeding was first brought, it is the first final judgment rendered in one of the courts which becomes conclusive in the other as res judicata.'"). Therefore, it makes no difference that the 2003 Orders were actually brought and decided prior to the D.C. litigation, and Duke Energy has sufficiently established the final judgment requirement for claim preclusion.

Second, Duke Energy must establish that the parties were

estop the present litigation."

identical or in privity in the two actions.  "Persons who are not parties to an action ordinarily are not bound by the judgment in that action."  <u>Klugh v. United States</u>, 818 F.2d 294, 300 (4th Cir. 1987).[9]  Here, Duke Energy argues that the same parties are present in both suits - the EPA on one side and UARG and Duke Energy on the other side.  Plaintiffs, however, argue that the same parties are not present in both suits because the Environmental Defense, North Carolina Sierra Club, and North Carolina Public Interest Research Group, who intervened in the present suit, were not parties to the D.C. litigation.  Although Plaintiffs are technically correct, if Duke Energy successfully establishes the other elements of claim preclusion, only Plaintiff-Intervenors, and not the United States, could pursue these same discovery requests.

Third, to meet the requirements for claim preclusion, Duke Energy must establish that the claims in the second matter are based upon the same cause of action involved in the earlier proceeding.  See <u>Croskey v. United States Office of Special Counsel</u>, 132 F.3d 1480, 1997 WL 702364, at *3 (D.C. Cir. Oct. 17, 1997) (holding that res judicata did not apply to two sets of documents when both sets were part of the plaintiff's

---

[9] <u>See</u> <u>id.</u> (explaining that the doctrine of virtual representation "must cautiously be applied" only where the parties' rights are "so closely aligned in interest as to justify precluding relitigation" and there exists "at least the tacit approval of the court").

investigative file at the United States Office of Special Counsel, but they were different documents and the document sought in the plaintiff's second suit was not even in existence at the time of the plaintiff's original discovery request); <u>Wrenn v. Shalala</u>, No. 95-5198, 1995 WL 225234, at *1 (D.C. Cir. Mar. 8, 1995) ("[T]o the extent the complaint involves Freedom of Information Act ("FOIA") requests that were the subject of Wrenn's previous litigation . . . those claims are barred by the doctrine of res judicata. However, to the extent Wrenn has raised new FOIA claims that were not and could not have been litigated in that prior action . . . dismissal on res judicata grounds was not warranted.") (internal citations omitted); <u>In re Am. Tobacco Co.</u>, 880 F.2d 1520, 1527 (2d Cir. 1989) (holding that res judicata did not apply to a second set of subpoenas that were "plainly narrower" than an earlier set of subpoenas that had been quashed for being overly broad and burdensome and therefore the "two sets of subpoenas are significantly different" for purposes of preclusion); <u>Berbson v. Interstate Commerce Commission</u>, 625 F.Supp. 13, 15 (D.Mass. 1985) (holding that res judicata applied when the exact same documents were requested in an earlier and a later suit and the same basis for non-disclosure existed in both cases); <u>see also</u> <u>Westwood Chemical Co., Inc.</u>, 656 F.2d at 1227 (observing that a party was precluded under res judicata from taking the depositions of several corporate officers when a prior

court had already determined that a different set of officers were protected and "[i]n each instance, it is the construction of the same 'General Release' which denies [] the right to engage in discovery of . . . [the] officers").

Duke Energy argues, "If claim preclusion does not apply in these circumstances, the number of times UARG's privilege could be subject to re-litigation would be limited only by the number of UARG members EPA could subpoena." (Doc. 368 at 13.) Plaintiffs, however, argue that Duke Energy's preclusion arguments fail because the D.C. litigation "involved a different dispute over a different set of documents."[10] (Doc. 373 at 5.) The D.C. litigation addressed discovery that the D.C. Plaintiffs sought from UARG in separate suits against Duke Energy, Ohio Edison Co., Cinergy Corp., and American Electric Power Service Corp., totaling approximately 3,800 documents. The Magistrate Judge's 2003 Orders, in contrast, addressed 285 documents, two of which were found to be protected, that Plaintiffs sought directly from Duke Energy. (Doc. 373 at 9.) Because the D.C. Special Master never examined any of the 285 documents requested in this case, Duke Energy cannot establish that claim preclusion

---

[10] Plaintiffs make the additional argument that even if the D.C. litigation and the 2003 Orders had involved the same documents, the D.C. Plaintiffs' voluntary dismissal in the D.C. suit means that enforcement of the 2003 Orders would not be barred.

applies.[11]

## C. ISSUE PRECLUSION (COLLATERAL ESTOPPEL)

Duke Energy also claims that issue preclusion applies in this case. Issue preclusion, also known as collateral estoppel, bars "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 748-49 (2001)). For issue preclusion to apply, the proponent, in this case Duke Energy, must establish that

> (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue must have been actually determined in the prior proceeding; (3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment must be final and valid; and (5) the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum.[12]

---

[11] Additionally, even assuming that the 285 documents requested in this case were examined by the D.C. Special Master, some ambiguity remains as to the full extent to the record before the D.C. Special Master on which he based his findings of privilege and work-product protection.

[12] Because none of the Plaintiff-Intervenors in this suit were parties in the D.C. litigation, they never had "a full and fair opportunity to litigate the issue in the previous forum," and therefore should not be precluded from relitigating any of the four issues Duke Energy claims are precluded. See Ritter v. Mount St. Mary's College, 814 F.2d 986, 994 (4th Cir. 1987) ("[E]xtension of the doctrine of collateral estoppel to situations not involving the identical parties to the prior suit

13

Sedlack v. Braswell Servs. Group, 134 F.3d 219, 224 (4th Cir. 1998). Issue preclusion is a "judge-made rule, capable of flexible interpretation to serve the interests of judicial economy by preventing needless relitigation. This flexibility is constantly limited by the overriding principle that the courts should protect a litigant's right to a full and fair opportunity to litigate his claims." Ritter v. Mount St. Mary's College, 814 F.2d 986, 994 (4th Cir. 1987); see also E.E.O.C. v. Morgan Stanley & Co., Inc., 132 F.Supp.2d 146, 159 (S.D.N.Y. 2000) ("At the outset, there is reason to doubt that issue preclusion could ever apply in connection with the intensely fact-specific and discretionary balancing of the equities involved in determining the desirability of a protective order with respect to two different subpoenas.").

According to Duke Energy, issue preclusion applies to four issues decided in the D.C. litigation: 1) that UARG, an unincorporated association, is entitled to attorney-client privilege over communications with its counsel, Hunton & Williams, regarding the New Source Review ("NSR") requirements of the Clean Air Act; 2) that the privilege covering UARG's communications with Hunton & Williams has not been waived by Hunton & Williams' direct communications with UARG's

---

has rightly been undertaken with great caution.")

approximately fifty members; 3) that documents prepared by UARG's
counsel about NSR regulations (like those at issue in the present
discovery dispute) are protected from discovery by attorney-
client privilege; and 4) that documents prepared by UARG's
counsel regarding EPA rulemaking under the Clean Air Act (like
those at issue in the present discovery dispute) were prepared in
anticipation of litigation for purposes of work product
protection.  (Doc. 368 at 13-14.)

As the proponent of issue preclusion, Duke Energy bears the
burden of establishing all of its elements.  Duke Energy,
however, fails to meet its burden of showing that the issues, and
the requested documents, are identical in both the D.C.
litigation and the Magistrate Judge's 2003 Orders.  With regard
to Duke Energy's first claim of preclusion, that UARG is entitled
to attorney-client privilege, the Magistrate Judge's 2003 Orders
never held that UARG was not capable of having an attorney-client
privilege with Hunton & Williams, but simply held that Duke
Energy had failed to meet its burden of establishing privilege in
this instance.  Therefore, the issue of whether or not UARG could
hold attorney-client privilege is not disputed.  Furthermore,
Duke has failed to show that the record before the D.C. Special
Master is the same as that before the Magistrate Judge in this
case.

With regard to Duke Energy's second claim of preclusion,

Plaintiffs argue that issue preclusion does not apply to its waiver argument because the D.C. Magistrate Judge, Special Master, and district court never addressed whether UARG had waived any privilege by sharing documents among its members. (Doc. 373 at 13.) Duke Energy, however, argues that the entire waiver discussion in the Magistrate Judge's 2003 Orders "stems from [the] erroneous conclusion of law that an organization like UARG has no privilege." (Doc. 368 at 15.) According to Duke Energy, the "EPA cannot avoid issue preclusion by making waiver arguments that could have been made in the DC Court." (Doc. 368 at 16.) As stated above, however, the Magistrate Judge never found that UARG had no privilege - he simply found that Duke Energy had failed to meet its burden of establishing this privilege.

Finally, with regard to Duke Energy's third and fourth claims of preclusion, both of which involve documents prepared by UARG's counsel, Duke Energy cannot establish the documents are precluded because the D.C. Special Master never examined any of the documents addressed in the Magistrate Judge's 2003 Orders.[13]

---

[13] Duke Energy, while observing that "[o]ne purpose of issue preclusion is to avoid inconsistent results," argues that it would have been impossible for the D.C. Special Master to apply deference to the earlier decisions in both Duke Energy and Ohio Edison, because six documents it examined appeared in the privilege logs in both cases, with the Ohio Edison court determining that privilege applied and the Duke Energy court determining that privilege did not apply. (Doc. 368 at 17 and n.11.)

Determining whether issue preclusion applies to the Magistrate

Judge's 2003 Orders requires determining whether or not the two

sets of discovery documents are "essentially identical."  See

McQueen v. United States, 264 F.Supp.2d 502, 514 (S.D. Tex. 2003)

(refusing to apply claim preclusion to requests for information

that "may not be essentially identical"); Nat'l Treasury

Employees Union v. Internal Revenue Serv., 765 F.2d 1174, 1178

n.7 (D.C. Cir. 1985) (finding that issue preclusion applied when

the parties stipulated that the allegedly privileged information

deleted on a second form, which was identical to the first form

except for the date, was of the "same kind" ordered redacted from

the earlier form).

    In In re Subpoena Duces Tecum Issued to Commodity Futures

Trading Comm'n, 439 F.3d 740 (D.C. Cir. 2006), a plaintiff sought

a series of documents addressing the Commodity Futures Trading

Commission's investigation of and settlement with the defendant.

When the defendant withheld some documents, claiming they were

privileged, the plaintiff moved to compel disclosure and a

magistrate judge found that the withheld documents were

protected.  Id. at 742.  The plaintiff then served the Commission

with a third-party subpoena to produce the defendant's documents

in its possession.  The defendant objected and argued that the

plaintiff was collaterally estopped by the magistrate judge's

prior ruling.  The district court, however, granted the

plaintiff's motion to compel, and the D.C. Circuit affirmed.  <u>Id.</u>

The D.C. Circuit held that the magistrate judge's finding of privilege was not entitled to preclusive effect under the principle of collateral estoppel.[14]  It explained that the defendant had failed to meet its burden of showing that the same documents were being contested in both suits.  <u>Id.</u> at 747.  The D.C. Circuit reasoned that neither the court in the prior suit nor the court in the subsequent suit "appear[ed] to have examined the withheld documents or the privilege log" and "[t]hus [the defendant] has been unable to show that the specific documents [the plaintiff] seeks in the D.C. district court already have been determined to be privileged by the Magistrate."  <u>Id.</u> According to the D.C. Circuit, "This court is not in a position to determine with confidence that the withheld documents ruled by the Magistrate to be protected . . . are the same documents [the defendant] sought to have withheld in the D.C. district court proceedings."[15]  <u>Id.</u>

In <u>In re Subpoena</u>, the D.C. Circuit found that the defendant

_____

[14] <u>See</u> <u>id.</u> at 746 (refusing to address whether a magistrate's order could be a final order for purposes of collateral estoppel and instead "[a]ssuming finality").

[15] <u>Id.</u> at 748 ("The Magistrate's Order does not address whether [the documents at issue] were included within the scope of its ruling," and "[h]ence, nothing on the record before this court shows with a reasonable degree of certainty that the privilege found by the Magistrate reached the eight sets of documents at issue in the D.C. district court").

failed to establish the elements of collateral estoppel when it did not demonstrate that the two orders specifically addressed the same documents.  Here, it remains unclear how many of the documents that Plaintiffs seek from Duke Energy overlap with the 20 boxes of documents from the D.C. litigation.  It is clear, however, that the D.C. Special Master purposefully did not examine any of the documents sought in either the <u>Ohio Edison</u> or the <u>Duke Energy</u> suits.  (Doc. 373 at 9.)  As Plaintiffs argue, "The only thing that can be said with certainty about the two document sets is that they both contain UARG documents, and that none of the documents subject to the 2003 discovery orders were reviewed by the DC Court."  (Doc. 373 at 10 n.5.)  Because the documents requested by Plaintiffs in the present suit were never examined by the Special Master in the D.C. litigation, Duke Energy cannot meet its burden of showing that the issues in the two cases are essentially identical for purposes of claim preclusion.[16]  Additionally, the Special Master and D.C. court's concern with the extremely burdensome nature of complying with the discovery requests (20 boxes of material) is not applicable here – where Plaintiffs have already received and returned the

_____

[16] Plaintiffs further argue, "Even assuming that the special master's privilege determinations were correct, Duke has made no showing that the types of materials found by the special master to be privileged included the general PSD updates, summaries, and explanation of regulatory interpretations at issue in this case." (Doc. 394 at 13.)

283 "non-protected" documents.[17]

## IV.  RELEVANCE

In addition to its allegations of claim and issue
preclusion, Duke Energy also claims that the requested documents
are irrelevant and protected by attorney-client privilege, the
common interest rule, and work product protection.

"For good cause, the court may order discovery of any matter
relevant to the subject matter involved in the action.  Relevant
information need not be admissible at the trial if the discovery
appears reasonably calculated to lead to the discovery of
admissible evidence."  Fed. R. Civ. P. 26(b)(1).  The Fourth
Circuit has stated that "deposition-discovery rules are to be
accorded a broad and liberal treatment."  Ralston Purina Co. v.
McFarland, 550 F.2d 967, 973 (4th Cir. 1977).  According to the
North Carolina District Court in Spell v. McDaniel,

> Rules 26 through 37 of the Federal Rules have been
> interpreted liberally to allow maximum discovery.  It
> is clear that what is relevant in discovery is far
> different from what is relevant at trial, in that the

---

[17] Plaintiffs point out that the D.C. Court quashed the
United State's subpoenas with respect to 3,600 documents that the
Special Master never even reviewed – not based upon privilege
evaluations (since none were made) but "presumably [based on] the
same 'burden' concerns that caused the special master to
recommend against segregating non-privileged portions of the 200
documents that he did review."  (Doc. 373 at 13.)  The discovery
requests in this case involve only 283 documents, making these
same burden concerns inapplicable.

> concept at the discovery [stage] is much broader.
> Discovery is designed to define and clarify the issues.
> If requested materials are reasonably calculated to
> lead to discovery of admissible evidence, the discovery
> request is relevant.  Therefore, discovery requests
> should be complied with if there is a reasonable
> possibility that the information sought may be relevant
> to the subject matter of the action.

591 F.Supp. 1090, 1114, 40 Fed.R.Serv.2d 508 (E.D.N.C. 1984)

(internal citations omitted).  "Furthermore, the burden of

showing that the requested discovery is not relevant to the

issues in the case is on the party resisting discovery." Flora

v. Hamilton, 81 F.R.D. 576, 578, 26 Fed.R.Serv.2d 783 (M.D.N.C.

1978).  Therefore, Duke Energy bears the burden of showing that

the requested discovery is not relevant as that term applies in

discovery.

In its attempt to meet this burden, Duke Energy argues that

Duke Energy's or UARG's subjective understanding of the

regulations at issue cannot show that the Government provided

fair notice of its interpretation of the disputed regulation.  In

contrast, Plaintiffs argue that the documents are relevant to

potentially shed light on Duke Energy's defense that it did not

receive fair notice of the EPA's interpretation of the

regulations.  (Doc. 164 at 4.)

Duke Energy cites United States v. Ohio Edison Co., 2002 WL

1585597 (S.D.Ohio July 11, 2002), in support of its argument.  In

Ohio Edison, however, an Ohio district court found that

information regarding Ohio Edison's interpretation of the EPA's regulations was in fact relevant, but some of this information was inadmissible because it was protected by attorney-client privilege.  The court explained,

> The Court assumes that information which Ohio Edison learned about the interpretation of these regulations from sources other than its own attorneys, even if those sources were not the EPA, has been disclosed. For discovery purposes, that type of information meets the broad relevance test set forth in Fed.R.Civ.P. 26(b) even if the District Judge ultimately determines that it is only the agency's official pronouncements which "count" with respect to the defenses raised.

Id. at *6.

Plaintiffs and the Magistrate Judge cite United States v. Hoechst Celanese Corp., 128 F.3d 216 (4th Cir. 1997), in which the Fourth Circuit explained that minutes from a defendant company's meeting supported the conclusion that the EPA's communications not only should have but actually did put the company on notice of the EPA's interpretation.  Id. at 229 ("It is well established that 'even if the agency has not given notice in the statutorily prescribed fashion, actual notice will render that decision harmless.'")  Furthermore, Plaintiffs cite Fluor Constructors, Inc. v. Occupational Safety and Health Review Comm'n, 861 F.2d 936, 940-42 (6th Cir. 1988), for the proposition that a common understanding in the industry may constitute constructive notice of a regulation's interpretation.  Id. at 942

(finding that the defendant had received sufficient notice to satisfy the Due Process clause when the "common understanding in the construction industry" provided clarity about an OSHA regulation).

This court, in light of the Fourth Circuit's opinion in Hoechst, considering the minutes of a company's meeting in its analysis of notice, as well as the Ohio district court's opinion in Ohio Edison, finding the communications between UARG and Ohio Edison to be relevant, holds that Duke Energy has failed to meet its burden of establishing that the Magistrate Judge was clearly erroneous in finding the discovery at issue to be relevant. As the Magistrate Judge observed in his Orders, "It is important to remember that the Court is not deciding the admissibility of evidence [for trial purposes], but rather need only determine whether the proposed evidence 'is relevant to the claim or defense of any party.'" (Doc. 164 at 6 (quoting Fed. R. Civ. P. 26(b)(1)).)

## V. ATTORNEY-CLIENT PRIVILEGE

As the proponent of attorney-client privilege, Duke Energy bears the "burden of persuasion as to *each* element of the privilege." Santrade, Ltd. v. Gen. Elec. Co., 150 F.R.D. 539, 542 (E.D.N.C. 1993) (quoting Republican Party of North Carolina v. Martin, 136 F.R.D. 421, 426 (E.D.N.C. 1991)). Attorney-client privilege only applies if:

> (1) the asserted holder of the privilege is or sought
> to become a client; (2) the person to whom the
> communication was made (a) is a member of the bar of a
> court, or his subordinate and (b) in connection with
> the communication is acting as a lawyer; (3) the
> communication relates to a fact of which the attorney
> was informed (a) by his client (b) without the presence
> of strangers (c) for the purpose of securing primarily
> (i) an opinion of law or (ii) legal services or (iii)
> assistance in some legal proceeding, and not (d) for
> the purpose of committing a crime or tort; and (4) the
> privilege has been (a) claimed and (b) not waived by
> the client.

North Carolina Elec. Membership Corp. v. Carolina Power & Light

Co., 110 F.R.D. 511, 513 (M.D.N.C. 1986).

The Fourth Circuit has explained that attorney-client

privilege, while it has a "venerable pedigree," remains

"inconsistent with the general duty to disclose and impedes the

investigation of the truth." United States v. Under Seal, 748

F.2d 871, 875 (4th Cir. 1984). Therefore, this privilege "must

be strictly construed." Id.

> Any disclosure inconsistent with maintaining the
> confidential nature of the attorney-client relationship
> waives the attorney-client privilege. Any voluntary
> disclosure by the client to a third party waives the
> privilege not only as to the specific communication
> disclosed, but often as to all other communications
> relating to the same subject matter.

United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982).

Duke Energy argues that the Magistrate Judge based his 2003

Orders on a "fundamental misunderstanding" that UARG could not

have attorney-client privilege. (Doc. 367-3 at 4.) This

24

statement oversimplifies the Magistrate Judge's findings, however, which directly, although briefly, rejected Duke's "unsupported" argument that the court should "treat the UARG as if it were a corporation so that all communications among members would be as between officers of a corporation" before addressing the question of whether UARG and its members met the requirements for the joint defense/common interest rule.  (Doc. 164 at 10.) (See Doc. 244 at 14-15 ("In requesting reconsideration, the UARG again asserts that it and its members should be viewed as being one entity so that legal matters of one member become legal matters of the other members with respect to attorney-client privilege and work product protection.  The Court previously rejected that argument.").)

When a client is an unincorporated association, establishing privilege becomes more complex.  See Reed v. Baxter, 134 F.3d 351, 357 (6th Cir. 1998) ("[T]here is little authority about which agents of an organizational client are the client for purposes of the attorney-client privilege.")  Duke Energy argues, "Because UARG is not a natural person, no communication from H&W [Hunton & Williams] could go to the client without going to the UARG members."  (Doc. 367-3 at 10.)  This statement is overly broad, however, because Hunton & Williams could presumably communicate with representatives of UARG without communicating with the power companies and trade associations that make up its

membership.  In <u>Bell v. Ivory</u>, cited by Duke Energy, a district court found that communications between the chair of an organization's board of directors and the organization's attorney were likely privileged but did not actually address wider dissemination of information among regular members.  966 F.Supp. 23, 32 n.19 (D.D.C. 1997) ("Of course, Spielberg [the organization's attorney] and IIJP [the special interest organization] had an attorney-client relationship.  Accordingly, any information passed on to Spielberg by Harvey in her role as chair of IIJP's Board of Directors would likely be subject to the attorney-client privilege.")  Contrary to Duke's argument, <u>Bell</u> suggests that to remain privileged, the communication should be evaluated with regard to the organizational structure as opposed to the membership structure.

Some district courts have found communications between an unincorporated association and its members to be privileged.  <u>See</u> <u>Schwartz v. Broadcast Music, Inc.</u>, 16 F.R.D. 31, 32-33 (S.D.N.Y. 1954) ("Each individual member of the [unincorporated] association is a client of the association's lawyer.  If, therefore, the conversation was one in which plaintiff Moore was seeking Mr. Finklestein's legal advice and if the communications were confidential, plaintiff Moore may properly invoke privilege."); <u>United States v. American Radiator & Standard</u> <u>Sanitary Corp.</u>, 278 F. Supp. 608, 614 (W.D.Pa. 1967) (finding

that an attorney-client relationship existed between an association's counsel and a corporation that was a member of the association and refusing to determine whether an attorney-client relationship existed between the association's counsel and an employee or officer of the client corporation).

In <u>United States v. Am. Society of Composers, Authors and Publishers ("ASCAP")</u>, 129 F.Supp. 2d 327, 337 (S.D.N.Y. 2001), however, a New York district court explained that the "mere status of being a member of an unincorporated association no longer makes one a client of the association's attorneys." <u>See Willig, Williams & Davidson v. Walters</u>, 1993 WL 224723, at *3 (E.D.Pa. June 22, 1993) (explaining that pursuant to the entity theory of representation, "an attorney who represents an organization does not *automatically* represent its individual members. A case by case review on the representation issue is appropriate"); <u>City of Kalamazoo v. Michigan Disposal Serv.</u>, 151 F.Supp.2d 913, 917-18 (W.D.Mich. 2001) (finding that the attorney for a joint defense group had an attorney-client relationship with each of the members of the group because "unlike the typical union or trade association, the association at issue here was not an ongoing concern but rather was formed by a group of defendants for the limited purpose of presenting a joint defense on issues common to the defendants" and "existed solely within the confines of [the specific litigation] and had no existence or purpose

apart from the litigation"). The general issue in <u>ASCAP</u> was conflict of interest, not attorney-client privilege, and the court addressed whether ASCAP's counsel could defend ASCAP in a suit brought by one of its members.[18] <u>ASCAP</u>, 129 F.Supp. at 337-38. In fact, in <u>ASCAP</u>, the district court acknowledged that "ASCAP has even conceded that 'ASCAP's general counsel is the attorney for each of ASCAP's members for purposes of invoking the attorney-client privilege against a third party, where a member has requested association-related legal advice.'" <u>Id.</u> at 337.

In <u>Robinson v. Texas Auto. Dealers Ass'n</u>, 214 F.R.D. 432 (E.D.Tex. 2003), <u>vacated in other part</u>, 2003 WL 21911333 (5th Cir. 2003), a Texas district court examined communications between chief counsel for the Texas Automobile Dealers Association ("TADA") and TADA members, ultimately determining that TADA had failed to establish the existence of attorney-client privilege. The district court rejected the holdings in <u>Schwartz v. Broadcast Music</u> and <u>United States v. American Radiator</u> (above), explaining that "such a blanket rule does not

---

[18] The New York district court considered a variety of factors, including: "the nature of disclosures to the attorney; the member's expectations of the attorney; the reasonableness of those expectations; whether the attorney had affirmatively assumed a duty to represent the member; whether the member had independent representation; whether the attorney represented the member prior to representing the association; and whether the member relied upon the attorney's representation of its individual interest . . . [t]he size of the association can also be a factor in assessing the reasonableness of the member's expectations." <u>Id.</u> at 338.

adequately consider the variability in the character of trade associations and their relationships with their members." Id. at 451. Instead, the court reasoned, "[W]hile members of a trade association may certainly establish an attorney-client relationship with the trade association's attorney(s), it must be determined on a case-by-case basis whether those members actually took the necessary action to do so." Id. at 452.

In Robinson, the Texas district court explained, "Absent some showing that all TADA members intended to make Karen Coffey [TADA's attorney] their attorney, other than joining the TADA and receiving mailings, Defendants have failed to carry their burden of establishing that all TADA members were Coffey's clients." Id. at 453. The district court found that the defendants' evidence that Coffey had sent members of TADA information about litigation that they may or may not have participated in, that Coffey believed that all TADA members considered her to be their attorney, and that some of the TADA members believed her to be their attorney, to be "facially insufficient" to establish attorney-client privilege.[19] Id. at 452. The court emphasized

---

[19] The Texas district court explained, "Examples of the type of evidence that might satisfy that burden would include a provision in the TADA membership agreement or other literature which indicates that membership in TADA creates an attorney-client relationship, discussions between Coffey and TADA members regarding the creation of such a relationship, or written agreements such as engagement or authorization letters signed by individual TADA members." Id. at 452.

that it remained the defendants' burden, as the proponents of the
privilege, to establish that "each TADA member who received these
communications was Coffey's client or sought to become her client
at the time the communication occurred." _Id._ at 453 (expressing
concern that "many of the recipients [of the communications at
issue] had, at the time the communications were sent, failed to
return a requested 'authorization' to be represented by TADA and
failed to make requested contributions to the TADA Legal Defense
Fund"); see also, United States v. Exxon Corp., 87 F.R.D. 624,
638 (D.D.C. 1980) ("Wide dissemination does indicate a likelihood
that the communication was not confidential, though it is surely
not determinative. . . . Accordingly, the court will consider
dissemination as one factor in any decision concering specific
documents.") (internal citation omitted).

Both the Southern District of Illinois and the Southern
District of Ohio (as well as the D.C. court - as addressed above)
have found the communications between UARG and its members to be
privileged.  In United States v. Illinois Power Co., the district
court explained, "No one denies that UARG and its members
possessed an expectation of privacy in the information provided
by Hunton & Williams, so that requirement is met.  Production of
the documents would, at the very least, reveal the kinds of
subjects upon which UARG members sought legal advice."  2003 WL
25593221, at *3 (S.D.Ill. April 24, 2003).  Unfortunately, it is

unclear from the district court's opinion whether it considered UARG and its members to be one client for purposes of privilege or whether it applied the joint-defense/common-interest rule.[20]

Id. at *3-*4. The court found that

> the requested documents were distributed to a defined
> group of recipients - the member companies of UARG.
> These companies were likely all concerned with the same
> issue of how the EPA was interpreting regulations and
> rulings, and together as UARG sought legal advice on
> these matters. There was no waiver of privilege
> through disclosure to third parties because UARG's
> members were joined in a common interest in current and
> potential litigation.

Id. at *4. Thus, the district court found the communications to be both privileged and protected by the joint defense/common interest rule, despite dissemination among members. The Seventh Circuit, however, unlike the Fourth Circuit, has explicitly stated that no "threat of litigation" is required for the common interest rule to apply.

In United States v. Ohio Edison Co., an Ohio district court explained,

> There is no dispute that Hunton & Williams is legal
> counsel to UARG and may be consulted by UARG members
> for legal advice on issues which are common to some or
> all of the members. There is also no dispute that
> Hunton & Williams authored 39 of the 40 documents at

---

[20] In Illinois Power Co., the United States had argued that the "supposed presence of other companies at meetings of UARG destroys confidentiality by the 'wide distribution' of the requested documents, or in the alternative, that such companies are not engaged in a joint defense." Id. at *4.

> issue.  Further, it is apparent that issues relating to
> whether UARG members are in compliance with federal
> environmental regulations and whether those regulations
> apply to specific projects being considered by the
> members are matters about which legal advice can
> properly be rendered.  Given these undisputed matters,
> the only remaining issue is whether there is enough
> evidence from which the Court can conclude that, in
> these documents, Hunton & Williams actually rendered
> protected legal advice.

Opinion and Order, <u>United States v. Ohio Edison Co.</u>, No. C2-99-

1181 at 5 (S.D. Ohio Jan. 6, 2003).  While acknowledging that

Ohio Edison's affidavit stated "in a rather conclusory fashion

that UARG documents 'contain or reflect confidential attorney-

client communications,'" the district court concluded that Ohio

Edison had presented sufficient evidence to establish privilege.

<u>Id.</u>  The court explained that the most significant question was

"whether communications initiated by Hunton & Williams occurred

in response to a request of legal advice from UARG or any of its

members."  <u>Id.</u>  "[T]hese communications from Hunton & Williams

would at least arguably reveal client confidences, including the

types of subjects about which the UARG members sought legal

advice."  <u>Id.</u> at 8.  In <u>Ohio Edison</u>, the Ohio district court

accepted, without discussing, the idea that UARG and its members

were clients of Hunton & Williams for purposes of attorney-client

privilege.  Therefore, the court did not elaborate on whether the

privilege had been waived by dissemination among UARG's

members.[21]

In contrast to the courts in <u>Illinois Power</u> and <u>Ohio Edison</u>, the Magistrate Judge in this case found that Duke Energy had failed to establish the existence of attorney-client privilege. (<u>See</u> Doc. 164 at 10; Doc. 244 at 14-15.)  As stated above, Duke Energy, as the proponent of attorney-client privilege, bears the burden of persuasion as to each element of the privilege.  In <u>Byrnes v. Jetnet Corp.</u>,[22] a district court for the Middle District of North Carolina explained, "It is incumbent upon the proponent [of the privilege] to specifically and factually support his claim of privilege, usually by affidavit, to satisfy this burden, and an improperly asserted privilege is the equivalent of no privilege at all."[23]  111 F.R.D. 68, 71

---

[21] Instead, the court's sole discussion of waiver occurs in a single paragraph where the court concludes that the privilege has not been waived because of the single unauthorized disclosure (in violation of UARG's guidelines) of a memo to non-members of UARG in 1989.  <u>Id.</u> at 9.

[22] Magistrate Judge Eliason was the Magistrate Judge in both the Order in <u>Byrnes</u> and the 2003 Orders at issue.

[23] The court explained that the proponent of the privilege must

> disclose the identity and position of all in attendance at the joint meetings, and [] establish that the meetings were, in fact, between attorneys and their respective "corporate clients," as opposed to simply witnesses. . . .  [and] explicitly define the nature and scope of the interest (identical or merely similar) it allegedly has in common with [the other parties] and specify the extent any legal interests overlapped with commercial interests or other conversations.

(M.D.N.C. 1986) (finding that the court could not determine whether attorney-client privilege existed because the proponent of the privilege had failed to establish "the necessary factual predicate").  In Byrnes, the district court found that the proponent's reliance on "counsel's conclusory allegation" that the communications in question were based on common interests and were thus privileged was "clearly insufficient" to establish attorney-client privilege.  Id. at 72; see also Brown v. American Partners Federal Credit Union, 183 N.C.App. 529, 536-37, 645 S.E.2d 117, 123 (2007).  Here, like in Byrnes, Duke Energy offered affidavits with conclusory allegations.  The Magistrate Judge's holding, that those facts failed to establish the existence of attorney-client privilege, is not clearly erroneous.

## VI.   JOINT DEFENSE OR COMMON INTEREST RULE

The Fourth Circuit recognizes an exception to waiver of attorney-client privilege in the joint defense rule, now "more properly identified as the 'common interest rule.'"[24]  In re Grand Jury Subpoenas 89-3 and 89-4, 902 F.2d 244, 249 (4th Cir.

---

Id. at 71-72.

[24] Although originally limited to the context of criminal co-defendants, the joint defense/common interest rule has been expanded to the civil context because "[t]he need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter."  Under Seal, 902 F.2d at 248-49.

1990) (quoting United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989)).  Although not a privilege in and of itself, the rule applies to material covered by attorney-client privilege and work product protection.  Id.  According to the Fourth Circuit,

> Whether an action is ongoing or contemplated, whether the jointly interested persons are defendants or plaintiffs, and whether the litigation or potential litigation is civil or criminal, the rationale for the joint defense rule remains unchanged: persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims.

Id.

Despite the Fourth Circuit's elaboration on and even expansion of the rule, litigation remains a central component.[25] The Fourth Circuit referred to "ongoing or contemplated" actions, "defendants or plaintiffs," "litigation or potential litigation," and a "common interest in litigation."  Id.  As a district court for the Eastern District of Virginia observed,

> In every case cited by the Fourth Circuit to support its broad reading of the privilege in Under Seal, both parties claiming the common interest privilege were involved in some type of litigation.  It is true that the prospect for litigation could be so remote that it involved 'potential co-parties to prospective

---

[25] The Fourth Circuit warned against promoting form over substance when applying the joint defense rule and explained that the underlying rationale of the rule "focuses not on when documents were generated, but on the circumstances surrounding the disclosure of privileged documents to a jointly interested third party."  Id. at 249.

litigation,' but the prospect of litigation still had
to be there.

Fed. Election Comm'n v. Christian Coal., 178 F.R.D. 61, 73

(E.D.V.A. 1998) (internal citations omitted), aff'd in part and

modified in part, 178 F.R.D. 456 (E.D.Va. 1998).

In United States v. Aramony, the Fourth Circuit explained,

"To be entitled to the protection of this [joint defense]

privilege the parties must first share a common interest about a

legal matter.  But it is unnecessary that there be actual

litigation in progress for this privilege to apply."[26]  88 F.3d

1369, 1392 (4th Cir. 1996) (internal citations omitted); see also

Sheet Metal Workers Int'l Ass'n. v. Sweeney, 29 F.3d 120, 124

(4th Cir. 1994).  The Fourth Circuit in Aramony held that the

joint defense rule did not protect a defendant's communications

with his employer's attorneys because he and his employer

"clearly did not share a common interest about a legal matter"

despite the defendant's claims that he and his employer shared a

common strategy, which included investigating and preparing

defenses to accusations against the defendant, "with respect to

---

[26] See Hanson v. United States Agency for Int'l Dev., 372
F.3d 286, 292 (4th Cir. 2004) ("[T]he common interest doctrine
applies when two or more parties consult or retain an attorney
concerning a legal matter in which they share a common interest.
In this context the communications between each of the clients
and the attorney are privileged against third parties, and it is
unnecessary that there be actual litigation in progress for this
privilege to apply.") (internal citations omitted).

the press inquiries and any potential litigation to which the press reports could give rise." <u>Aramony</u>, 88 F.3d at 1392. The Fourth Circuit explained,

> The development of defenses to allegations against Aramony simply is not a legal matter concerning UWA. Although these defenses could help preserve UWA's reputation, the preservation of one's reputation is not a legal matter. If the allegations concerning Aramony could have subjected UWA to civil or criminal liability, Aramony's claim would be stronger. But, because Aramony has not shown how UWA would be affected (apart from the stain of its reputation) by the allegations concerning him, the joint defense privilege is inapplicable here.

<u>Id.</u>

The Fourth Circuit, while acknowledging that "it is unnecessary that there be actual litigation in progress for this privilege to apply," has not clarified how attenuated the prospect of litigation can be for the common interest rule to still apply. <u>Aramony</u>, 88 F.3d at 1392. The cases where the Fourth Circuit has recognized a common interest privilege, however, have all involved existing or at least pending litigation. <u>See</u> <u>In re Grand Jury Subpoenas 89-3 and 89-4</u>, 902 F.2d 244 (joint prosecution of a claim and joint defense of a counterclaim); <u>Hanson v. United States Agency for Int'l Dev.</u>, 372 F.3d 286 (4th Cir. 2004) (construction dispute); <u>see also</u> <u>In Re Grand Jury Subpoena: Under Seal</u>, 415 F.3d 333, 341 (4th Cir. 2005) (affirming the district court's refusal to apply the joint

defense privilege prior to the time the parties actually cooperated in a common defense, when there was no joint-defense agreement, no evidence that the parties were pursuing a common legal strategy, one party was in the "early stages of its internal investigation," and interviews with the proponent of the privilege were to "gather information" rather than to "formulat[e] a joint defense"); <u>Fed. Election Comm'n</u>, 178 F.R.D. at 73 (finding the common interest rule did not apply when the record showed no evidence "*any* actual, contemplated, or prospective litigation" at the time the privileged information was shared and the third party was involved in the litigation only to the extent that he supplied information to prepare for an IRS audit, he did not receive any benefit from the shared information, and he was not "directly" effected by the outcome of the litigation); <u>Front Royal Ins. Co. v. Gold Players, Inc.</u>, 187 F.R.D. 252, 258 (W.D.Va. 1999) ("While the Fourth Circuit has recognized this common interest rule, it appears that the Fourth Circuit cases recognizing this rule have all involved privileged materials which were shared with parties which were directly involved in litigation.") (internal citations omitted).

The Fourth Circuit most recently addressed the subject of the common interest rule in <u>Hunton & Williams v. United States Dep't of Justice</u>, 590 F.3d 272 (4th Cir. 2010), within the context of a suit under the Freedom of Information Act

("FOIA").[27]   The Fourth Circuit explained, "The common interest

doctrine requires a meeting of the minds, but it does not require

that the agreement be reduced to writing or that litigation

actually have commenced."   Id. at 287.   The court distinguished

between an agreement to undertake a joint legal strategy and an

"agreement to exchange information in order to make an

assessment."[28]   Id. at 285.   According to the Fourth Circuit,

> First, although a common interest agreement can be
> inferred where two parties are clearly collaborating in
> advance of litigation, mere "indicia" of joint strategy
> as of a particular point in time are insufficient to
> demonstrate that a common interest agreement has been
> formed.   Second, it is not clear that the particular
> "indicia" identified by the district court [that the
> parties "agreed to exchange declarations, other
> proposed pleadings, and their views on issues relating
> to the effect of any injunction"] pointed to an actual
> common interest agreement, as opposed to a mere
> confidentiality agreement.

Id. at 284-85.   Furthermore, the fact that the parties later

concluded that they shared each other's interest failed to shield

"communications between the two before that decision was made."

Id. at 286.

_____

   [27] While the Fourth Circuit elaborated on the proper use of
the rule, it also referred to the "judicial skepticism that FOIA
demands," making it unclear whether the same level of scrutiny
would be applied to contexts outside of the FOIA.   Id. at 287.

   [28] The Fourth Circuit explained, "While agreement need not
assume a particular form, an agreement there must be.   If RIM was
simply approaching DOJ over the prospect that there might one day
be a joint litigation effort, such contacts and discussions seem
too preliminary to remove from disclosure under Exemption 5 [of
the FOIA]."   Id. at 285.

In <u>Hunton & Williams</u>, the Fourth Circuit observed that,
based on the fact that the attorney representing DOJ "routinely"
created common interest agreements, his delay in creating a
written common interest agreement may have indicated that DOJ had
not yet made a final decision about becoming involved in the
litigation.  <u>Id.</u> at 286.  Here, although UARG and its members'
failure to create a written common interest agreement is not
dispositive, it may indicate that no such agreement existed.
According to the Fourth Circuit, the fact that two or more
parties may have different motivations for pursuing their common
interest is irrelevant in determining whether the common interest
rule applies.  <u>Id.</u> at 282-83.  The court explained that

> the agreement between RIM and DOJ . . . makes it clear
> that RIM and DOJ had committed to working together to
> achieve that goal. . . .  It does not matter that RIM
> was motivated by the commercial benefit that would
> accrue to it if it succeeded in opposing the BlackBerry
> injunction while the government was motivated by
> concern for the public interest.  What matters is that
> there was a unity of interest in preserving a non-
> disruptive pattern of governmental BlackBerry use, and
> RIM and DOJ could rely on one another's advice, secure
> in the knowledge that privileged communications would
> remain just that.

<u>Id.</u> at 282-83.  "A fair interpretation of a common interest
agreement, however, must leave room for the parties to debate the
means by which they will secure their common end."  <u>Id.</u> at 283
n.1.

While the Fourth Circuit has yet to explicitly address

40

whether there must be actual or pending litigation in order for the common interest rule to apply, other circuits are split on this issue.  In <u>In re Santa Fe Int'l Corp.</u>, the Fifth Circuit held that there must be a "palpable threat of litigation at the time of the communication, rather than a mere awareness that one's questionable conduct might some day result in litigation, before communications between one possible future co-defendant and another . . . could qualify for protection."  272 F.3d 705, 711 (5th Cir. 2001).  In contrast, in <u>United States v. BDO Seidman, LLP</u>, the Seventh Circuit held that the common interest doctrine applies "where the parties undertake a joint effort with respect to a common legal interest" and, though the rule is strictly limited to "those communications made to further an ongoing enterprise," communications "need not be made in anticipation of litigation to fall within the common interest doctrine."  492 F.3d 806, 815-16 (7th Cir. 2007) (affirming the district court's finding that the common interest doctrine applied when two companies "acting as joint venturers, shared a common legal interest 'in ensuring compliance with the new regulation issued by the IRS,' and in making sure that they could defend their product against potential IRS enforcement actions") (internal citations omitted).

In his 2003 Orders, the Magistrate Judge found that the Fourth Circuit "would likely proceed cautiously" in expanding the

privilege and therefore adopted the standard employed by the Fifth Circuit in <u>Santa Fe International Corp.</u> that a "palpable threat of litigation" was required before the common interest doctrine could be invoked. (Doc. 164 at 13-14.) The Magistrate Judge explained that for Duke Energy to meet its burden of showing that the common interest rule applied, it must demonstrate "an agreement among all members of the UARG to share information as a result of a common legal interest relating to ongoing or contemplated litigation." (Doc. 164 at 14.) According to the Magistrate Judge, "contemplated litigation" meant a "palpable threat of litigation," which he interpreted as "at least as stringent as the anticipation of litigation standard used for work product." (Doc. 164 at 14.)

The Magistrate Judge found that Duke Energy's conclusory statements failed to meet this standard. (Doc. 164 at 22.) The affidavits submitted by Duke Energy failed to establish that the documents in question were created in anticipation of litigation. (Doc. 164 at 16.) The affidavits submitted by Duke Energy failed to identify any specific litigation at issue, although one affidavit from an attorney at Hunton & Williams argued that all UARG communications about rulemaking were privileged because "almost every EPA rulemaking under the Clean Air Act results in a judicial challenge." (Doc. 164 at 18.) These general statements, however, do not establish "anticipated" litigation

42

with the necessary specificity. Because the Fourth Circuit has

not clarified the exact parameters of the common interest rule

and has in fact emphasized that claims of privilege should be

strictly construed, Duke Energy has failed to establish that the

Magistrate Judge committed clear error in either determining that

a palpable threat of litigation was required for the common

interest rule to apply or in holding that Duke Energy's

conclusory affidavits failed to establish this palpable threat.[29]

**VII. WORK PRODUCT PROTECTION**

To be eligible for work product protection, a "document must

be prepared *because* of the prospect of litigation when the

preparer faces an actual claim or a potential claim following an

actual event or series of events that reasonably could result in

litigation."[30] Nat'l Union Fire Ins. Co. v. Murray Sheet Metal

---

[29] This court further notes that a "palpable threat of
litigation" or a similar standard assists in determining a common
interest. Absent some indicia of the type of common interest, it
is simply not clear whether the various individual members of
UARG share a common interest in litigation or a common interest
in industry and business decisions.

[30] Duke Energy and UARG argue that the Magistrate Judge
should have applied the "inevitable litigation" standard, used in
cases involving the Freedom of Information Act. "[T]he law
permits the invocation of Exemption 5 [of the FOIA] to protect
attorney work product in the presence of 'some articulable claim,
likely to lead to litigation. Indeed, if litigation was
inevitable, there is no need to identify a specific claim." See
Judicial Watch, Inc. v. Reno, 154 F.Supp.2d 17, 18 (D.D.C. 2001)
(internal citations omitted) (finding that, while it appeared
that litigation over INS's decision to return Elian Gonzalez to
Mexico was "likely," it was not so obvious that the district
court could simply take judicial notice of it and a "barebones,

<u>Co., Inc.</u>, 967 F.2d 980, 984 (4th Cir. 1992) (emphasis in original).  Documents prepared in the ordinary course of business do not qualify for this privilege.[31]  <u>Id.</u>  In <u>Nat'l Union Fire Insurance Company</u>, the Fourth Circuit explained,

> We take notice of the fact that members of society tend to document transactions and occurrences to avoid the foibles of memory and to perpetuate evidence for the resolution of future disputes.  And because litigation is an ever-present possibility in American life, it is more often the case than not that events are documented with the general possibility of litigation in mind.  Yet, "[t]he mere fact that litigation does eventually ensue does not, by itself, cloak materials" with work product immunity.

---

conclusory" declaration did not establish that litigation was inevitable).  As explained above, however, the Magistrate Judge correctly applied binding authority from <u>Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.</u>, 967 F.2d 980.

Duke Energy and UARG also urged the Magistrate Judge to find that documents "prepared in contemplation of participating in rulemaking deserve work product protection."  The Magistrate Judge refused, however, and correctly observed that in "the cases cited by the UARG . . . there is an actual institution of an investigation so that the threat of litigation is, in fact, imminent."  (Doc. 244 at 19-20.)

[31] The Fourth Circuit quoted with approval the opinion in <u>Janicker v. George Washington Univ.</u>, which stated, "The fact that a defendant anticipates the contingency of litigation resulting from an accident or an event does not automatically qualify an 'in house' report as work product."  94 F.R.D. 648, 650 (D.D.C. 1982); <u>see</u> <u>Hennessey v. United States Agency for Int'l Dev.</u>, 121 F.3d 698, 1997 WL 537998, at *6 (4th Cir. Sept. 2, 1997) (holding that a district court erred in finding a report, created after a company was threatened with litigation, to be protected by work product protection when the report was intended to be shared with the opposing party and was commissioned to further the completion of the project - not "*because* of the prospect of litigation").

Id. at 984.  "Determining the driving force behind the preparation of each requested document is therefore required in resolving a work product immunity question."  Id.

Duke Energy, the party asserting work product protection, bears the burden of proof of establishing that it is entitled to this protection.  Sandberg v. Virginia Bankshares, Inc., 979 F.2d 332, 355 (4th Cir. 1992), vacated pursuant to joint agreement by the parties, 1993 WL 524680 (4th Cir. April 7, 1993); see North Carolina Elec. Membership Corp. v. Carolina Power & Light Co., 110 F.R.D. 511, 515 (M.D.N.C. 1986) ("The proponent must provide the court with enough information to enable the court to determine privilege, and the proponent must show by affidavit that precise facts exist to support the claim of privilege.")  In Suggs v. Whitaker, a North Carolina district court explained,

> In meeting this burden, such party [the proponent of
> the protection] may not rely on conclusory allegations
> or mere statements in briefs. . . .  Rather, it is
> incumbent upon the party to come forward with a
> specific demonstration of facts supporting the
> requested protection.  Such demonstration should
> preferably be made through affidavits from
> knowledgeable persons.  Failure to so satisfy this
> burden, even though affidavits have been submitted,
> will lead to denial of the motion.

152 F.R.D. 501, 504-05 (M.D.N.C. 1993) (internal citations omitted).  "[C]laims that litigation became a realistic possibility at a certain time will normally have to be supported by affidavits which give specific factual detail for that

conclusion." Pete Rinaldi's Fast Foods, Inc. v. Great Am. Ins. Companies, 123 F.R.D. 198, 203 (M.D.N.C. 1988); see also Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B, 230 F.R.D. 398, 418 (D.Md. 2005) ("Moreover, the Court will not speculate as to the reasons the documents were created or construct a scenario under which the documents could arguably be privileged. Just as in the case of attorney-client privilege, the proponent must provide specific factual support for its assertion.")

In Sandberg, the Fourth Circuit held that the work product doctrine did not protect notes taking by a company's general counsel. The court explained,

> Although the general counsel's affidavit indicates the purposes of the April 20 meeting [where the notes were taken], it does not indicate her purpose in making the notes. The mere fact that a lawsuit was pending does not transform an attorney's notes into material prepared in anticipation of litigation. . . . her purpose in taking the notes is not self-evident.

Sandberg, 979 F.2d at 356; see also Neuberger, 230 F.R.D. at 418 ("The fact that defendant anticipated litigation with plaintiff does not make all documents thereafter 'generated by or for its attorneys subject to work product immunity. A party claiming work product immunity must still establish the underlying nexus between the preparation of the document and the specific litigation.'") (quoting Burton v. R.J. Reynolds Tobacco Co., 175

F.R.D. 321, 328 (D.Kan. 1997)); see also Taroli v. Gen. Elec. Co., 114 F.R.D. 97, 99 (N.D. Ind. 1987) ("[A]lthough [the claims examiner] stated that she had 'sufficient factual information' to determine that litigation was a realistic possibility, her affidavit did not specify what information was available to her prior to making that determination. . . . The insurance company cannot expect a court to rubberstamp its decision based upon a sketchy affidavit.")

Similarly, in Portsmouth Redevelopment & Hous. Auth. v. BMI Apartments Associates, a Virginia district court found that the proponent of work product protection had failed to carry its "burden of establishing that each document for which it seeks work-product protection was prepared in anticipation of litigation." 155 F.R.D. 136, 139 (E.D. Va. 1994), vacated pursuant to settlement (Jul. 25, 1994). According to the court, the fact that "a few of the documents contain the notation 'because of the likelihood of litigation concerning this matter'" did not meet the proponent's burden. Id. at 139-40. Also, the proponent's "broad, conclusory assertion that the likelihood of litigation was obvious" failed to meet its burden. Finally, the proponent failed to meet its burden when it submitted an affidavit from its general counsel, which stated that "[a]ll of the work [he] performed was with the expectation that litigation might result" and that he had been assigned to offer advice about

"any possible liability arising from the [] inquiry [at issue] and about the type of response, if any, to make." Id. According to the court, these "conclusory remarks" only reflected that counsel had "the general possibility of litigation in mind" when he prepared the documents and did not establish work product protection. Id.

Here, the Magistrate Judge was not clearly erroneous in finding that, like the proponents of work product protection in both Sandberg and Portsmouth, Duke Energy has failed to establish that the "driving force behind the preparation of each requested document" is litigation. Nat'l Union Fire Ins. Co., 967 F.2d at 984. According to the Magistrate Judge, Duke Energy supports its assertion of work product protection with a series of "conclusory assertions in affidavits." (Doc. 164 at 16.) These assertions include statements by one of UARG's attorneys that all UARG communications related to rulemaking are privileged because "almost every EPA rulemaking under the Clean Air Act results in judicial challenge." (Doc. 164 at 18.) According to the Magistrate Judge, Duke Energy's main problem is that, despite its conclusory assertions, it cannot identify any particular litigation, existing or anticipated, in which Duke Energy was involved.[32] The Magistrate Judge found that Duke Energy

---

[32] But see Illinois Power Co., 2003 WL 25593221, at *5 (finding that the documents in question were created in "anticipation of litigation" because they "make references to

48

essentially argues that "whenever a business group bands together for a common purpose of making their will known to government regulators, all attorney communication with the group is privileged and/or work product." (Doc. 164 at 19-20.) Based on the Fourth Circuit's holding in <u>National Union Fire Insurance Company</u>, Duke Energy fails to meet its burden of showing that the Magistrate Judge committed clear error when he found that Duke Energy had failed to establish the requirements of work product protection.

## IV. UARG'S FIRST AMENDMENT ARGUMENT

Out of an abundance of caution, this court, like the Magistrate Judge, also addresses UARG's arguments for a protective order. (<u>See</u> Doc. 244 at 8 ("Duke Energy's other ground for reconsideration relies on all of the motions filed by the UARG. . . . Therefore, out of an abundance of caution, the Court will consider all of the UARG's motions as if they had been raised by Duke Energy.").) In addition to reiterating Duke Energy's claims, UARG argues that "compelling Duke Energy to produce UARG communications given to Duke Energy infringes on the

---

'enforcement initiative' and 'possible agency investigation.'
Given the actions taken by the EPA against several electric
utility companies prior to and during 1998, it is hardly
unreasonable to believe that these documents were caused by the
anticipation of at least some articulable claim EPA had against
Defendants, and that such claim was likely to lead to
litigation").

UARG's First Amendment right as a 'legal advocacy group,'"
compelling disclosure of UARG's "political associations and
beliefs."  (Doc. 244 at 9.)

The cases cited by UARG in support of its argument are both
non-binding and distinguishable from the present case.  <u>See</u>
<u>Federal Election Comm'n v. Machinists Non-Partisan Political</u>
<u>League</u>, 655 F.2d 380, 388 (D.C.Cir. 1981) (seeking "all available
materials which concern a certain political group's 'internal
communications,'" including membership and volunteer lists);
<u>Wyoming v. U.S. Dep't of Agric.</u>, 208 F.R.D. 449, 455 (D.D.C.
2002), <u>appeal dismissed as moot</u>, 414 F.3d 1207 (seeking
"extraordinarily broad" and "irrelevant" information from non-
parties and where plaintiff failed to indicate that it had made
reasonable efforts to obtain the information elsewhere);
<u>Austrialia/Eastern U.S.A. Shipping Conference v. United States</u>,
537 F.Supp. 807, 811-12 (D.D.C. 1982), <u>appeal dismissed as moot</u>,
1986 WL 1165605 (seeking "petitioners' contacts and
communications with governmental agencies" among other things and
making no "showing of need supportive of other than an 'official
curiosity' standard"); <u>see</u> Doc. 244 at 10 ("Those cases are
inapposite, in that a wide range of information was sought with
respect to parties' political activities or influencing
efforts.").

In <u>North Carolina Elec. Membership Corp. v. Carolina Power &</u>

<u>Light Co.</u>, the plaintiffs, during discovery, had requested production of "each document relating to existing, contemplated or proposed state legislation affecting the area in which an electric utility may market electric power and each document relating to contemplated or proposed federal legislation regulating the supply of electric power in bulk or power exchange services." 666 F.2d at 51. The defendants, two utility companies, objected, claiming that the documents were both privileged and "constitutionally protected." <u>Id.</u> The Fourth Circuit explained that the "contention that the discovery of this material would have a chilling effect is without merit." The court cited <u>Herbert v. Lando</u>, 441 U.S. 153 (1979), where the Supreme Court held that discovery of a producer's "behind the scene" planning conference for a news special would not have a chilling effect upon the news organization's first amendment rights. <u>See</u> <u>id.</u> at 53 ("If discovery into the internal affairs of a news organization does not have a chilling effect, then neither would discovery in this case."). In light of the Fourth Circuit's holding in <u>North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.</u>, Duke Energy has failed to meet its burden to show that the Magistrate Judge committed clear error by finding that compelling discovery did not violate UARG's First Amendment rights.

## V.    CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' motion to lift the stay of enforcement of the Magistrate Judge's 2003 Orders be **GRANTED**.  It is **FURTHER ORDERED** that the Magistrate Judge's Orders from April 11, 2003, October 22, 2003, and November 3, 2003, be **AFFIRMED**.  While affirming the Magistrate Judge's 2003 Orders compelling discovery, however, this court explicitly finds that these documents are discoverable for purposes of this order only.  Accordingly, it is therefore **ORDERED** that disclosure is limited solely to this litigation and any documents provided in this case may not be disclosed or used in any other litigation unless ordered by this court.

This the 30th day of April 2012.


_____
United States District Judge