# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ENVIRONMENTAL DEFENSE, ) | |
| NORTH CAROLINA SIERRA CLUB, ) | |
| and ) | |
| NORTH CAROLINA PUBLIC ) | Civil Action No. 1:00 CV 1262 |
| INTEREST RESEARCH GROUP, ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | |
| ) | |
| DUKE ENERGY CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

**SUPPLEMENTAL REPLY BRIEF OF DUKE ENERGY CORP.**

# GLOSSARY

**Abbreviation**

| | |
|---|---|
| **CAA** | Clean Air Act |
| **Duke MIL** | Brief In Support Of Duke Energy's Motion *In Limine* Under The Federal Rules Of Evidence (Doc. 425) (Sept. 1, 2011) |
| **Duke MSJ** | Brief in Support of Duke Energy's Motion for Summary Judgment (Doc. 433) (Sept. 1, 2011) |
| **Duke Opp.** | Brief in Opposition to Plaintiffs' Motion for Summary Judgment On All Remaining Claims (The "Plant Modernization Program" Claims) (Doc. 438) (Oct. 21, 2011) |
| **Duke Reply** | Consolidated Reply In Support Of Duke Energy's Motion *In Limine* And Motion For Summary Judgment (Doc. 440) (Nov. 15, 2011) |
| **Duke Supp. Br.** | Supplemental Brief of Duke Energy Corp. (Doc. 453) (May, 28, 2013) |
| **ECS** | Extended Cold Shutdown |
| **GADS** | Generating Availability Data System |
| **NC DENR** | North Carolina Department of Environment and Natural Resources |
| **NCUC** | North Carolina Utilities Commission |
| **NSR** | New Source Review |
| **PMP** | Plant Modernization Program |
| **Pls. MIL Opp.** | Plaintiffs' Consolidated Opposition to Duke Energy's Motions in Limine to Exclude the Testimony of Robert Koppe, Ranjit Sahu, Bruce Biewald, and Philip Hayet (Doc. 436) (Oct. 21, 2011) |
| **Pls. MSJ** | Plaintiffs' Memorandum in Support of Motion for Summary Judgment on all Remaining Claims (the "Plant Modernization Program" Claims) (Doc. 435) (Sept. 1, 2011) |
| **Pls. Reply** | Plaintiffs' Reply in Support of Motion for Summary Judgment On All Remaining Claims (the "Plant Modernization Program" Claims) (Doc. 439) (Nov. 15, 2011) |
| **Pls. Supp. Br.** | Plaintiffs' Supplemental Memorandum in Support of Motion for Summary Judgment on all Remaining Claims (the "Plant Modernization Program" Claims) (Doc. 454) (May 28, 2013) |
| **RMRR** | Routine Maintenance, Repair and Replacement |

## NOTE ON EXHIBITS

This brief makes use of the exhibits filed with the Court in support of Duke's Motions *in Limine* under the Federal Rules of Evidence (indexed at Doc. 425-1), exhibits filed with Duke's Brief in Opposition to Plaintiffs' Motion for Summary Judgment (indexed at Doc. 438-1), exhibits filed with Duke's Reply in Support of Motions *in Limine* and Motion for Summary Judgment (indexed at Doc. 440-1) and exhibits filed with Duke's Supplemental Brief (indexed at Doc. 453). In order to avoid confusion and for the ease of the Court, Duke has numbered its exhibits consecutively for the briefing of its Motions *in Limine*, the parties' pending motions for summary judgment, and supplemental briefs. Thus, the first exhibit Duke submits with this supplemental reply brief is Ex. 140.

References to Plaintiffs' Exhibits ("Pls.' Exs.") are to exhibits filed by Plaintiffs with their Memorandum in Support of Motion for Summary Judgment on all Remaining Claims (the "Plant Modernization Program" Claims) (Doc. 435).

Duke lists and identifies the exhibits cited herein in the accompanying Index of Exhibits.

## NOTE ON EMPHASIS

All emphasis to the text of quotations included in this brief has been added, unless otherwise noted herein as existing in the original.

## NOTE ON REGULATIONS

All regulations cited are to the 1981 version, unless otherwise noted herein.

## SUPPLEMENTAL REPLY BRIEF OF DUKE ENERGY CORP.

Plaintiffs devote almost the entirety of their supplemental brief to setting forth detailed facts regarding Duke's RMRR defense. But, as Duke has shown, to the extent that this Court rules in Duke's favor on either the "baseline" or the "causation" issues—both of which can be resolved as a matter of law—then Plaintiffs cannot prove their case-in-chief. Duke would then be entitled to summary judgment without any need for the Court to reach the fact-intensive RMRR defense. Duke Supp. Br. at 1-2, 3, 11.

This supplemental reply focuses on the dispositive legal issues to be resolved by this Court and makes four points. *First*, Plaintiffs' case-in-chief relies on emissions increase calculations that impermissibly assume a "zero baseline" rather than the appropriate baseline of "normal source operations." *Second*, because a baseline of "normal source operations" should apply, summary judgment should be granted to Duke because Plaintiffs have no evidence of an emissions increase relative to a non-zero baseline. In fact, Plaintiffs expressly *abandoned* the expert testimony they had previously offered based upon a non-zero baseline. *Third*, summary judgment should be granted to Duke because Plaintiffs have no evidence that the PMP projects "caused" an emissions increase. *Fourth*, Plaintiffs' supplemental brief serves only to underscore that the RMRR issue is highly fact-intensive and can be resolved, if necessary, only after a trial.

1. As Duke demonstrated in its supplemental brief (at 4-5), a key legal issue before this Court is the appropriate "baseline" for judging whether the PMP projects

could be expected to "result in a significant net emissions increase." 40 C.F.R. § 51.24(b)(2)(i). Plaintiffs address this fundamental issue in only glancing fashion in their supplemental brief, offering little more than *ipsi dixit* that a "'zero' baseline is required by the law and facts of this case." Pls. Supp. Br. at 2.

As Duke demonstrated, Plaintiffs' zero baseline is contrary to the law. Duke Supp. Br. at 4-9. Although not explained in their supplemental brief, Plaintiffs' position is that the "baseline" must be "the two year period 'immediately preceding'" the repairs. Pls. Reply at 4. But the relevant regulation states that the baseline "shall" be "*a* two year period" that is "representative" of "normal source operation[s]," not *non*-operations. 40 C.F.R. § 51.24(b)(21)(ii). Nowhere does the regulation say that the baseline must be "*the*" period that "immediately" precedes a repair.

Plaintiffs' contrived baseline is also foreclosed by the authoritative views of the North Carolina Department of Environment and Natural Resources ("NC DENR"), the entity that actually determines whether or not a project triggers the NSR permitting obligations. Duke Supp. Br. at 5; Duke Reply at 18-19; Duke MIL at 51. It is undisputed that at the time of the PMP projects, NC DENR had a policy that pre-shutdown operations should be used for the baseline—even for projects undertaken during shutdown.[1] This was NC DENR's policy "however long the shutdown is" and "even if

---

[1] *See* Duke MIL at 48-51; Duke Opp. at 9-12; Duke Reply at 15-17. The head of its NSR section testified that NC DENR generally considers "the two years prior to the shutdown" to be the representative time period. Dep. of John Evans at 17:12-16 (Ex. 28).
2

the modification occurred in the shutdown."[2]  Because NC DENR has primary enforcement responsibility in North Carolina, its views about the appropriate baseline must be given deference.  *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489, 491 (2004); *see also* Duke Reply at 18-22; Duke Opp. at 10.

This is also how EPA understood its regulation *at the time of the PMP*.  Duke Supp. Br at 4-5; *see also* Duke Reply at 19-20; Duke MIL at 52-54.  Prior to these enforcement actions, EPA repeatedly stated that its regulations require the use of a unit's pre-repair "normal source operations" as the baseline.  For example, in its *WEPCo* Remand Determination, EPA recognized that a temporary shutdown was not representative of "normal operations" for utilities.  Even when a unit at issue was shut down because of physical problems, EPA determined that a pre-shutdown baseline period was "required by [EPA's] regulations." *WEPCo* Remand Determination at 5 (Ex. 111); *see also id.* at 1; 57 Fed. Reg. 32,314, 32,323 (July 21, 1992).[3]

Duke also demonstrated in its supplemental brief that Plaintiffs' position contradicts the "facts of this case."  Duke Supp. Br. at 7-11.  The evidence proves that

---

[2] Dep. of John Evans at 17:12-16, 19:6-10, 20:9-11 (Ex. 28).

[3] Plaintiffs assert that EPA stated in 1992 that a pre-shutdown baseline cannot be used for units that were temporarily shut down.  Pls. Supp. Br. at 2 n.2 (citing 57 Fed. Reg. at 32,325).  Even if EPA had taken this position, it came years *after* the PMP projects were undertaken and cannot be the basis for imposing liability on Duke.  *See* Duke Supp. Br. at 6-7; Duke Opp. at 12-16.  But the 1992 notice actually emphasized that a pre-shutdown baseline is appropriate when such a baseline "is more representative of the unit's 'normal' operations," 57 Fed. Reg. at 32,325, and that in *WEPCo* EPA had expressly approved use of a pre-shutdown baseline for a unit that had to be shut down to repair severe physical problems, *id.* at 32,323; *see also WEPCo* Remand Determination at 6 (Ex. 111).

3

pre-repair "normal source operations" for Duke's PMP units was one of significant generation and emissions. Plaintiffs discuss at length the repairs that occurred during the PMP,[4] but do not dispute that the units were operable and operating until shutdown. That is because the uncontested operating data—the data Plaintiffs acknowledge to be the "industry-standard," Pls. MIL Opp. at 2—forecloses any claim that the units could not operate absent the work done during the PMP. *Cf.* Pls. Supp. Br. at 2.

The operating data show that each of the 13 PMP units generated substantial amounts of electricity in the 12 months before they entered ECS and successfully started almost every time they were called upon. *See* Duke Supp. Br., Exs. 113-115. Further, the GADS data show that the 13 PMP units could have generated even greater amounts of electricity because there were substantial periods of time in which they were available to generate but were not called upon to do so. *See id.*, Exs. 113, 116. And that is why every one of the plant engineers deposed by Plaintiffs confirmed that the units could still operate when placed into ECS, and would have continued to operate even without PMP.[5]

2. Duke has demonstrated that it is entitled to summary judgment if the Court rejects Plaintiffs' zero baseline because Plaintiffs have failed to present any evidence or calculations of an emissions increase using a non-zero baseline. *See* Duke Reply at 8, 28;

---

[4] Many of the repairs cited in Plaintiffs' supplemental brief are legally irrelevant. *See, e.g.*, Pls. Supp. Br. at 7 (Allen 2 generator); *id.* at 11 (Cliffside 1 feedwater heaters). The only "major modifications" identified in the NOV, and the only "major modifications" alleged in the Complaint, were the boiler tube repairs. Duke Supp. Br. at 19.

[5] *See, e.g.*, Queen Dep. at 84-85 (Ex. 140); Cobb Dep. at 59 (Ex. 141); Joseph Dep. at 46-47, 62-64, 236-37 and 240-41 (Ex. 142); Peacock Dep. at 71-72 (Ex. 143); Willoughby Dep. at 66, 117-18, 126 (Ex. 144); Deese Dep. at 424-25 (Ex. 145).

4

Duke MSJ at 6; *see also* Duke Supp. Br. at 3, 9. Now, for the first time, Plaintiffs state that "resolving" "whether emissions increased using a non-zero baseline … would require presentation of competing emission estimates." Pls. Supp. Br. at 2 n.3. That is wrong; Plaintiffs have no "competing emissions estimates" using a non-zero baseline.

On remand, Plaintiffs made a strategic decision to litigate this case solely on a zero-baseline theory. Plaintiffs initially offered two expert-sponsored theories of liability—the GADS methodology and the PROMOD methodology. *See, e.g.*, Duke MSJ at 5. The GADS methodology relied on a *non-zero* baseline, and the PROMOD methodology relied exclusively on a *zero* baseline. *See, e.g.*, Duke Opp. at 7, 18; Duke MIL at 20, 23. However, the GADS methodology predicted *no* net significant emissions increase for many of the PMP units. *See* Duke MSJ at 9 & n.4. Plaintiffs made a strategic judgment to *abandon* the GADS methodology. Pls. MIL Opp. at 2 (plaintiffs "are not relying on GADS data for the Plant Modernization Program claims"). Plaintiffs claimed that the GADS methodology was "irrelevant" to their claims. *Id.*[6]

Having abandoned the only expert testimony or evidence that used a non-zero baseline, Plaintiffs have no "competing emissions estimates" to put forward at trial.[7]

---

[6] This is the *second* time Plaintiffs have made a strategic decision to abandon an argument and then later sought to resurrect their abandoned claim. As Duke has previously explained, EPA waived its zero-baseline argument in order to appeal this Court's decision in *Duke I*. *See* Duke Reply at 9-11; Duke Opp. at 8-9.

[7] The only "evidence" Plaintiffs cite to show a "dispute[d]" issue are generation projections made by a potential Duke expert witnesses. *See* Pls. Supp. Br. at 2 n.3 (citing Pls. MSJ at 30 n.37). As *Celotex* made clear, Plaintiffs must put forward their own evidence to satisfy their burden of proof; Plaintiffs cannot rely on a Duke expert that may

5

Because Plaintiffs lack admissible evidence on a dispositive element of their case, Duke is entitled to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

3. Plaintiffs do not address their independent obligation to show that the PMP units "caused" a significant net emissions increase. *See* Duke Supp. Br. at 10-11. As Duke demonstrated, Plaintiffs' experts simply "presumed" causation and concede that they did not undertake the "fact-dependent" inquiry required by the applicable legal standard. *Id.* at 10; Duke MIL at 45-46.

Plaintiffs do, however, assert—without citation to evidence—that the PMP projects were "required" for the units to continue to operate. Pls. Supp. Br. at 2. The assertion that the PMP projects were "necessary" for the units to be returned to operation is contrary to the record evidence, and cannot satisfy Plaintiffs' burden to establish causation. The operating data and the plant engineers' testimony confirm that the repairs were not required to continue operation of the units. *Supra* p. 4. Plaintiffs therefore have no evidence that the PMP projects "caused" an emissions increase.

---

never be called as a witness. *See also Sharpe v. United States*, 230 F.R.D. 452, 457 (E.D. Va. 2005) ("If testimony based on [expert] reports should be excluded, then summary judgment is clearly appropriate, as the plaintiff will have failed to meet her burden of producing admissible evidence to create a genuine issue of material fact."); *see also Estate of Harvey v. Roanoke City Sheriff's Office*, 585 F. Supp. 2d 844, 863 (W.D. Va. 2008) (plaintiff's expert was not qualified to testify regarding the applicable standard of care and, thus, that the medical defendants were entitled to summary judgment on the plaintiff's medical malpractice claim); *Free v. Bondo–Mar–Hyde Corp.*, 25 F. App'x 170, 172-73 (4th Cir. 2002) (per curiam) (summary judgment where plaintiffs could not carry their burden after their expert testimony was excluded). In any event, the "evidence" of future generation cited by Plaintiffs does not prove what Plaintiffs must show to overcome summary judgment: a calculation of "significant net emissions increase" caused by the projects relative to a "baseline" of "normal source operation."

4. As discussed above, and in Duke's supplemental brief, this Court should grant Duke summary judgment because Plaintiffs' case-in-chief fails as a matter of law. However, Plaintiffs devote almost all of their supplemental brief to arguing Duke cannot sustain its burden on an affirmative defense—*i.e.*, that the PMP projects qualify as RMRR. This is an issue this Court need not even reach. Duke Supp. Br. at 11-12.

To the extent the Court does address the issue, Plaintiffs' arguments fail.[8] *First*, Plaintiffs ignore the industry context in which the projects should be evaluated. *See* Kinsey Decl. ¶ 8 (Ex. 139) ("Routine replacements of tube assemblies … can appear to the uninitiated as significant events."). When put in proper context, as provided by Duke's industry expert, the facts support a finding of RMRR for each of the *WEPCo* factors. Duke Supp. Br. at 15-19; Exs. 123-135.[9]

*Second*, Plaintiffs' discussion of the work done at Duke's units demonstrates the existence of factual disputes for each *WEPCo* factor that cannot be resolved at this stage.

"Frequency." Plaintiffs claim that there is "no evidence that similar total renovations would be considered routine." Pls. Supp. Br. at 19. In fact, Duke has produced evidence that EPA itself considered similar work to be RMRR.

---

[8] Plaintiffs again argue that RMRR is "'very narrow,'" Pls. Supp. Br. at 1. This Court has previously ruled, however, EPA is bound by its own prior interpretation of the regulations, in which RMRR requires reference to industry practice and includes life extension. Duke Opp. at 20-21; *infra* p. 8.

[9] Contrary to Plaintiffs' misstatements, Pls. Supp. Br. at 1 n.1, Mr. Tuppeny both opined that the projects were commonly performed within the industry and described the projects as "routine." *See, e.g.*, Tuppeny Rep. at 93 (Ex. 63).

7

- In 1988, WEPCo complained to EPA's Administrator that EPA was treating WEPCo's project differently than other life extension projects in the industry. *See* Thomas Ltr. at 2 (Ex. 79). WEPCo identified as one such project Duke's PMP work at Dan River Unit 2. Childress Ltr. at 26 (Ex. 78).

- In the work at Dan River Unit 2, Duke had "[r]eplaced the lower economizer bank, a large portion of the drum circuit, all of the feedwater heaters and all of the condensate and heater drain pumps" in an outage that included "overhaul of the precipitators and other auxiliary equipment and repair of the generator rotor." *Id.* EPA distinguished that work from WEPCo's on the basis that Duke did not replace steam drums. Thomas Ltr. at 4 (Ex. 79).

- EPA surveyed life extension in the utility industry in 1988-1989, during which it learned about all the PMP projects. Farmer Memo., Attach. 3 (Ex. 74) (identifying the Duke PMP plants among "Potential Utility Life Extension Projects"). EPA told Congress that its survey detected no violations. Reilly Ltr. at 2 (Ex. 146).

- EPA told Congress in 1990 that most utility life extension projects are not similar to *WEPCo*, GAO Report at 29, 30-31 (Ex. 80), and in 1991 reiterated that life extension can be RMRR. Rosenberg Ltr. at 5 (Ex. 81).

- EPA knew in the early 1990s about the PMP work at Duke's plants and their return to service, but took no enforcement action. Knudsen Ltr. (Ex. 147); Bloomer Dep. at 25-30, 34-41, 47-48 (Ex. 148); Shawver Ltr. (Ex. 149).

- EPA stated in 1995 that "restoration" (*i.e.*, refurbishment) projects fell within the scope of RMRR. Nichols Ltr. at 19 (Ex. 150).[10]

"Purpose." Plaintiffs argue that a "comprehensive renovation program was the only way [the units] could return to service" and that Duke devised PMP in order to "add new capacity" to the system. Pls. Supp. Br. at 3, 4 (internal quotation marks omitted). In fact, the units were available to operate prior to PMP, and could have continued operating. *Supra* p. 4. The NCUC found the PMP work prudent because it would enhance the reliability of these units for future use, thereby *preserving* the existing

---

[10] Plaintiffs' disavowal of prior EPA statements also raises factual fair notice issues that the Court cannot resolve on Plaintiffs' motion. Duke Supp. Br. at 7 n.3; *see also United States v. Chrysler Corp.*, 158 F.3d 1350, 1354-57 (D.C. Cir. 1998) (holding that an agency may not enforce a standard for which it did not provide fair notice).

8

capacity. Ex. 59 at 9, 16, 19; *see also* Deese Dep. at 496-98 (Ex. 145). Through PMP, Duke extended the life of these units *as an alternative* to building new capacity. *Id.* at 422.[11]

"Nature" and "Extent." Plaintiffs argue that PMP represented "a different approach than routine plant maintenance" that "required extended maintenance outages to accommodate upgrade and modernization activities." Pls. Supp. Br. at 5 (internal quotation marks omitted). Plaintiffs imply that the length of ECS correlated to the scope of the PMP activities. The facts show otherwise.

- The work Duke performed during PMP was similar to what Duke performed during planned turbine outages. Kinsey Decl. ¶ 9 (Ex. 139); Deese Dep. at 836 (Ex. 145). Duke's engineers and plant operators considered the work routine. *See, e.g.*, Peacock Dep. at 86 (Ex. 143) (describing work at Buck Units 3, 4, and 5 during PMP as "routine within the industry").
- The primary difference between PMP and the typical turbine outages concerned the schedule. Queen Dep. at 33 (Ex. 140). Having the units in ECS eliminated the time pressure typical for turbine outages. Kinsey Decl. ¶ 9 (Ex. 139); Willoughby Dep. at 23-24 (Ex. 144).
- ECS allowed Duke's maintenance crews to work on the PMP units in "off-peak" times, when they were not needed to work elsewhere on operating units within the system. Queen Dep. at 80 (Ex. 140). This "levelized" approach to the schedule meant that work might go on for months in PMP, whereas Duke would normally have done it during a turbine outage in only two to three weeks. *Id.* at 136-37.
- Unlike *WEPCo*, the outage length was a function of system demand, not a function of the work performed. Duke Opp. at 22 n.18. In other words, the work undertaken in PMP did not span the ECS outage. In fact, it generally occurred towards the end of ECS. *Id.*

---

[11] EPA expected this very result when it told Congress that every unit over 50 MW would undergo life extension around age 30, without triggering NSR, and operate up to age 65. GAO Report at 36 & n.1 (Ex. 80). Almost all the PMP units have now been retired. Second Supp. Knudsen Decl. ¶¶ 3-4 (Ex. 66); Long Ltr. (Ex. 151).

9

- Duke took advantage of this down-time, when the units were not needed, to work on components that had failed (corrective maintenance) as well as components that were expected to fail in the future (predictive maintenance). *See, e.g.*, Joseph Dep. at 182-84 (Ex. 142) (PMP work included replacements that were expected in the future).
- With respect to the work itself, Plaintiffs misstate the scope of the projects at issue. Several of the components cited in Plaintiffs' brief (turbines, generators, feedwater heaters, controls) are not relevant. *Supra* n.5. With respect to the remainder (economizers, waterwalls, superheaters, and reheaters), Duke did not replace all the component systems in their entirety. Tuppeny Dep. at 96-97 (Ex. 152) (describing relevant projects to consist of partial, rather than complete, replacements); *see, e.g.*, Tuppeny Rep. at 15-21 (Ex. 63) (describing partial replacements at Allen).

"Cost." Plaintiffs' cost figures rely entirely on a document (Pls. Ex. 20) produced by an unknown author. Plaintiffs attempted to establish the accuracy of that document with Duke's Rule 30(b)(6) witness on the PMP projects, with no success. *See, e.g.*, Deese Dep. at 1286-87 (Ex. 145) ("Without knowing the source of this document, I would be reluctant to say whether these numbers were accurate or not."). In fact, Duke's accounting records do not keep costs on an "outage" basis as reflected in Pls. Ex. 20, but on a project-by-project basis. *Id.* at 770. Duke's Supplemental Interrogatory Number 2 provided the cost of the relevant projects as reflected in those accounting records. Ex. 117. Using that data, Duke's expert William H. Tuppeny provided $/kw figures far below those cited by Plaintiffs here. Ex. 123-136; Tuppeny Rep. at 17-49 (Ex. 63).

## CONCLUSION

This Court should grant summary judgment in Duke's favor on all claims and deny Plaintiffs' motion for summary judgment on the RMRR issue.

10

Respectfully submitted,

FOR DEFENDANT DUKE ENERGY CORPORATION:

/s/ Jim W. Phillips, Jr.
Jim W. Phillips, Jr. (NC Bar # 12516)

| OF COUNSEL: | BROOKS, PIERCE, MCLENDON, |
| --- | --- |
| Dean M. Moesser | HUMPHREY & LEONARD LLP |
| DUKE ENERGY CORPORATION | 2000 Renaissance Plaza |
| Associate General Counsel | 230 North Elm Street |
| 5555 San Felipe – Suite 1245 | Greensboro, NC 27401 |
| Houston, TX 77056 | jphillips@brookspierce.com |
| (713) 375-0688 | (336) 232-4644 |

Garry S. Rice (NC Bar # 13674)
DUKE ENERGY CORPORATION
Deputy General Counsel
Office of General Counsel
550 South Tryon Street
Charlotte, NC 28202

Nash E. Long, III (NC Bar # 24385)
HUNTON & WILLIAMS LLP
101 S. Tryon Street
Charlotte, NC 28280
(704) 378-4728
nlong@hunton.com

*/s/ Mark Hopson*
Mark D. Hopson
Frank R. Volpe
Samuel B. Boxerman
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
mhopson@sidley.com

June 7, 2013

11

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing were served via the Court's ECF system this 7th day of June, 2013, upon all counsel of record.

/s/ Nash E. Long, III
Nash E. Long, III
